Christian T. Zabilowicz (SBN 355341)
5RB,
5 Gray's Inn Square,
London, WC1R 5AH,
United Kingdom
Telephone: (747) 320-7532
Email: chriszabilowicz@5rb.com

*Attorney for Applicant HUMAN ENGINE, Ltd.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Ex Parte* Application of | Miscellaneous Case No. 3:26-mc-80016 |
| HUMAN ENGINE, LTD., | **DECLARATION OF PAUL GREENBERG IN SUPPORT OF HUMAN ENGINE'S *EX PARTE* APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 GRANTING LEAVE TO OBTAIN DISCOVERY FOR USE IN FOREIGN PROCEEDINGS** |
| Applicant, | |
| For an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery For Use in Foreign Proceedings | |

DECLARATION OF PAUL GREENBERG IN SUPPORT OF HUMAN ENGINE LTD'S *EX PARTE*
§ 1782 APPLICATION

1   **DECLARATION OF PAUL GREENBERG**

2   I, Paul Greenberg, declare as follows:

3   **Introduction**

4   1.      I am over the age of 18 and am not a party to this action.  I have personal

5   knowledge of the facts set forth below except as to those facts set forth upon information

6   and belief.  As to those facts, I believe them to be true.  If called as a witness, I would and

7   could testify competently to the matters set forth below.  I make this Declaration pursuant

8   to 28 U.S.C. § 1746 in support of HUMAN ENGINE, Ltd.'s (hereinafter "HUMAN

9   ENGINE") *Ex Parte* Application for an Order pursuant to 28 U.S.C. § 1782 requesting

10  third-party discovery from Glassdoor, LLC ("Glassdoor") for use in foreign proceedings

11  in England (the "Application").

12  2.      I am a solicitor of the Courts of England and Wales.  I was admitted to

13  practice in England and Wales on October 1, 1999, and I have practiced in England since

14  then.  I am a solicitor of the law firm, Cohen Davis Solicitors (registered as Cohen Davis

15  Ltd.), a firm that specializes in, *inter alia*, defamation.  HUMAN ENGINE has retained my

16  law firm to advise on and to pursue imminent contemplated defamation proceedings in the

17  High Court of Justice of England and Wales against the person who published an

18  anonymous review on Glassdoor.co.uk which is accessible at the following URL:

19  https://www.glassdoor.co.uk/Reviews/Employee-Review-Human-Engine-UK-E8744692-

20  RVW95528533.htm (the "Review").  Attached hereto as **Exhibit 1** is a true and correct

21  copy of the Review which is incorporated herein by this reference.

22  **Glassdoor**

23  3.      According to its public representations, Glassdoor maintains its headquarters

24  in the city and county of San Francisco, California.[1]  Glassdoor's own website, in its Terms

25  _____

26  [1] See Glassdoor, *How Do I Serve Legal Documents on Glassdoor?*, Glassdoor Help Center
    (last visited Jan. 12, 2026),  https://help.glassdoor.com/s/article/How-do-I-serve-legal-

27

28

1    of Use, provides that its users must "agree that all [] subpoenas and discovery proceedings

2    arising from such subpoenas shall be issued from, brought and resolved exclusively in the

3    state courts located within Marin County, California or the federal courts in the Northern

4    District of California."  Attached hereto as **Exhibit 2** is a copy of Glassdoor's Terms of

5    Use, printed from Glassdoor's website on December 18, 2025 which is incorporated herein

6    by this Reference.

7         **The Review**

8         4.      The Review complained of was posted on Glassdoor's website on March 4,

9    2025 by an anonymous person claiming to have been formerly employed by HUMAN

10   ENGINE for over a year.

11        5.      The Review rates HUMAN ENGINE one star out of five and carries the title,

12   "Avoid Like the Plague – Unless You Enjoy Chaos, Hypocrisy, and Casual Sexism –

13   Anonymous employee Human Engine UK Employee Review".

14        6.      Under the title of "Pros", the Review reads: "One forms everlasting bonds

15   with their employees because of the deep trauma that they collectively share of having

16   worked at Human Engine".

17        7.      Under the title of "Cons", the Review reads:

18
19        Human Engine is an absolute masterclass in how not to run a company. If you're
          looking for guidance, mentorship, or even basic management competence, you
20        won't find it here. Senior leadership knows nothing but expects juniors to figure
          out everything themselves—because why bother leading when you can just
21        throw people into the deep end and watch them drown?

22        And let's talk about their charming relationship with clients. They hate them.
23        Every single one. If Human Engine's leadership spent half as much time
          actually delivering value as they do badmouthing the people who pay them, they
24        might have a half-decent reputation. But no, that would require basic
          professionalism, which is in short supply here.
25   _____

26   documents-on-Glassdoor?language=en_US ("…Glassdoor's headquarters (where we keep
     our records) is in San Francisco County, California.")

27

28

1

2   Oh, and if you're a woman? Good luck.They are casually sexist to the point that

3   women leave faster than they can hire replacements, and to top it off, they're
    racist without even realising it. Whether it's tone-deaf comments, complete

4   cultural ignorance, or just flat-out failing to create an inclusive environment,
    they tick every box. But don't worry, they'll just gaslight you into thinking it's

5   all in your head while the boys' club keeps patting itself on the back.

6   The "great culture" they love to brag about? Translation: a toxic mess where

7   openly swearing about clients is normal, and the "great work-life balance"
    applies only to senior leadership. If you're anything under the director grade,

8   expect to be overworked, undervalued, and then blamed for everything that goes

9   wrong.

10  Promotion? That's a joke. The definition of "good performance" changes
    whenever it suits them, ensuring you never quite meet the standard. Unless, of

11  course, you become a full-time member of the Senior Leadership Team fan

12  club—worship them enough, and you might get a pat on the head.

13  So, unless you enjoy being gaslit, overworked, and stuck in a never-ending cycle

14  of incompetence, run far, far away.

15  **Defamation Under English Law**

16      8.      Under English law, a statement is defamatory if it contains an imputation that

17  tends to lower the claimant in the estimation of right-thinking members of society and tends

18  to have a substantially adverse effect on the way that people would treat the claimant. *See*

19  *Millett v Corbyn* [2021] EWCA Civ 567 at ¶ 9.  To have a prima facie claim in defamation,

20  a statement must also have caused or be likely to cause serious harm to the claimant's

21  reputation; for a body that trades for profit, a statement must have caused or be likely to

22  cause the body "serious financial loss".  *See* Defamation Act 2013, § 1.  Allegations that

23  impugn the honesty or fairness of the business methods employed by a company, the

24  conditions experienced by employees, or the treatment of customers, have been considered

25  by the English courts to give rise to an actionable claim for defamation.  *See, e.g., Public*

26  *Joint Stock Company Rosneft Oil Company v HarperCollins Publishers Ltd* [2021] EWHC

27

28

DECLARATION OF PAUL GREENBERG IN SUPPORT OF HUMAN ENGINE LTD'S *EX PARTE*
§ 1782 APPLICATION
4

3141 at ¶ 13 (summarizing the circumstances in which a company will have an actionable claim for defamation at common law in England). A true and correct copy of the Court of Appeal decision in *Millett v Corbyn* is attached hereto as **Exhibit 3**. A true copy of the High Court decision in *Public Joint Stock Company Rosneft Oil Company v HarperCollins Publishers Ltd* is attached hereto as **Exhibit 4**.

9.    The Review is defamatory of HUMAN ENGINE under English law because it makes serious and false allegations that HUMAN ENGINE and its senior leadership: (i) "[lack] basic management competence" and "basic professionalism", "know nothing", and "throw [their employees] in the deep end and watch them drown"; (ii) mistreat clients and disparage them, including by "badmouthing" and "swearing" about them; (ii) engage in dishonest and unfair business practices, such as only promoting employees that "worship" senior leadership and favoring senior leadership to the detriment of junior employees; and (iv) tolerate and normalize discriminatory behavior in the workplace, including by being "casually sexist" toward women and "racist without even realising it". These allegations are precisely the kind that the Court of Appeal in *Public Joint Stock Company Rosneft Oil Company* found (at ¶ 13—see above) held would have a tendency to damage it in the way of its business: they go to "the conditions experienced by employees, which might impede the recruitment of the best qualified workers, or make people reluctant to deal with it" and they "impugn[] the honest or fairness of the business methods employed by" HUMAN ENGINE.

10.    For these reasons, based on my substantial experience practising defamation law in England, I consider that HUMAN ENGINE plainly has a prima facie claim against the anonymous reviewer in defamation in England. Further, given that the allegations contained in the Review are entirely baseless, the usual defenses of "truth"[2] and "public interest"[3] would, in my view, inevitably fail (as would any other defenses).

---

[2] Defamation Act 2013, §2.
[3] Defamation Act 2013, §4.

11.     Accordingly, it is necessary to bring this Application in order to identify the person who published the Review, so that a claim may be brought against them in England. I confirm that should this Application successfully reveal the identity of the person who posted the Review, my firm has been instructed to immediately commence a claim in the High Court of Justice of England and Wales for defamation.

**Attempts to Engage with Glassdoor Directly**

12.     On 17 September 2025, my firm wrote to Glassdoor requesting that it remove the Review, confirming it had done so, and to preserve all of the relevant records in relation to the anonymous reviewer.  The letter clearly stated that the Review was defamatory under the Defamation Act 2013 and constituted a breach of Glassdoor's policies.  Attached hereto as **Exhibit 5** and incorporated herein by this reference is a true and correct copy of Cohen Davis Solicitor's letter to Glassdoor.

13.     On 10 October 2025, Glassdoor responded to my firm's letter dated 17 September 2025.  Glassdoor's response stated that it does not take sides in factual disputes, and so it refused to take action against the defamatory Review.  Further, Glassdoor stated that my firm's preservation request does not include a court order and that there is no authority to preserve such information without a court order.  Finally, Glassdoor informed my firm that any order must be served at its registered agent's address at Glassdoor LLC, c/o CT Corporation, 330 N Brand Blvd, Glendale, CA 91203, United States. Attached hereto as **Exhibit 6** and incorporated herein by this reference is a true and correct copy of Glassdoor's response to my firm's letter.

14.     Upon receiving Glassdoor's response, I considered whether my firm should reply and request, at a minimum, that Glassdoor disclose the identity of the individual who posted the Review so that HUMAN ENGINE could pursue action directly against that person. However, given Glassdoor's statement in its response that it "would not take additional steps in this instance (beyond existing practices) as this is potentially intrusive

1    to our users and burdensome to Glassdoor," together with its published policy stating that

2    "**if someone asks us to tell them who wrote a review, we say no**" (emphasis in original),

3    I concluded that making such a request would be futile and would result in unnecessary

4    expense to HUMAN ENGINE.  Attached hereto as <u>**Exhibit 7**</u> is a copy of Glassdoor's

5    "Legal FAQ" response to the question "Will Glassdoor protect my identity if an employer

6    asks or if someone takes legal action to find out who I am?", which is incorporated herein

7    by this Reference.

8         15.     Accordingly, HUMAN ENGINE files this Application because there is no

9    other mechanism available to it to obtain the identifying information necessary to initiate

10   a claim in England against the person who posted the Review.

11   <u>**English Courts Accept Evidence Obtained Under 28 U.S.C. § 1782**</u>

12        16.     Based on my review of relevant caselaw in England and Wales, it is clear

13   that English courts continue to be receptive to receiving evidence obtained through the

14   Section 1782 procedure, and I am not aware of any reason why the position of the English

15   courts might subsequently change.

16        17.     Indeed, English courts have repeatedly accepted evidence obtained from U.S.

17   District Courts through applications made under 28 U.S.C. § 1782.  The leading authority

18   is the House of Lords decision in *South Carolina Co. v Assurantie N.V.* [1987] 1 A.C. 24

19   (HL), in which the House of Lords overturned a finding by the Court of Appeal that use of

20   the procedure under 28 U.S.C. § 1782 was inherently objectionable and an abuse of process

21   by interfering with the Court's control of its own procedure.  The House of Lords especially

22   rejected the argument that a party to English litigation, "by seeking to exercise a right

23   potentially available to them under the Federal law of the United States [specifically 28

24   U.S.C. § 1782], has in any way departed from, or interfered with, the procedure of the

25   English court."  *Id.* at 40.  Instead, the House of Lords explained that "[a]ll they have done

26   is what any party preparing his case in the High Court here is entitled to do, namely to try

27

28

to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case." *Id.* at 42. A true and correct copy of the House of Lords decision in *South Carolina Co. v Assurantie N.V.* is attached hereto as **Exhibit 8**.

18.    This position was very recently confirmed by the High Court of Justice of England and Wales in *BHP Group (UK) Ltd & Anor v PGMBM Law Ltd* [2025] EWHC 3153 (TCC), in which the Court reiterated that parties in England are "entitled to make use" of the Section 1782 procedure, including in circumstances where the procedure obtains discovery that would otherwise be unavailable in England.  A true and correct copy of the High Court's decision in *BHP Group (UK) Ltd & Anor v PGMBM Law Ltd* is attached hereto as **Exhibit 9**.

19.    In sum, based on these and other English authorities, it is clear that English courts continue to be receptive to the evidence sought by this Application.  In addition, I confirm that I am unaware of any proof-gathering restrictions or policies under English law or the civil procedure rules that would be circumvented by obtaining evidence pursuant to 28 U.S.C. § 1782.

**Undertaking**

20.    I confirm that HUMAN ENGINE undertakes not to use any information disclosed by virtue of this application for any purpose other than to pursue legal remedies in respect of the anonymous reviewer.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 14th day of January, 2026, at London, England, United Kingdom.

1

2

3     _Paul Greenberg_

      _____

      Paul Greenberg

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF PAUL GREENBERG IN SUPPORT OF HUMAN ENGINE LTD'S *EX PARTE*
§ 1782 APPLICATION

# Exhibit 1

  



# Human Engine (UK)

⊘ Engaged employer

| Follow | Add a review |
|--------|--------------|

| | 5 | -- | 6 | 1 | -- |
|---|---|---|---|---|---|
| Overview | **Reviews** | Jobs | Salaries | Interviews | Benefits |

# Avoid Like the Plague – Unless You Enjoy Chaos, Hypocrisy, and Casual Sexism - Anonymous employee Human Engine (UK) Employee Review

**See all Reviews (5)**

1.0 ★☆☆☆☆ ⌄                          4 Mar 2025    •••

 **Anonymous employee**

 Former employee, more than 1 year

✗ Recommend    ◓ CEO approval    ✗ Business outlook

**Pros**
One forms everlasting bonds with their employees because of the deep trauma that they collectively share of having worked at Human

Engine.

## Cons

Human Engine is an absolute masterclass in how not to run a company. If you're looking for guidance, mentorship, or even basic management competence, you won't find it here. Senior leadership knows nothing but expects juniors to figure out everything themselves—because why bother leading when you can just throw people into the deep end and watch them drown?

And let's talk about their charming relationship with clients. They hate them. Every single one. If Human Engine's leadership spent half as much time actually delivering value as they do badmouthing the people who pay them, they might have a half-decent reputation. But no, that would require basic professionalism, which is in short supply here.

Oh, and if you're a woman? Good luck.They are casually sexist to the point that women leave faster than they can hire replacements, and to top it off, they're racist without even realising it. Whether it's tone-deaf comments, complete cultural ignorance, or just flat-out failing to create an inclusive environment, they tick every box. But don't worry, they'll just gaslight you into thinking it's all in your head while the boys' club keeps patting itself on the back.

The "great culture" they love to brag about? Translation: a toxic mess where openly swearing about clients is normal, and the "great work-life balance" applies only to senior leadership. If you're anything under the director grade, expect to be overworked, undervalued, and then blamed for everything that goes wrong.

Promotion? That's a joke. The definition of "good performance" changes whenever it suits them, ensuring you never quite meet the standard. Unless, of course, you become a full-time member of the Senior Leadership Team fan club—worship them enough, and you might get a pat on the head.

So, unless you enjoy being gaslit, overworked, and stuck in a never-ending cycle of incompetence, run far, far away.

**Advice to Management**
Read this review.

 Helpful    ⤳ Share

See reviews by:    Popularity | Rating | Date | All

---

## Other Employee Reviews

**See all Reviews (5)**

5.0 ★★★★★ ∨                              1 May 2025    • • •

## Great place to work with great people

 **Anonymous employee**

Current employee

✓ Recommend    ◠ CEO approval    ✓ Business outlook

Pros
- Enjoyable company to work for with a relaxed company culture –…

Cons
- The nature of the projects vary depending on the client(s)

Show more ∨

 Helpful    ⇗ Share         2

---

5.0 ★★★★★ ⌄        4 Apr 2025    •••

## Growing management consultancy firm

 Anonymous employee

Current employee

✓ Recommend    ◐ CEO approval    ✓ Business outlook

**Pros**
Interesting and varied client work across the public sector Firm is...

**Cons**
As fairly new company, still installing some processes, policies and...

Show more ⌄

 Helpful    ⇗ Share

---

## Discover more reviews about Human Engine (UK).

See reviews by:   Popularity   |   Rating   |   Date   |   All

## Popular conversations

 ### Finance
A community for Finance professionals across companies

👤 1.7M

 **Financial Advisor** 2mo

I'm 23 barely in the industry. I work at a bank. On Thursday, manager invited a few of us to celebrate his bday. I had an appetizer & glass of wine. I have student loans. The bill comes & the majority vote to sp…
read more

 62  ◯ **111 Comments**

 **Financial Advisor** 2mo

Has anyone faced ageism? I turned 50 yesterday. Office usually brings a cake for monthly bdays. Three men and myself, female. All 3 are older, 56, 59 and 62. I was asked by a 35 year old male, when …
read more

 38  ◯ **100 Comments**

 **Raymond James** 1mo

Have you heard of the new quiet quitting? Basically it's individuals that do the necessary work but not trying to climb the corporate ladder. Is this actually a thing?
read more

♡😋 27  ◯ **60 Comments**

**Join the conversation**

## Top companies for "Compensation and Benefits" near you



**SelfEmployed.com**
Compensation and benefits
3.9★



**Deloitte**
Compensation and benefits
3.6★



**Experian**
Compensation and benefits
3.9★



**Pertemps**
Compensation and benefits
3.3★

# ꞌGLASSDOOR²

**Glassdoor**
About / Press
Awards
Blog

**Employers**
Get a FREE Employer Account
Employer Centre

Contact Us

## Information

Help

Guidelines

Terms of Use

Privacy and Ad Choices

Do Not Sell Or Share My Information

Cookie Consent Tool

## Work With Us

Advertisers

Careers



Download the App

United Kingdom

---

Browse by: Companies, Jobs, Locations, Communities, Recent posts

Copyright © 2008-2025. Glassdoor LLC. "Glassdoor," "Worklife Pro," "Bowls," and logo are proprietary trademarks of Glassdoor LLC.

# **Exhibit 2**



# 'GLASSDOOR'

Sign in



## Terms of Use (2022-12-01)

**Revised:** December 1, 2022 (update summary and previous version)

These Terms of Use (the "**Terms**"), which incorporate our Privacy Policy, govern your access to and use of our services, including our various websites, such as Glassdoor.co.uk and Fishbowlapp.com, applications, ads, communications, events, and other covered products or services that link to these Terms (collectively "**services**"). By accessing and using the services, you agree to comply with these Terms. If you're using the services on behalf of a company or other legal entity, then "you" also means such company or legal entity and you agree to be bound by these Terms even if we have a separate agreement with you. You may not use the services if you do not agree to the linked version of the Terms at the time you access the services.

For the purposes of these Terms, "**Glassdoor**," means Glassdoor LLC.

THESE TERMS REQUIRE THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS, AND ALSO LIMIT THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE. SEE SECTION 12 FOR ADDITIONAL INFORMATION.

## 1. Eligibility to Use the Services

To access or use the services, you must be at least 18 years of age or the age of majority in your jurisdiction, if older, and not prohibited from doing so by applicable law. Except as set forth below, or as otherwise approved by us, the services are for your personal, non-commercial use unless you enter into a separate agreement with us for your commercial use. You may not use the services if we've terminated your account(s) or banned you.

## 2. Glassdoor Services Accounts

### 2.1 Accounts And Profiles

You must create an account and provide certain personal data to access most of our services.

## ˈGLASSDOOR²  

- You're responsible for safeguarding your account(s), and you accept responsibility for all activities that occur via your account(s). Glassdoor disclaims any liability for third-party actions made via your account(s). You agree to notify us immediately if you suspect any unauthorized use of your account(s) or access to your password(s).

- In order to provide you with access to features across our services, we may create and link different services' accounts for you.

When you set up an account to access the services, we create a profile for you that will include personal data you provide (a "**Profile**").

- We may update your Profile with information we obtain from third parties. We may also use personal data you provide to us via your resume(s) or our other services. You can read more about how we collect and process your data in our **Privacy Policy**.

- We may attempt to verify your employment history or status through various methods, including third party integrations or services. We may also utilise signals we receive from your current or former employer. Glassdoor is not responsible to you or any third party if we are unable to or inaccurately verify your employment history or status.

- Portions of your Profile may be visible to other users and the public (e.g., your name and profile picture) depending on the services you use. We may also in certain circumstances allow you to share your Profile with third parties or provide you with the ability to change your Profile's visibility settings. However, your Profile will not publicly include or link to Your Content (as defined in section 3), which you submit semi-/anonymously to our services. You can read more about your anonymity options in section 4 of these Terms and in our **Privacy Policy**.

### 2.2 Communications

By creating an account, you agree to accept and receive communications from Glassdoor, Glassdoor **affiliates**, and our third-party service providers.

'GLASSDOOR' 

purposes means having a majority of shares or the right and ability to direct management.

These communications may be via email, text message, calls, push notifications, or otherwise. You understand and agree that you may receive communications generated by automatic telephone dialing systems delivering pre-recorded messages sent by or on behalf of Glassdoor, its affiliates, and/or our third-party service providers, including communications concerning your account(s), our services, and services offered by our affiliates. Message and data rates may apply.

- To opt out of receiving text messages, you must reply "STOP" from the device receiving the messages.

- To unsubscribe from non-service-related emails, please use the unsubscribe or email settings link in the email(s) you receive. If you unsubscribe only from an individual type of email communication (e.g., a particular job alert), you will continue to receive other types of emails. We may also offer a settings function via our services to manage your email preferences.

- To turn off push notifications, use in-app and/or operating system settings on your device.

Unless you choose to delete your account(s), you cannot unsubscribe from certain communications that are required as part of your use of our services (e.g., communications about changes to these Terms.)

## 3. Content on Glassdoor Services

"**Content**" means any work of authorship or information, including photos, logos, advertisements, comments, opinions, postings, resumes, salaries, messages, questions, text, files, images, works of authorship, e-mail, data, audio, video, or other materials.

### 3.1 Rights to Your Content

You are solely responsible for your use of the services and any Content you authorize for use on the services, or which is submitted via your account ("**Your Content**").

We do not claim ownership in Your Content that you submit or



'GLASSDOOR'

unrestricted, irrevocable, perpetual, non-exclusive, fully-paid, and royalty-free license (with the right to sublicense through unlimited levels of sublicenses) to use, reproduce, copy, process, modify, publish, translate, transmit, perform, display, create derivative works of, adapt, and distribute Your Content in any and all media (now known or later developed) throughout the world and display your name, images, likeness, voice, video, and any such other Content that you submit, link, or otherwise make available through the services, throughout the world in any manner or media, on or off the services including for purposes of promoting our services.

- To the greatest extent permitted by applicable law, you hereby expressly waive any and all of your moral rights applicable to Glassdoor's exercise of this license.

- You agree that this license includes the right for us to provide, promote, and improve the services and to make Content submitted to or through the services available to other companies, organisations, or individuals for the syndication, broadcast, distribution, promotion, or publication of such Content on other media and services, subject to our terms and conditions for such Content use.

- No compensation will be paid with respect to Content that you submit through the services.

- Some of the live audio/video events hosted on or through the services may be recorded. By using the services and attending/participating in such audio/video events you agree to any such recordings and agree that all rights, titles, and interests in such recordings will vest in Glassdoor.

- You should only submit Content to the services that you are comfortable sharing with others under these Terms.

By submitting ideas, suggestions, documents, feedback, and/or proposals, (collectively, "**Submissions**") to Glassdoor or its employees or agents, you acknowledge and agree that Glassdoor is entitled to use, disclose, reproduce, license and otherwise distribute, and exploit these Submissions as we see fit, entirely without obligation or restriction of any kind on account of intellectual property rights or otherwise.

### 3.2 Your Limited Rights to Content



# 'GLASSDOOR'

provide and Glassdoor owns and retains all rights in the services. If you're an authorised user, we hereby grant you a limited, revocable, non-transferable, non-sublicensable license under the rights licensable by us to use the services and use Content from our services solely for your personal use in connection with the services. Except as provided in this section, you agree not to:

- reproduce, modify, publish, transmit, distribute, publicly perform or display, sell, adapt, or create derivative works based on the services or the Content (excluding Your Content); or

- rent, lease, loan, or sell access to the services.

The trademarks, logos, and service marks ("**Marks**") displayed on the services are our property or the property of third parties. You are not permitted to use these Marks without our prior written consent or the consent of the third party that owns the Mark. Glassdoor reserves all rights not expressly granted in these Terms.

## 3.3 Content on the Services

Content from Glassdoor, as well as users, advertisers, and other third parties is made available to you through the services. . You understand and agree that:

1. The services may contain or link to sponsored third-party Content or ads. The type, degree, and targeting of ads are subject to change, and you acknowledge and agree that we may place ads in connection with the display of any Content or information on the services, including Your Content.

2. We are not responsible for, and do not endorse, any third-party Content, including linked content, ads and information about third-party products and services, job ads, the employer and salary-related information provided by others, or the opinions of any third party, including panelists, group leaders, or other users, including those involved in audio or video events, or translations, transcriptions, or captions of any Content;

3. We make no guarantees about the accuracy, currency, suitability, reliability, or quality of the information or Content on or linked to via our services, including translations, transcriptions, or captions; and

4. We assume no responsibility for unintended, objectionable, inaccurate, misleading, or unlawful Content made available by



## ʼGLASSDOOR²

Decency Act, and any equivalent or similar laws in other jurisdictions which are intended to exclude or limit the liability of online service providers who provide access to user-generated content, we generally cannot be held liable for claims arising from the Content provided by third parties on the services. For more information, please see our **Legal FAQs**.

## 4. Your Use of the Services

### 4.1 Using Glassdoor Services

Glassdoor offers a variety of services that may change from time to time, at our sole discretion.

- Whether or not you've set up an account on our services, if you use our services we may process your personal data. We describe how we may use your personal data in our **Privacy Policy**. This includes personal data we use to offer or provide our services to you, our customers, other users, and the public, as well as to manage and improve our services. We also collect and share personal data with third party service providers acting on our behalf, including providers of analytics services that may record or log your activities on our services, including text you enter, pages you visit, and features you interact with. By using our services, you agree to this data processing and sharing.

- We may offer you the ability to create and/or join groups to have conversations and create communities with other users (also known as "bowls"). Groups may have managers or leaders (also known as "community" or "bowl leaders") who have access to additional features for managing their groups (e.g., the ability to pin or highlight Content or approve new members). Leading a group is an unofficial, voluntary position that may be available to users of the services. We are not responsible for actions taken by group leaders. Group leaders are not, and may not represent that they are, authorised to act on behalf of Glassdoor. We reserve the right to revoke or limit a user's ability to lead a group at any time and for any reason or no reason, including for breaching these Terms.

- We may provide you with the ability to research jobs, including via search functionality and through personalised ads and recommendations. We may also allow you to submit job applications via our services. We work with **our affiliates** to provide this service. When you click the apply (or a similar) button to submit an application, your application is sent to the

’GLASSDOOR’



- While we and our affiliates endeavor to make this service the best it can be, employer websites and their service providers are not controlled by us, and we cannot guarantee that your application will be properly received and logged by any third-party employer upon transmission. If you have any reason to think your application was not received by an employer, we suggest you contact them directly to confirm.

- Glassdoor does not guarantee the identity of an employer or any individuals working for any employers, and therefore advises users to exercise caution when applying to jobs. Glassdoor does not guarantee the validity of a job offer; users should verify the validity of a job offer before taking adverse action regarding their current employment situations. You are solely responsible for verifying the accuracy of any employer or job offer.

## 4.2 Anonymity And Identity On Glassdoor

Depending on the services you use, we may offer you different options for controlling how your personal data and identity are represented to other users, employers, and the public.

- A portion of your Profile on our community and conversation services (e.g., Fishbowl and community and conversation features across our services) is always public. Therefore, your profile picture, company name, title, and other general information (but not including your semi-/anonymous Content submissions) will be visible to the public and available via search. Content submitted with semi-/anonymous identifiers such as your company name or job title is not associated with the publicly-visible portion of your Profile.

- When you submit Content such as a post, comment, or question, you may be able to control how you represent yourself using different anonymity options. For example, when using some of our services, you can choose to submit Content with your company name, your job title, or your full name.

- When submitting other Content, such as reviews, you may be required to include certain personal data for public display, such as your employer, job title, and/or location.

- In some groups, we may allow you to make your Profile visible to other members of the group so you can interact with them.



## ’GLASSDOOR’

approval questions may be shared with the leader(s) for that group.

- We endeavor to offer opportunities to use our services while preserving your anonymity, However, you acknowledge that Glassdoor cannot guarantee your anonymity as, depending on your specific situation and circumstances and the contents of your Content, even semi-/anonymous identifiers, such as company or job title, especially when paired with other information such as your location, may allow someone to identify you or narrow down your identity to a small group of people (e.g., employees in a particular department at your company). You should understand this risk before submitting Content to the services.

## 4.3 House Rules

You represent and warrant that you will use the services solely for lawful purposes in a manner consistent with these Terms and any and all applicable laws, regulations, or other legally enforceable obligations (including contractual obligations) you may have towards us and/or any third parties.

- You are solely responsible for your use of the services and Your Content.

- You agree that by submitting or authorising Your Content for use on the services, you have reviewed,understood, and agreed to adhere to our **Glassdoor Community Guidelines** and **Fishbowl Community Guidelines** (collectively, our "**Community Guidelines**"), which are incorporated into these Terms .

- You understand that you may expose yourself to liability if Your Content or use of the services violates applicable law or any third-party right.

- If you work for a multi-level marketing company, you agree that you have reviewed and will abide by the **Glassdoor Guidelines for Multi-Level Marketing Companies**.

- If you choose to use the services to conduct a promotion, including a contest or sweepstakes ("**Promotion**"), you alone are responsible for conducting the Promotion in compliance with all applicable laws and regulations. You and your Promotion must state that the Promotion is not sponsored by, endorsed by, or



own risk. We reserve the right to restrict your use of the services to conduct Promotions.

We allow users to submit Content about their experiences working for employers when they have been employed by the employer as a full-time, part-time, contractor, freelancer, independent employee, or provide work that is an integral part of the employer's value chain.

- We also allow users to submit Content regarding the staffing firms that place them in these roles.

- We consider all workers in these roles as 'employees' with regard to Content submitted to Glassdoor services.

- While we may provide the option for Glassdoor users to specify the category of their employment when they submit Content (e.g contractor, freelancer), we may not consider this a requirement. It does not violate our Community Guidelines or these Terms for a worker in any one of these roles to submit Content as an "employee."

You agree that you will not:

1. Impersonate another person, or use their email address or phone number, or misrepresent your current or former affiliation with an employer;

2. Create accounts under false or fraudulent pretenses; create or use an account for anyone other than yourself; or create multiple active accounts to submit Content or interact with other users;

3. Submit Content that you do not own or have the right to submit in accordance with the license set forth in these Terms;

4. Violate these Terms, the terms of your agreements with us, explicit restrictions set forth in our Community Guidelines, or any applicable law, rule, or regulation;

5. Submit Content that is defamatory, libelous, or fraudulent; that you know to be false or misleading; or that does not reflect your honest opinion and authentic experience;

6. Act in a manner that is harassing, trolling, threatening, abusive, racist, bigoted, or is otherwise objectionable (as solely determined by Glassdoor);

7. Discriminate regarding access to communities or groups that you create, manage, lead, or participate in. (For company



## ʼGLASSDOOR²

8.  Promote, endorse, or further illegal activities;

9.  Disclose information in violation of any legally enforceable confidentiality, non-disclosure, or other contractual restrictions or rights of any third party, including any current or former employers or potential employers;

10.  Violate the privacy, publicity, copyright, patent, trademark, trade secret, or other intellectual property or proprietary rights of any third-party;

11.  Submit anything pornographic or sexually explicit in nature, or engage in the exploitation of persons in a sexual or violent manner;

12.  Solicit or submit minors' personal data;

13.  Except as expressly approved by us or as otherwise approved in these Terms, and subject to applicable laws, use the services for commercial activities and/or promotions such as contests, sweepstakes, barter, pyramid schemes, advertising, affiliate links, and other forms of solicitation;

14.  Imply a Glassdoor endorsement, sponsorship, or partnership of any kind without our express written permission;

15.  Send messages in violation of the USA CAN-SPAM Act or any other applicable anti-spam law;

16.  Introduce software or automated agents to the services, or access the services so as to produce multiple accounts, generate automated messages, or to scrape, strip, or mine data from the services without our express written permission;

17.  "Frame" or "mirror" or otherwise incorporate part of the services into any website, or "deep-link" to any portion of the services without our express written permission (except in instances where we make such functionality available via an API or formal embedding feature);

18.  Copy, modify, or create derivative works of the services or any Content (excluding Your Content) without our express written permission;

19.  Copy or use the information, Content (excluding Your Content), or data on the services in connection with a competitive service, as solely determined by Glassdoor;

20.  Violate antitrust laws by engaging in anticompetitive conduct, such as sharing commercially sensitive information pursuant to an express or tacit agreement in restraint of trade;



22.  Interfere with, disrupt, modify, reverse engineer, or decompile any data or functionality of the services;

23.  Interfere with, disrupt, or create an undue burden on the services or the networks or services connected to the services; and/or

24.  Introduce any viruses, trojan horses, worms, time bombs, cancelbots, corrupted files, or similar software to the services; or attempt to circumvent any security feature of the services.

### 4.4 Actions We May Take

We may, at our sole discretion:

- Stop (permanently or temporarily) providing the services or any features within the services to you or to users generally.

- Create limits on use and storage at our sole discretion at any time.

- Remove, refuse to distribute, or limit distribution or visibility of any Content on the services.

- Suspend or terminate users.

## 5. Special Provisions Applicable to Employers and Enterprise Customers.

### 5.1 Posting Jobs to the Services

You may not post any job ad, as determined solely by Glassdoor, that:

1.  Does not comply with the applicable laws or regulations of the state and country where the job is to be performed, including laws relating to labor and employment, equal employment opportunity and employment eligibility requirements, data privacy, data access and use, and intellectual property;

2.  Contains false information or solicits employees by intentional misrepresentation, such as, misrepresentation of the terms of employment, the hiring entity, or the identity of the poster;

3.  Requires an application fee or up-front or periodic payments; requires recruitments of others; resembles a multi-level marketing scheme, franchise, pyramid scheme, "club membership", distributorship or sales representative agency arrangement; only pays commissions (except where the listing



marketing scheme;

4.  Involves any screening requirement where such screening requirement is not an actual and legal requirement of the advertised position;

5.  Contains any logo or brands, or link to websites, other than your own or those of any entity for which you are authorised to submit job ads;

6.  Contains multiple job openings in a single job ad (unless you've purchased a service that permits this);

7.  Does not comply with Title VII of the Civil Rights Act or the **EEOC's Enforcement Guidance on Employer's Consideration of Arrest and Conviction Records in Employment Decisions**, and/or relevant national, federal, state, and local laws that prohibit employers from discriminating against people with criminal backgrounds and require employers to delay inquiry into an applicant's criminal history until later in the hiring process;

8.  Discriminates against applicants on the basis of gender, race, religion, sexual orientation, age, disability, or any other ground(s) prohibited by applicable law.

You agree that Glassdoor may, at its sole discretion, remove or prevent the posting of any job ad for any or no reason.

## 5.2 Content on Glassdoor Services

You may not offer incentives in exchange for Content related to any company. You may not trade Content submissions with other employers. We will remove Content where we believe that users were compensated to submit Content.

You may not coerce employees to submit Content. Coercion includes asking employees to provide proof to an employer that they submitted Content whether or not that proof includes the contents of the Content itself.

## 5.3 Communications With Users.

We may inform a user when you have taken an action with respect to information we or our affiliates have shared with you on behalf of that user, such as when you open the user's application, view their resume or profile on the services (or an affiliate's services), and/or make a decision about their application. When you view, store, or



with our users our observations based on such data analysis. For example, we may tell our users which employers are more likely to open applications submitted via the services, which employers are active on the services, and how long on average certain aspects of the candidate process take for a given employer. We may send out reminder emails to users you wish to interview. We may also send emails to users on your behalf indicating that your job ad is potentially a match for the user's resume or job preferences. You understand and agree that Glassdoor may take such actions.

## 5.4. Special Provisions Applicable to Advertisers

This provision applies to all advertisers, including employers who purchase or post job ads or display ads. Unless we agree otherwise, you may not use or otherwise process data collected or derived from ads ("**Ad Data**") for any purpose (including retargeting, building or augmenting user profiles, allowing piggybacking or redirecting with tags, or combining with data across multiple advertisers' campaigns) other than to assess the performance and effectiveness of your campaigns on an aggregate and anonymous basis. You may not, and you may not permit a third party to, transfer or sell any Ad Data to, or use Ad Data in connection with, any ad network, ad exchange, data broker, or other party not acting on behalf of you and your campaigns. You may use information provided directly to you from users if you provide clear notice to and obtain applicable consent from those users and comply with all applicable laws and industry guidelines, including those applicable to data protection.

# 6. Enforcement by Glassdoor or Third Parties

## 6.1 Removal of Content

While we have no obligation to do so, we reserve the right to review and remove any Content (or portion thereof) that we believe, in our sole discretion, violates these Terms or other applicable policies linked on the services (including our Community Guidelines), or that we deem, in our sole discretion, inappropriate. If you see any Content on the services that you believe violates our policies, you may report that Content by clicking on an applicable report link adjacent to that Content or by contacting us. Once notified, we will review the Content and consider whether to remove it (or a portion thereof). Please note: our interpretation of our policies and the decision whether or not to remove Content is within our sole discretion. You



# 'GLASSDOOR'

## 6.2 Copyright Policy

Please see our **Copyright Complaint Policy** for information about copyright disputes.

## 6.3 Other Enforcement Actions

While we have no obligation to do so, we reserve the right to investigate and take appropriate action in our sole discretion against you if you violate these Terms, including without limitation: removing Content (or portions thereof) from the services; suspending some or all of your rights to use the services; terminating your account(s); reporting you to law enforcement, regulatory authorities, or administrative bodies; and taking legal action against you.

## 6.4 Disclosing User Personal Data & Defending our Users

You understand and agree that in certain circumstances we may disclose users' personal data to third parties, such as when we are required to by law or valid legal process. You can read more about the specific circumstances in the "Other Instances When We May Disclose Your Data" section of our Privacy Policy. While we have no obligation to do so, we reserve the right, to the fullest extent permitted by applicable law, to take appropriate action to protect the anonymity of our users against the enforcement of subpoenas or other information requests that seek a user's identifying information or personal data. We make no guarantee or representation that we will seek to protect user anonymity or, if we elect to do so, that we will be successful.

## 7. Indemnity

You agree to defend, indemnify, and hold us and our affiliates and subsidiaries and our and their respective officers, directors, board members, board advisors, employees, partners, agents successors and assigns (collectively, the "Glassdoor Group") harmless from any loss, liability, claim, or demand, including reasonable attorneys' fees and costs, made by any third party due to or otherwise arising from your use of the services, including due to or arising from your breach of any provision of these Terms, or related to you providing false information regarding your identity or employment history or status.

'GLASSDOOR²  

maximum extent allowable under applicable law. Nothing in this section is intended to limit any rights you have which may not be lawfully limited.

Any communications, including emails, texts, or notifications or messages corresponding with any activity on the services or any other communications service, product, or feature provided on or through the services, are provided solely as a courtesy. Glassdoor disclaims all warranties with regard to the transmission or storage of these courtesy notices, does not guarantee their delivery or receipt, and does not guarantee the date or time at which they may be sent or received. In the event a message being sent is intended for a closed account, these messages will not be deliverable.

Glassdoor assumes no responsibility and disclaims all liability for the content, accuracy, completeness, legality, reliability, or availability of any information, including job posting/ad, salary estimate, template, career page, screener question, answer to screener question, resume information, message, or Content you submit, send, view, or receive through the services.

You are solely responsible for your interactions with advertisers, employers, and other users and we are not responsible for their activities, omissions, or other conduct, whether online or offline. We are not responsible for any incorrect, inaccurate, or unlawful Content (including any information in Profiles) submitted to the services, whether caused by users or by any of the equipment or programming associated with or utilised in the services. We assume no responsibility for any error, omission, interruption, deletion, defect, delay in operation or transmission, communications line failure, theft or destruction or unauthorised access to, or alteration of, any communication with advertisers, employers, or other users. We are not responsible for any problems or technical malfunction of any hardware and software due to technical problems on the Internet or on the services or combination thereof, including any injury or damage to users or to any person's device related to or resulting from participation or downloading materials in connection with the services. Under no circumstances shall we be responsible for any loss or damage resulting from the use of the services or from any Content submitted to the services or transmitted to users, or any interactions between users of the services, whether online or offline.

# ’GLASSDOOR²

THE WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, QUIET ENJOYMENT, ACCURACY, OR NON-INFRINGEMENT. WE MAKE NO WARRANTY THAT: (1) THE SERVICES WILL MEET YOUR REQUIREMENTS; (2) THE SERVICES WILL BE AVAILABLE ON AN UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE BASIS; OR (3) THE RESULTS THAT MAY BE OBTAINED FROM THE USE OF THE SERVICES WILL BE ACCURATE OR RELIABLE.

YOU HEREBY RELEASE THE GLASSDOOR GROUP FROM ANY AND ALL CLAIMS, DEMANDS, AND LOSSES, DAMAGES, RIGHTS, CLAIMS, AND ACTIONS OF ANY KIND THAT ARE EITHER DIRECTLY OR INDIRECTLY RELATED TO OR ARISES FROM: (1) THE ACTIONS, CONTENT, OR DATA OF THIRD PARTIES (INCLUDING, ADVERTISERS, EMPLOYERS, AND OTHER USERS) (2) YOUR PARTICIPATION IN ANY OFFLINE EVENTS.

Glassdoor reserves the right in its sole discretion to review, improve, modify, or discontinue, temporarily or permanently, the services and/or any features, information, services, materials, Content, or information on the services with or without notice to you. You agree that Glassdoor will not be liable to you or any third party for any modification or discontinuance of the service or any portion thereof.

IN NO EVENT SHALL THE GLASSDOOR GROUP BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY LOST PROFIT OR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES ARISING FROM YOUR USE OF THE SERVICES, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THESE TERMS, WHERE PERMITTED BY APPLICABLE LAW, YOU AGREE THAT THE GLASSDOOR GROUP'S LIABILITY TO YOU FOR ANY DAMAGES ARISING FROM OR RELATED TO YOUR USE OF THE SERVICES (FOR ANY CAUSE WHATSOEVER AND REGARDLESS OF THE FORM OF THE ACTION), WILL AT ALL TIMES BE LIMITED TO ONE HUNDRED U.S. DOLLARS ($100).

You acknowledge that you are familiar with the provisions of Section 1542 of the California Civil Code (or similar applicable law in your jurisdiction), which provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES



# ʼGLASSDOORʼ

SETTLEMENT WITH THE DEBTOR." You hereby expressly waive and relinquish all rights and benefits under Section 1542 of the California Civil Code and any law or legal principle of similar effect in any jurisdiction with respect to the releases and/or discharges granted in these Terms, including but not limited to the releases and/or discharges of unknown claims.

## 9. Termination

These Terms remain in effect while you use the services and, for registered users, as long as your account(s) remains open. You may delete your account(s) at any time. We may suspend or terminate your account(s) or your access to parts of the services, for any or no reason, without notice to you. We will have no liability whatsoever to you for any termination of your account(s) or related deletion of your data.

All provisions of these Terms shall survive termination or expiration of these Terms except those provisions granting access to or use of the services. For the avoidance of doubt, you agree that these Terms apply to your use of the services and any Content submitted on the services at any time prior to the termination or expiration of these Terms.

## 10. Changes to These Terms

We may revise these Terms from time to time by posting an updated version available via a link on the services. If we make a change that we believe materially reduces your rights or increases your responsibilities, we will notify you by communication (e.g., by email or text message sent to the e-mail address or phone number specified in your account) and/or by means of a notice on the services prior to the change becoming effective. We may provide notice of changes in other circumstances as well. Any such changes will not apply to any claim brought prior to the effective date of the revised Terms incorporating such changes. We encourage you to periodically review this page for the latest information on our Terms. Your continued use of the services is subject to the most current effective version of these Terms.

## 11. Pre-Suit Discovery & Analogous Procedures Or Applications



to propound discovery seeking a user's identifying information, you agree to do so pursuant to a valid California subpoena, properly issued in connection with an active lawsuit and properly served on our registered agent in California at Glassdoor LLC., c/o CT Corporation, 330 N Brand Blvd, Glendale, CA 91203. You further agree that all such subpoenas and discovery proceedings arising from such subpoenas shall be issued from, brought, and resolved exclusively in the state courts located within Marin County, California or the federal courts in the Northern District of California, as appropriate, and you agree to submit to the personal jurisdiction of each of these courts for such discovery proceedings.

## 12. Dispute Resolution

PLEASE READ THIS SECTION 12 CAREFULLY AS IT AFFECTS YOUR RIGHTS. UNLESS YOU OPT OUT OF ARBITRATION PURSUANT TO SECTION 12.2.3 BELOW, YOU AGREE THAT BY ENTERING INTO THESE TERMS, YOU AND GLASSDOOR ARE EACH WAIVING THE RIGHT TO TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION. YOU AND GLASSDOOR AGREE THAT EACH PARTY MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. ANY ARBITRATION WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS ARE NOT PERMITTED.

### 12.1 Informal Dispute Resolution

- If either of us intends to seek arbitration under this section, the party seeking arbitration must first notify the other party of the dispute in writing at least 30 days in advance of initiating arbitration. You and we agree that the opportunity to meet and confer informally is a material term and a material reason we are offering this service and therefore you agree you will abide by it.

- Notice to Glassdoor should be sent to the Glassdoor LLC, c/o CT Corporation, ATTN: Litigation Department, 330 North Brand Boulevard, Glendale, CA 91203-2336. If you have an account with our services, we will provide notice by means of a communication to the email address or phone number associated with your account.



'GLASSDOOR'

- During the 30 day period, you and we agree to act in good faith to resolve the dispute. If you and Glassdoor cannot reach an agreement to resolve the claim within 30 days after the Notice is received, you or Glassdoor may commence formal proceedings in accordance with section 12.2.

## 12.2 Binding Arbitration Agreement, Exceptions to Arbitration, Governing Law & Venue

**12.2.1 Agreement to Arbitrate and Class Action/Class Arbitration Waiver.**

Subject to the exceptions to arbitration set forth in subpart 12.2.4 below, you and Glassdoor each agree that any and all disputes between Glassdoor and consumer (i.e., non-business/commercial) users arising under or related in any way to these Terms and/or your use of our services (and which are not otherwise resolved pursuant to section 12.1) must be resolved through binding arbitration as described in section 12.2. If an arbitrator or court decides that any part of this agreement to arbitrate set forth in section 12.2 is unenforceable, the remainder of section 12 of these Terms will nevertheless still apply (including the prohibition on class arbitration).

**12.2.2 Arbitration Procedure.**

- Any arbitration will be governed by the Consumer Arbitration Rules of the American Arbitration Association ("**AAA**"), if applicable, as modified by this section. The AAA's rules and a form for initiating the proceeding are available at **www.adr.org**. Any settlement offer made by you or Glassdoor shall not be disclosed to the arbitrator.

- Unless otherwise required by the applicable arbitration rules, the arbitration shall be held in San Francisco, California.

- For any claim where the total amount of the award sought is $10,000 or less, you and Glassdoor may elect to have the arbitration conducted by audio and/or a video communication system (including, but not limited to telephone conference or a video conference platform such as Zoom) or based solely on written submissions, which election shall be binding on you and Glassdoor subject to the arbitrator's discretion to require an in-person hearing. In cases where an in-person hearing is held, you or Glassdoor may attend by audio and/or a video communication system (including, but not limited to telephone



’GLASSDOOR²

- The arbitrator will decide the substance of all claims in accordance with applicable law, including recognised principles of equality, and will honor all claims of privilege recognised by law.

- The arbitrator shall not be bound by rulings in prior arbitrations involving different users, but is bound by rulings in prior arbitrations involving the same user to the extent required by applicable law.

- The arbitrator's award shall be final and binding and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

**12.2.3 Opt-Out Procedure.**

IF YOU ARE A NEW USER, YOU CAN CHOOSE TO REJECT THIS AGREEMENT TO ARBITRATE ("OPT-OUT") BY MAILING US A WRITTEN OPT-OUT NOTICE ("OPT-OUT NOTICE"). THE OPT-OUT NOTICE MUST BE POSTMARKED NO LATER THAN 30 DAYS AFTER THE DATE YOU ACCEPT THESE TERMS FOR THE FIRST TIME. YOU MUST MAIL THE OPT-OUT NOTICE TO GLASSDOOR LLC., C/O CT CORPORATION, ATTN: LITIGATION DEPARTMENT, RE: OPT-OUT NOTICE, 330 NORTH BRAND BOULEVARD, GLENDALE, CA 91203-2336.

- For your convenience, we are providing an Opt-Out Notice form that you may use. Please make sure to include your name, address (street address, city, state, and zip code), and the email address(es) associated with the account(s) to which the opt-out applies. You must sign the Opt-Out Notice for it to be effective.

- This procedure is the only way you can opt out of the agreement to arbitrate set forth in section 12.2. If you opt out of the agreement to arbitrate set forth in this section, all other parts of these Terms and section 12 will continue to apply to you. Opting out of the agreement to arbitrate has no effect on any previous, other, or future arbitration agreements that you may enter into or have entered into with us.

**12.2.4 Exceptions to Arbitration.**

The agreement to arbitration provisions set forth in subparts 12.2.1 and 12.2.2 above will not apply to the following:

1. small claims court cases that qualify for small claims status;

'GLASSDOOR' 

3.  any legal proceedings brought against any of the Glassdoor Group by companies or other legal entities, or individuals acting on behalf of such companies or other legal entities;

4.  any legal proceedings brought by any of the Glassdoor Group against companies or other legal entities, or individuals acting on behalf of any such companies or other legal entities; and

5.  a party's right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights.

6.  any claim for public injunctive relief, which must be adjudicated in court, not by the arbitrator. If either party seeks public injunctive relief, that request for relief shall be severed from any arbitration proceeding and stayed pending a final resolution of the arbitration, at which point the claim may be adjudicated.

7.  any claim not already subject to one of the exceptions listed in section 12.2.4 where any or all of the non-Glassdoor Group parties are located outside of the United States.

If, for some reason, the prohibition on class arbitrations set forth in section 12 cannot be enforced, then the entirety of the agreement to arbitrate set forth in subparts 12.2.1-3 will not apply; the remainder of section 12 will continue to apply.

**12.2.5 Governing Law and Venue.**

- For claims subject to the exceptions to arbitration set forth in subpart 12.2.4, these Terms and any and all claims, disputes, or other legal proceedings by or between you or us, including but not limited to any such claims or disputes that are in any way related to or arising under these Terms or your access to or use of our services, shall be governed by the laws of the State of California without giving effect to any conflict-of-laws principles that may otherwise provide for the application of the law of another jurisdiction. These claims or disputes shall be brought and litigated exclusively in the state courts located within Marin County, California or the federal courts in the Northern District of California, as appropriate, and you agree to submit to the personal jurisdiction of each of these courts for the purpose of litigating such claims or disputes.



’GLASSDOOR

Federal Arbitration Act applies to the construction of the agreement to arbitrate provisions set forth in section 12.2.

**12.2.6 Changes To The Agreement To Arbitrate**

- We will notify you of changes to section 12 by posting the changes at least 30 days before the effective date of the changes and by notice to the email address associated with your account. It is therefore essential that you keep your email address up to date. You can update your email address from your accounts settings page.

- If you do not agree to the changed terms, you may close your account within the 30 day period and you will not be bound by these changes. Otherwise, if you continue to use our services, the changed terms will apply to all disputes or claims governed by this section 12 that have arisen or may arise between you and Glassdoor which are initiated after the time the changed terms take effect.

- Notwithstanding any provision in these Terms to the contrary, you and we agree that if we make any changes to section 12 (other than a change to any referenced notice address or site links) in the future, that change will not apply to any claim that was filed in a legal proceeding prior to the effective date of the change.

## 13. Miscellaneous

- Except as specifically stated in another agreement we have with you, these Terms, and any other agreements, documents, or policies incorporated by reference in these Terms, constitute the entire agreement between you and us regarding the use of the services and these Terms supersede all prior proposals, negotiations, agreements, and understandings concerning the subject matter of these Terms.

- You represent and warrant that no person has made any promise, representation, or warranty, whether express or implied, not contained in these Terms to induce you to enter into this agreement.

- Our failure to exercise or enforce any right or provision of these Terms shall not operate as a waiver of such right or provision.



necessary so that the Terms shall otherwise remain in full force and effect and enforceable.

- To the extent allowed by law, the English language version of these Terms are binding and any translations are provided for convenience only.

- The Terms, and any rights or obligations hereunder, are not assignable, transferable or sublicensable by you except with Glassdoor's prior written consent, but may be assigned or transferred by us without restriction. Any attempted assignment by you shall violate these Terms and be void. The section titles in these Terms are for convenience only and have no legal or contractual effect. As used in these Terms, the word "including" means "including but not limited to."

- Certain elements of Glassdoor's websites and/or mobile apps are licensed pursuant to one or more of the United States patents described at **https://www.35usc287.com/mobile**.

Please **contact us** with any questions regarding these Terms.

’GLASSDOOR’

**Glassdoor**
About / Press
Awards
Blog
Contact Us

**Employers**
Get a FREE Employer Account
Employer Centre

**Information**
Help
Guidelines
Terms of Use
Privacy and Ad Choices
Do Not Sell Or Share My Information
Cookie Consent Tool

**Work With Us**
Advertisers
Careers



'GLASSDOOR'

Browse by: Companies, Jobs, Locations, Communities, Recent posts

Copyright © 2008–2026. Glassdoor LLC. "Glassdoor," "Worklife Pro," "Bowls," and logo are proprietary
trademarks of Glassdoor LLC.

# **Exhibit 3**



Neutral Citation Number: [2021] EWCA Civ 567

Case No: A2/2020/1286

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**
**Mr Justice Saini**
**[2020] EWHC 1848**

Royal Courts of Justice
Strand, London, WC2A 2LL

**Covid-19 Protocol: This judgment was handed down remotely by circulation to parties'
representatives by email and release to Bailii. The date of hand-down is deemed to be as
shown opposite:**

Date: 20 April 2021

Before :

**SIR GEOFFREY VOS,  MASTER OF THE ROLLS**
**DAME VICTORIA SHARP, PRESIDENT OF THE QUEEN'S BENCH DIVISION**
and
**LORD JUSTICE WARBY**
- - - - - - - - - - - - - - - - - - - -
Between :

**THE RT HON JEREMY CORBYN MP**               **Appellant/**
                                               **Defendant**

**- and –**

**RICHARD MILLETT**                            **Respondent**
                                               **/Claimant**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Anthony Hudson QC and Mark Henderson** (instructed by **Howe & Co**) for the **Appellant**
**William Bennett QC and John Stables** (instructed by **Patron Law**) for the **Respondent**

Hearing date: 16 March 2021
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Lord Justice Warby:**

## Introduction

1.  This is an appeal by the Rt Hon Jeremy Corbyn MP against decisions made at the trial of preliminary issues in a libel action.

2.  Mr Corbyn is the defendant in the action, which relates to words he used in a televised interview on the *Andrew Marr Show* ("the Programme"), first broadcast by the BBC on 23 September 2018.  At the time, Mr Corbyn was Leader of the Labour Party and Leader of the Opposition. During a wide-ranging interview, Andrew Marr asked Mr Corbyn if he was an anti-Semite. Mr Corbyn was asked first about an East London mural. He was then shown a recording of a speech he made in 2013, in which he referred to "Zionists" who "don't understand English irony":

    > "The other evening we had a meeting in Parliament in which Manuel made an incredibly powerful and passionate and effective speech about the history of Palestine, the rights of the Palestinian people. This was dutifully recorded by the thankfully silent Zionists who were in the audience on that occasion and then came up and berated him afterwards for what he had said. They clearly have two problems. One is they don't want to study history and secondly, having lived in this country for a very long time, and probably all their lives, they don't understand English irony either."

3.  Mr Marr suggested this was "A strange thing to say". The words complained of ("the Statement") were spoken by Mr Corbyn in answer to that suggestion. Those words are underlined in this extract from the transcript, which shows the immediate context.

    > JC:  <u>Well, I was at a meeting in the House of Commons and the two people I referred to had been incredibly disruptive, indeed the police wanted to throw them out of the meeting. I didn't. I said they should remain in the meeting. They had been disruptive at a number of meetings. At the later meeting when Manuel spoke they were quiet, but they came up and were really, really strong on him afterwards and he was quite upset by it. I know Manuel Hassassian quite well. And I was speaking in his defence. Manuel of course is the Palestinian Ambassador to this country</u>.

    > AM:  But why did you say, 'English irony'?

    > JC: Well, because of the way that Manuel, whose first language is not English, has an incredible command of English and made a number of ironic remarks towards them during the interchange that I had with them. This did happen some years ago, by the way.

    > AM:  And you also said that these people who might have been in this country for a very long time. What's relevant about that?

JC:  That Manuel had come recently to this country and fully understands English humour and irony and the use of language. They were both British born people who clearly obviously had been here all their lives.

AM:  But we've just agreed that the people who can identify antisemitism best are Jewish people. Many Jewish people thought that was anti-Semitic.

JC:  <u>They were very, very abusive to Manuel. Very abusive. And I was upset on his behalf from what he'd - he'd spoken obviously at the meeting but also the way he was treated by them at the end of it. And so I felt I should say something in his support. And I did</u>.

AM:  Given what Jewish comrades, Jewish members of the Labour Party have said about this, do you now accept that what you said was anti-Semitic?

JC:  Well, it was not intended to be anti-Semitic in any way and I have no intention and have absolute opposition in every way to anti-Semitism because I can see where it leads to. I can see where it leads to now in Poland, in Hungary, in Central Europe, I can see where it led to in the past. We have to oppose racism in any form and I do …"

4.    The claimant is Richard Millett, a "blogger", observer, reporter, and commentator whose subjects of interest include Israel, its policies on Palestine, and the Palestinian people. Mr Millett sued on the basis that, although he was not named in the Statement, he was defamed because national media coverage before the broadcast of the Programme made him identifiable to viewers as one of those referred to by Mr Corbyn's remarks about "Zionists".

5.    Mr Corbyn applied for an order for the trial of preliminary issues. Master Cook directed a trial of three issues: "(a) the natural and ordinary meaning of the statement complained of, including whether it refers to Mr Millett, and any reference innuendo; (b) whether that meaning conveys a statement of fact or opinion, or else in part a statement of fact and in part of opinion; and (c) whether the meaning conveys a defamatory tendency at common law."

6.    The issues were tried by Saini J.  His decision on issue (a) was that the words complained of referred to Mr Millett, and bore the following natural and ordinary meaning about him:

> "The Claimant attended a meeting at the House of Commons. He behaved in so disruptive a way at this meeting that the police wished to remove him from the premises. Mr. Corbyn however asked that the Claimant be allowed to remain. The Claimant had acted in a disruptive way at other meetings. At a further meeting at which Mr. Hassassian was a speaker, the Claimant was extremely abusive in his treatment of Mr. Hassassian after his speech. Such was the nature of this abuse that Mr. Hassassian was caused distress by the Claimant's

> behaviour. These actions of the Claimant so concerned Mr. Corbyn that he felt the need to speak to support Mr. Hassassian. This conduct of the Claimant towards Mr. Hassassian was based on what Mr. Hassassian had said and the views he was expressing."

There is no appeal against that decision. The appeal is against the Judge's further decisions that (b) this meaning is a statement of fact and (c) this meaning is defamatory of the claimant at common law.

### The Legal Framework

7.    In the past, a case like this would have been resolved by the verdict of a jury after the pleading of a full Defence and a trial of all the issues. By section 11 of the Defamation Act 2013 ("the 2013 Act"), Parliament removed the statutory presumption in favour of jury trial in libel cases. That has enabled judges to try discrete factual issues in these cases without waiting for a full trial. Preliminary trials such as the one in this case are now the norm. They can be held swiftly, and are likely to result in savings of time and costs: see *Greenstein v Campaign Against Antisemitism* [2019] EWHC 281 (QB) [10] (Nicklin J), *Vardy v Rooney* [2020] EWHC 3156 (QB) [8].  The Judge's task is to make findings of fact, applying well-known legal principles.

8.    The starting point is to identify the meaning the words would convey to the ordinary reasonable reader or viewer. For that purpose, the Court applies long-established principles conveniently distilled in *Koutsogiannis v The Random House Group Ltd* [2019] EWHC 48 (QB) [2020] 4 WLR 25 [12] (Nicklin J).  The practice is to read or watch the offending publication to capture an initial reaction, before reading or hearing argument. That has been approved by this Court as "the correct approach for a judge at first instance": *Tinkler v Ferguson* [2019] EWCA Civ 819 [9].

9.    At common law, a meaning is defamatory and therefore actionable if it satisfies two requirements. The first, known as "the consensus requirement", is that the meaning must be one that "tends to lower the claimant in the estimation of right-thinking people generally." The Judge has to determine "whether the behaviour or views that the offending statement attributes to a claimant are contrary to common, shared values of our society": *Monroe v Hopkins* [2017] EWHC 433 (QB), [2017] 4 WLR 68 [51]. The second requirement is known as the "threshold of seriousness". To be defamatory, the imputation must be one that would tend to have a "substantially adverse effect" on the way that people would treat the claimant: *Thornton v Telegraph Media Group Ltd* [2010] EWHC 1414 (QB), [2011] 1 WLR 1985 [98] (Tugendhat J).

10.    Today, there is an additional, statutory, requirement. Section 1(1) of the 2013 Act provides that "A statement is not defamatory unless its publication has caused or is likely to cause serious harm to the reputation of the claimant". This means that a claimant must now prove not only that the statement had a defamatory tendency, but also that it did as matter of fact cause serious reputational harm or was likely to do so: see *Lachaux v Independent Print Ltd* [2019] UKSC 27 [2020] AC 612.  We are not concerned with this issue. Master Cook refused Mr Corbyn's application for a trial of serious harm as a preliminary issue.

11.    One defence to a libel claim is the defence of honest opinion, provided for by section 3 of the 2013 Act. Section 3 abolished and replaced the common law defence of fair comment. But, so far as relevant, the section broadly reflects the common law. The terms "comment" and "opinion" are interchangeable. The matters a defendant must prove are identified in sub-sections (1) to (4):

> **"3 Honest opinion**
>
> (1)    It is a defence to an action for defamation for the defendant to show that the following conditions are met.
>
> (2) The first condition is that the statement complained of was a statement of opinion.
>
> (3) The second condition is that the statement complained of indicated, whether in general or specific terms, the basis of the opinion.
>
> (4)    The third condition is that an honest person could have held the opinion on the basis of—
>
> > (a) any fact which existed at the time the statement complained of was published;
> >
> > (b) anything asserted to be a fact in a privileged statement published before the statement complained of."

12.    The issue before the Judge was whether the first condition was met. The common law principles developed in relation to this requirement remain applicable to the statutory defence: *Butt v Secretary of State for the Home Department* [2019] EWCA Civ 933, [2019] EMLR 23 [32-33] (Sharp LJ, as she then was). Several cases summarising those common law principles were cited to the Judge, including *Butt* and *Koutsogiannis,* where Nicklin J said this (at [16]):

> "…when determining whether the words complained of contain allegations of fact or opinion, the court will be guided by the following points:
>
> (i) The statement must be recognisable as comment, as distinct from an imputation of fact.
>
> (ii) Opinion is something which is or can reasonably be inferred to be a deduction, inference, conclusion, criticism, remark, observation, etc.
>
> (iii) The ultimate question is how the word would strike the ordinary reasonable reader. The subject matter and context of the words may be an important indicator of whether they are fact or opinion.
>
> (iv) Some statements which are, by their nature and appearance opinion, are nevertheless treated as statements of fact where, for instance, the opinion implies that a claimant has done something but does not indicate what that something is, ie the statement is a bare comment.
>
> (v) Whether an allegation that someone has acted

"dishonestly" or "criminally" is an allegation of fact or expression of opinion will very much depend upon context. There is no fixed rule that a statement that someone has been dishonest must be treated as an allegation of fact."

13.    Although it may seem logical to consider first whether a statement is defamatory and only then to consider whether a defence of honest opinion is available, this may not always be the best approach. That is because a statement of opinion may be less reputationally damaging than an allegation of fact, so "the answer to the first question may stifle the answer to the second": *British Chiropractic Association v Singh* [2010] EWCA Civ 350, [2011] 1 WLR 133 [32]. It has become common for the two issues to be considered in the reverse order, as Saini J did in this case.

### The first issue: fact or opinion?

14.    The Judge began by identifying the right approach. He cited *Koutsogiannis* [16] and made clear that he had also had regard to the "comprehensive review of the case law in this area" contained in *Butt*. He indicated that he did not think he could draw assistance from findings in other cases about whether different words amounted to fact or opinion. His conclusion was expressed in this way (at [88]):

> "In my judgment, it is clear that Mr. Corbyn was making factual allegations in the Statement as to Mr. Millett's behaviour on more than one occasion. As to the submission that Mr. Corbyn was merely expressing a view on conduct, in my judgment this is a classic case of a statement which in context implies that a claimant has done something but does not indicate what that something is (a type of bare comment in Nicklin J's summary above). The Claimant succeeds on this issue."

15.    For Mr Corbyn it is now argued that the Judge "erred (in law and/or in fact) in ruling that the statement was entirely factual". Mr Hudson QC describes the Statement as an exercise of the right to freedom of expression by a senior politician in the context of discussion about a highly charged and sensitive political issue.  He characterises honest opinion as a statutory defence to a claim for libel which is "fundamental to the protection of political speech".  With this introduction, Mr Hudson advances three main submissions.

(1)    It is said that the Judge's use of the term "bare comment" shows that he must have concluded that Mr Corbyn's words were a statement of opinion but one that he must, as a matter of law, treat as a statement of fact, following point (iv) of the summary in *Koutsogiannis*. This was wrong, submits Mr Hudson: any such rule of law was disapproved of by the Supreme Court in *Joseph v Spiller* [2010] UKSC 53 [2011] 1 AC 852 and survives, if at all, in section 3(3) of the 2013 Act.  The Judge's approach wrongly conflated the first two stages of the statutory analysis, when the Judge was only concerned with the first condition.

(2)    In the alternative, it is submitted that the Judge was wrong in law and/or in fact to treat this as a case of "bare comment". The viewer could see that Mr Corbyn was

commenting specifically on Mr Millett's conduct during meetings, so the basis for the opinion was indicated, at least in general terms.

(3) Thirdly, it is submitted that the Statement was plainly one of opinion, and we should so hold. As he did before the Judge, Mr Hudson refers to the observation of this Court in *Tinkler v Ferguson* [27] that "an assertion that a person's behaviour is disruptive … is not an assertion of verifiable fact". He submits that the Judge was wrong not to reach the same conclusion.

16.    Mr Hudson is right to identify the defence of honest opinion as a bulwark of free speech. It must not be whittled away by artificially treating comments as if they were statements of fact. On the other hand, if a person could use this defence as a means of escaping liability for a false defamatory allegation of fact, the law would fail to give due protection to reputation. That is why the statutory defence only applies to a statement which is one of opinion.

17.    The statutory test refers to the "statement complained of", not the meaning of that statement, or the imputation it conveys. It is common ground that for this reason the wording of the preliminary issue in this case was not quite right. But Mr Hudson accepts that the Judge asked himself the right question: whether *the words used* were a statement of opinion or of fact.

18.    In this case, the issue is a narrow one: whether, in their context, the words "disruptive" and "abusive" were statements of opinion or statements of fact. The key principle of law is that the answer to that question must always be the one that would be given by the ordinary reasonable reader or – as in this case – viewer.  With a broadcast such as this, this is not a matter of studying the transcript, which cannot tell you how words are spoken, in what tone, or with what emphasis. It means watching and listening to the interview as a whole, bearing in mind that the ordinary viewer will do so only once. The Court should avoid over-elaborate analysis and give weight to its own impression. This approach applies equally to the methodology for deciding meaning, and whether the offending statement is fact or opinion. This, as I read the judgment, is precisely how the Judge approached the matter.

19.    This is a highly fact-sensitive process that focuses on the particular statement at issue. It is obvious that the Court cannot be bound or guided by findings made in other cases, about different words; Mr Hudson's reliance on *Tinkler v Ferguson* was rightly dismissed by the Judge. Nor can the political role and status of Mr Corbyn, or the political nature of the Programme and its subject-matter, alter the approach required as a matter of law, still less dictate the answer to the question of whether the Statement was one of fact or opinion. These are all important features of the context to which the Court should be alive when deciding how Mr Corbyn's words would have struck the ordinary viewer. But they are no more than that.

20.    The simple answer to Mr Hudson's first legal submission is that the Judge did not make the error he contends for. On a fair reading, the Judge's paragraph [88] begins with a clear and unequivocal finding that, in the context of the Statement, the terms "disruptive" and "abusive" were allegations of fact. The rest of paragraph [88] sets out an alternative basis for decision. It records the defence submission that the Statement was "merely expressing a view" and rejects it on the basis that even if (contrary to the Judge's view) the Statement was on its face opinion, the case would

be one of "bare comment" and thus fall within point (iv) of the *Koutsogiannis* summary.

21.   So, the Judge's decision on the fact/opinion issue represents an unobjectionable application of accepted principles to the undisputed facts of the case. A decision such as this is a finding of fact: see *Gatley* on Libel and Slander 12th ed, para 34.17 and cases there cited.  We do not second guess such findings.  Absent legal error, this Court would only interfere if it was satisfied that, allowing for the advantages available to the first instance court, the finding was wrong. That is not my view. I would go further. Having watched the whole interview, I agree with the Judge.

22.   Mr Corbyn was giving his explanation as to why he had said that the Zionists in the 2013 meeting did not understand English irony. To do so, he was explaining, from his standpoint, what had happened. He was telling the story. In doing so, he provided factual background and context.  In the particular words complained of he was, in my judgment, presenting viewers with a factual narrative: the people referred to had disrupted several meetings at the House of Commons; at one such meeting they had been extremely disruptive; and on the most recent occasion, whilst they had let Mr Hassassian speak, they had subjected him to extreme abuse afterwards. This would all have struck the viewer as Mr Corbyn's explanation of the factual background to his statement about "English irony".

23.   In my judgment Mr Hudson's criticism of the Judge's alternative ground of decision is also ill-founded, in law and in fact. First, it is clear that the concept of "bare comment" comes into play at the first step of the analysis, when deciding whether a statement is one of fact or opinion. Put another way, it is an aspect of the first condition (in section 3(2) of the 2013 Act). That is how the Judge treated it, and he was right to do so. The common law on the distinction between fact and comment was summarised by Lord Nicholls in *Cheng v Tse Wai Chun Paul* [2000] HKCFA 35, [2001] EMLR 777 [17] as follows:-

> "… the comment must be recognisable as comment, as distinct from an imputation of fact. If the imputation is one of fact, a ground of defence must be sought elsewhere, for example, justification or privilege. Much learning has grown up around the distinction between fact and comment. For present purposes it is sufficient to note that a statement may be one or the other, depending on the context. Ferguson J gave a simple example in the New South Wales case of *Myerson v Smith's Weekly Publishing Co Ltd* (1923) 24 SR (NSW) 20, 26: 'To say that a man's conduct was dishonourable is not comment, it is a statement of fact. To say that he did certain specific things and that his conduct was dishonourable is a statement of fact coupled with a comment.'"

The first condition (section 3(2) of the 2013 Act) was intended to reflect the common law as stated in this passage: see paragraph 21 of the Explanatory Notes to the Act. *Spiller* does not qualify or undermine this passage or affect the right approach to the first condition. *Spiller* was a decision about the separate common law requirement identified in paragraph [19] of *Cheng,* namely that to be defensible a comment must

"explicitly or implicitly indicate, at least in general terms, what are the facts on which the comment is being made."  The second condition (section 3(3) of the 2013 Act) was intended to reflect that common law requirement, as re-stated in *Spiller*: see paragraph 22 of the Explanatory Notes. The preliminary issues in this case did not include the second condition in section 3(3) and the Judge did not address it.

24.     Secondly, the Judge's approach to "bare comment" was correct.  When deciding whether a statement is one of fact or opinion, as Sharp LJ pointed out in *Butt v SSHD* [39]:

> "The ultimate determinant … is how the statement would strike the ordinary reasonable reader … – that is, whether the statement is discernibly comment (to such a reader) ... In that regard, the subject matter, the nature of the allegation and the context of the relevant words may well be important."

The cases on "bare comment" do not lay down a rigid rule of law that requires a court to depart from this key principle, and artificially treat a statement of opinion as if it was a statement of fact. On the contrary. The authorities show that "bare comment" is a pointer, or guideline, or rule of thumb that *reflects* the key principle. The question is, would the words used strike the ordinary viewer as a statement of fact or opinion? The answer does not turn on whether any given word is an adjective, noun, or verb, or some other part of speech. This is a matter of substance, not a formal, analytical matter of grammar or linguistics. In practice, when someone uses a descriptive word without giving any detail of what he is describing, that will tend to come across as an allegation of fact.  That is what the cases on "bare comment" say.  That is how the notion of "bare comment" was treated by Lord Nicholls in *Cheng,* and by Nicklin J in *Koutsogiannis*; and that, in my judgment, is how it was approached by Saini J in this case. So, although a statement that "the claimant said X, in Y tone, and in Z manner, and *that was* very, very abusive" would contain a comment on factual allegations, Mr Corbyn's statement was different. He said of the Zionists that *"they had been* incredibly disruptive" and that "*they were* very, very abusive", without more; and those – as Saini J held - were statements of fact.

**The second issue: defamatory at common law?**

25.     Under the heading "Defamatory Tendency/Seriousness", the Judge addressed the twin submissions on behalf of Mr Corbyn, that the Statement "**[a]** did not lower Mr Millett in the estimation of right-thinking people and, separately, **[b]** that it fell below the common law threshold of seriousness". (The lettering has been added by me, for clarity.)

26.     On issue [a], the Judge referred to the passage I have cited from *Monroe v Hopkins* and asked himself whether the type of conduct attributed by Mr Corbyn to Mr Millett would be "contrary to the common or shared values of our society and modern community". His answer was that "it is clear that this test is met".  He reasoned (at [100]):

> "Mr. Millett was being accused of abusive behaviour in relation to a public speaker on a controversial topic. This is an accusation of a type of conduct which is contrary to the values

of a modern democracy where freedom of speech is a cherished value. Further, the behaviour of which he was accused was of such a level of seriousness (at the first meeting to which Mr. Corbyn made reference) as to involve the police in potentially ejecting Mr. Millett and the other individual (suggesting criminal misconduct). Again, this suggests conduct falling below the standards expected of citizens in modern British society."

27.    The Judge then turned to issue [b], which he dubbed "the issue of seriousness and the *Thornton* threshold". He concluded that this was "a straightforward case when applying the multi-factorial approach summarised in *Gatley* at para. [2.4]." He explained this conclusion, at [102]:

> "Mr. Corbyn, one of the most prominent politicians at the time, accused Mr. Millett of seriously abusive behaviour towards a speaker, in the terms I have found above. Mr. Corbyn did this in careful language in an interview with a political journalist on what is arguably *the* major weekly national political programme, and which is free to air on the BBC, recorded live and aired during a prime time viewing period. The Statement was not a trivial matter and readily meets the *Thornton* standard at common law."

28.    Mr Hudson argues that the Judge's decision on defamatory tendency contained five legal flaws: the Judge (1) impermissibly introduced reference to "criminality", when no complaint was made that the words contained any such imputation, and the meaning found by the Judge did not contain this element; (2) was wrong to suggested that Mr Corbyn had accused Mr Millett of interfering with cherished free speech rights, when the Statement did not suggest any interruption or disruption of Mr Hassassian's speech but only "abusive" behaviour after it had concluded; (3) failed to recognise that the reasonable viewer would see the conduct attributed to Mr Millett as a legitimate exercise of the freedom of speech in the context of political disagreement; (4) misdirected himself by dealing separately with the consensus requirement and the threshold of seriousness; (5) took account of matters, such as Mr Corbyn's prominence and the high status and influence of the Programme, that were irrelevant to the question of what is defamatory at common law.  In any event, submits Mr Hudson, the Judge's decision on this issue was plainly wrong and should be reversed by us.

29.    Again, although the case for Mr Corbyn has been skilfully and attractively presented, my conclusion is that the Judge's decision should stand. This too is a finding on a question of fact: see Lord Devlin in *Lewis v Daily Telegraph* [1964] AC 234, 258 and *Gatley* para 34.5. The Judge made no error of law. His conclusions were not wrong, perverse or otherwise unreasonable. Indeed, I consider he was correct.

30.    Mr Hudson's first point relates to the Judge's bracketed reference to "suggesting criminal misconduct". It would be artificial to treat those words as adding to the meaning he had identified only a few paragraphs earlier. The reality, as the ordinary viewer would see it, is that the police could only be justified in wanting to "throw out" a person from an event if they saw evidence of some actual or threatened breach

of the peace, or some other public order offence. I would view the Judge's language as merely reflecting that reality.

31.    Mr Hudson's second and third points overlap. At the heart of the argument is the proposition that the judge failed to recognise that this was a highly charged political debate in which strong views are held on both sides, so that what Mr Millett was accused of doing was simply not contrary to common or shared values of our society, as the Judge found. I do not accept that the Judge went wrong in the ways alleged. He seems to me to have been fully alive to the political context. He was clearly right to identify Mr Millett's alleged conduct as an interference with the "cherished value" of free speech. He asked himself if that interference was serious enough to fall "below the standards expected of citizens in modern British society". That is a matter of fact and degree. The Judge rightly focused his attention on the specifics of the case: the ways in which Mr Millett had (allegedly) interfered with speech at public meetings, and the gravity of that interference. It was clearly relevant, in this context, that the disruption was alleged to have been so serious that the law enforcement authorities wished to remove Mr. Millett, and that the abuse was extreme and distressing.

32.    I do not agree that right-thinking viewers would regard the conduct attributed to Mr Millett as an acceptable exercise of free speech. The Judge clearly thought otherwise, and the context counts against it. All that viewers knew about the matter was what Mr Corbyn told them about it. They would see that he was telling them about Mr Millett's behaviour in order to explain his own controversial assertion that Mr Millett did not understand English irony. When talking of disruption Mr Corbyn was setting the scene for that explanation. He did not downplay what had happened but emphasised its seriousness. He introduced the fact that the police wanted to throw Mr Millett out of the meeting. And Mr Corbyn gave viewers no reason to think that Mr Hassassian's speech was one that justified the extreme and distressing abuse of which he spoke. On the contrary, he made clear that he warmly approved of the speech, and he emphasised how "very, very, abusive … very abusive… " Mr Millett had been in response.

33.    The Judge was not wrong to deal separately with the consensus requirement and the threshold of seriousness. These are normally treated as separate but complementary components of the common law test. That is how they were presented to the Judge in Mr Hudson's skeleton argument below, citing *Allen v Times Newspapers Ltd* [2019] EWHC 1235 (QB) [19(1)]. Moreover, this seems an arid debate. It cannot matter whether the Court approaches the two components separately or in conjunction with one another: the answer should be the same either way.

34.    Mr Hudson does have a point when he criticises the Judge's adoption of a "multi-factorial" approach to the common law threshold of seriousness. As Mr Bennett came to accept in oral argument, the question is whether the imputation crosses the threshold. Circumstantial matters are generally left out of account at this stage, though they may come in when it comes to the statutory requirement of serious harm. I think the Judge may have been misled by the passage in *Gatley* to which he referred, which is not firmly grounded in authority, and appears to me to conflate questions about the threshold of seriousness and issues going to the separate question of whether a case that crosses that threshold should be struck out as an abuse under the *Jameel* principle (*Jameel v Dow Jones Inc* [2005] EWCA Civ 75, [2005] QB 946). But I do not believe that the Judge's conclusion can be faulted. Alleging disruptive behaviour that leads

the police to want to remove a person from a public meeting, and alleging such verbal abuse of a public speaker that the Leader of the Opposition was forced to speak up in controversial terms to defend him, crosses the common law threshold of seriousness. The Judge was right to hold that such allegations would tend to have a substantial adverse effect on the attitude that people would take to Mr Millett.

### Disposal

35.    For the reasons I have given, I would dismiss the appeal.

**Dame Victoria Sharp, President of the Queen's Bench Division:**

36.    I agree.

**Sir Geoffrey Vos, Master of the Rolls:**

37.    I also agree.

# Exhibit 4



Neutral Citation Number: [2021] EWHC 3141 (QB)

Case No: QB/2021/001210

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**

Royal Courts of Justice
Strand, London, WC2A 2LL
Date: 24/11/2021

**Before** :

**THE HONOURABLE MRS JUSTICE TIPPLES DBE**
- - - - - - - - - - - - - - - - - - - -

**Between:**

**Public Joint Stock Company Rosneft Oil Company**          **Claimant**

**- and –**

**(1) HarperCollins Publishers Limited**
**(2) Catherine Belton**          **Defendants**


- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Desmond Browne CBE QC and Clara Hamer (**instructed by **Carter-Ruck**) for the **Claimant**
**Andrew Caldecott QC and David Hirst** (instructed by **Wiggin LLP**) for the **Defendants**

Hearing date: 29th July 2021
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Covid-19 Protocol:  This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii.  The date and time for hand-down is deemed to be 10am on Thursday 24 November 2021.**


.............................

1

MRS JUSTICE TIPPLES
Approved Judgment

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

**The Honourable Mrs Justice Tipples DBE:**

## INTRODUCTION

1. This is a second libel action which arises out of the publication of a book with the title 'Putin's People', and the sub-title 'How the KGB Took Back Russia and Then Took on the West' ("**the Book**"). The author is Catherine Belton ("**the author**") and the publisher is William Collins, an imprint of HarperCollins Publishers Limited. The Book was published electronically on 2 April 2020, in audiobook on 11 April 2020 and in hard copy from 16 April 2020. The paperback edition came out on 15 April 2021.

2. On 31 March 2021 the claim form was issued seeking damages, an injunction and related relief in defamation. The defendants are the publisher and the author.

3. This claim is related to *Roman Abramovich v (1) HarperCollins Publishers Ltd; (2) Catherine Belton*, Claim No: QB-2021-001025 ("***Abramovich v HarperCollins***") which also arises out of publication of the Book. There are common issues as to the natural and ordinary meaning of the Book and, on 9 July 2021, Nicklin J gave case management directions in relation to the claim so that the issues on meaning could be determined by the same judge.

4. The claimant, Public Joint Stock Company Rosneft Oil Company ("**the claimant**" or "**Rosneft**"), was directed by 14 July 2021 to send the defendants written notice of its case, identifying the words complained of, and the natural and ordinary meaning that the claimant contends that the words complained of bear. The defendants were directed to serve their response by 19 July 2021. Nicklin J then directed a trial of the following preliminary issues: (i) the natural and ordinary meaning of the words complained of; (ii) whether the words complained of, in the meaning(s) found, are defamatory of the claimant at common law; (iii) whether the respective statements complained of are (or include) a statement of fact or expression of opinion.

5. The trial of the preliminary issues took place on 29 July 2021.

6. This judgment concerns that trial and *only* relates to the meaning of the passages complained of in the Book. The defendants have not yet been required to file a defence and so no substantive defences have been raised. The court is not, at this stage, adjudicating on any issues concerning the Book other than meaning (and the other preliminary issues identified in paragraph 4 above). Specifically, the court is not determining whether allegations made in the Book about the claimant or anyone else are true.

7. The claimant complains that it has been defamed by the publication in the Book of the words identified in 19 specific passages of the Book. The passages are in chapters 7, 9, 11 and 14 of the Book and are set out in Annex to this judgment (and the numbered passages referred to below are to the numbered passages in the Annex). There are four meanings advanced by the claimant: meanings 1 to 4. The defendants take issue with the claimant's case and have identified what they say the passages complained of mean.

8. The parties' rival meanings are set out below, when I consider each of the claimant's four meanings in turn. Further, it is the defendants' case that none of the meanings are defamatory of the claimant at common law. This is because the first meaning is a "low-

MRS JUSTICE TIPPLES
Approved Judgment

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

level historic allegation" and the passages complained of in relation to the three other meanings do not refer to the claimant in a defamatory sense, but refer to others.

9. I should also mention that in a letter from its solicitors dated 26 July 2021, the claimant confirmed that it is the same legal entity now that it was prior to its listing on the London Stock Exchange on 14 July 2006 and during the earlier events covered in meanings 1 to 3.

10. As I explained in my judgment in *Abramovich v HarperCollins* [2021] EWHC 3154 (QB), I read the whole Book in hard copy in advance of the hearing. I knew that the claimant was complaining about the Book, but I did not know what it was complaining about. I was provided with the documents relating to the claim shortly before the hearing and it was only then, when I had read the whole Book, that I read the passages complained of in the context of this claim. I did so without any reference to the parties' rival contentions or submissions on meaning. That was to capture my initial reaction as a reader, which is the accepted general practice in trials of this nature: see, for example, *Tinkler v Ferguson* [2019] EWCA Civ 819 at [9] and [37].

11. The parties provided the court with detailed skeleton arguments and at the hearing Mr Browne QC, for the claimant, and Mr Caldecott QC, for the defendants, made succinct oral submissions. It is important to remember, and I have kept well in mind, that at a trial on meaning over-elaborate analysis of the various passages relied on by the parties must be avoided, and counsel were mindful to avoid this trap (see, for example, *Sheikh v Associated Newspapers* [2019] EWHC 2947 (QB), Warby J at [25]).

## RELEVANT LEGAL PRINCIPLES

12. The relevant legal principles are set out in *Abramovich v HarperCollins* [2021] EWHC 3154 (QB) at paragraphs 13 to 21, so I do not repeat them here. The law to be applied in determining meaning is set out in *Koutsogiannnis v The Random House Group Ltd* [2020] 4 WLR 25, Nicklin J at [11]-[12] and the repetition rule and *Chase* levels of meaning are also relevant to the issues in this case. These principles apply, albeit in a slightly modified form, where the claim is brought by a company (see, for example, *Triplark Limited v Northwood Hall (Freehold) Ltd* [2019] EWHC 3494 (QB), Warby J ("**Triplark**") at [12]).

13. It is clearly established that a company is entitled to sue in respect of defamatory matters which can be seen as having a tendency to damage it in the way of its business. Examples are those that go to credit such as might deter banks from lending to it, or to the conditions experienced by its employees, which might impede the recruitment of the best qualified workers, or make people reluctant to deal with it: see *Derbyshire County Council v Times Newspapers Ltd* [1993] AC 534, HL ("**Derbyshire**") at 547B-C, per Lord Keith of Kinkel. The editors of *Duncan and Neill on Defamation* (5th Edition; 2020) ("**Duncan & Neill**") explain that "an allegation which impugns the honesty or fairness of the business methods employed by the corporation or company may be actionable, as may allegations which reflect adversely on the financial position or the efficiency of the company" (see para. 10.02).

14. An imputation is now only actionable by a company if it has a tendency to cause a substantial adverse effect on people's attitudes towards the company: *Triplark* at [11] to [13]. The threshold has been set higher by statute which requires a company to prove that

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

the harm to its reputation has caused or is likely to cause it "serious financial loss": section 1(2) of the Defamation Act 2013.

15. Further, it is also well established that a company cannot bring an action in respect of allegations which reflect solely on its individual officers, and not on the corporation: see *Bognor Regis Urban District Council v Campion* [1972] 2 QB 169, Browne J at 175 (cited with approval in *Derbyshire* at 545E-547A). In cases where the words might be thought to "reflect primarily upon human beings" the court will examine carefully a contention that they are damaging to the company's business reputation: *Multigroup Bulgaria Holding AD v Oxford Analytica Ltd* [2001] EMLR 28 [41], Eady J ("***Multigroup***").

16. The editors of *Duncan & Neill* explain the following in relation to allegations reflecting on the officers or employees of a company at para. 10.05:

"But allegations about officers of a corporation or company, or even about an individual employee if they relate to their work in their employment, will often reflect on the corporation or company itself, either because the act of the individual or individuals will be identified in the mind of the publishee with the employer, or because the allegations involve some imputation against the methods of selection of staff or their supervision. Similarly, allegations against a corporation or company will often involve by necessary inference imputations against those who are responsible for its direction and control. Such inferences may arise more easily in the case of directors of a small family company than in the case of directors (especially non-executive directors) of a large organisation".

17. In *Undre v Harrow LBC* [2017] EMLR 3 ("***Undre***"), Warby J explained at [21]:

"Cases where individuals and companies are co-claimants can give rise to difficulties when it comes to reference and meaning. A single set of words can defame both a company director or officer and the company itself, particularly if the individual is so closely associated with the company that those who know them will treat one as an alter ego of the other." (underlining added).

18. The words underlined in *Undre* were relied on by Mr Browne, for the claimant, as one of his examples where a reader identifies the act of an individual with the company. He submitted that, in relation to the association between Mr Igor Sechin and the claimant in the present case, this example is particularly apt.

19. However, as was explained in *Jameel v Times Newspapers Ltd* [2004] EMLR 665, CA at [35] by Sedley LJ:

"It has to be kept well in mind that a limited liability company is a distinct legal person, not an extension of its proprietor (if I may adopt an imprecise but useful term). To defame the proprietor, even in an article which identifies the business as his, is not to defame the company unless the article also suggests that the company is itself implicated in the wrongdoing or suspicion of wrongdoing attributed to the individual, or it merits investigation for the same reasons as its proprietor. This article suggests none of those things." (underlining added)

20. Examples of words which reflect solely upon a company's individual officers, and not upon the company itself, were identified by Warby J in *Triplark* at [55]:

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

"This could be the case where the allegation is of personal misconduct, such as sexual promiscuity, by an officer of the company… Equally, however, a publication might (at least in principle) impute misconduct by a director, for instance bribery, in the course of business activities on behalf of the company but, on a proper analysis, it might nevertheless defame only the individual and not the company for which he or she worked."

21. Therefore, in Warby J's second example of bribery by a director, the proper analysis referred to is to identify whether the company itself is implicated. If it is not, then it will only be the individual that is defamed, not the company for which he or she worked.

22. In any event, whether a company can maintain a claim for defamation turns on two fundamental requirements: the words must refer to the corporate claimant, and they must convey a defamatory meaning about the corporate claimant (see *Undre* at [23]; and *Triplark* at [55] in which Warby J identified this as the "first principle" derived from the following cases: *Multigroup*, *Elite model Management Corporation v BBC* (25 May 2001, unrep.), Eady J ("*Elite*"); *Al Rajhi Banking & Investment Corporation v The Wall Street Journal Europe SPRL* [2003] EWHC 1358 (QB), Eady J ("*Al Rajhi*")).

23. I should mention here that both parties made submissions in relation to *Multipark*, *Elite* and *Al Rajhi*. Those authorities were considered by Warby J in *Triplark*, and I do not see any reason to depart from the three principles Warby J derived from them: see *Triplark* at [55]-[57].

24. The real dispute between the parties in relation to meaning 2 is whether, in the context of the words complained of, an individual's relationship with the claimant is so close that the reader treats him "as an alter ego of the company". Mr Browne relied on the words underlined in *Undre* in support of this submission that Mr Sechin is the alter ego of the claimant and, as a result, the claimant is implicated in the wrongdoing alleged. Mr Caldecott, for the defendants, disagreed with this approach, particularly in the context of a state-owned oil company, which is what the claimant was at the time of the allegations in the passages complained of in meaning 2. The claimant's business activities were related to managing its activities in the oil sector of the economy, and the ordinary reader would expect such a company to have a board of management for that purpose. This, he submitted, required the court to identify, amongst other things, whether any allegation in the publication would reasonably be understood to be directed at the company's board of management, and where the allegation is historic, whether it reflects adversely on the company at the time of publication and satisfies the threshold of seriousness.

25. In the present context, the reader knows that the claimant is a state-owned oil company. The reader will also know that it is not an insubstantial organisation. Rather, it is described as a "state-owned oil giant" (passage (1); p.227). That means that is unlikely that a reader will understand that Igor Sechin is the claimant's alter ego. In any event, even if the words complained of identify the claimant's business as that of Mr Sechin, the claimant will not be defamed unless the words complained of "also suggest that the company is itself implicated in the wrongdoing or suspicion of wrongdoing attributed to the individual, or it merits investigation for the same reasons as its proprietor" (see *Jameel* at [35], per Sedley LJ).

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

26. It is these considerations that I have in mind in relation to the meanings advanced by the claimant and, in particular, meaning 2 to which these principles are the most relevant.

27. The final point I should make in relation to corporate libel claims is that, even if viable on its face, a corporate libel claim might represent an abuse of the court's process, if the reality is that the company has been "put up" by individuals who are seeking to use it indirectly to vindicate their personal reputations or obtain compensation (see *Triplark* at [12] and [57], where Warby J identified this as the "third principle" derived from *Multigroup*, *Elite* and *Al Rajhi*). Nevertheless, this is a "more complex issue" which might be the case if, for example, there is material before the court which demonstrates that the company is being used "as some kind of "front" for an individual, seeking to clear his or her name indirectly" (*Triplark* at [57]). In this case, Mr Caldecott sought to persuade me that the claimant has been "put up" by President Putin or Mr Sechin to vindicate their personal reputations. This was a trial of preliminary issues on meaning and fact/opinion and, on the material before me, I am unable to make any determination at this stage on this basis, and do not do so.

## THE BOOK: BROAD IMPRESSION

28. This is set out in *Abramovich v HarperCollins* [2021] EWHC 3154 (QB) at paragraphs 23 to 31, so I do not repeat it again here. Likewise, the findings I have made in relation to context at paragraphs 32 to 37 of that judgment are also relevant, and I do not repeat them here.

## MEANING

29. Both parties rely upon the whole of the Book, including the footnotes and index, for the full context and meaning of the words complained of.

30. The specific passages complained of are as follows:

   a. **Meaning 1**: pp. 227-228 of the Book. This concerns the purchase price paid by the claimant for Severnaya Neft.

   b. **Meaning 2**: pp. 281-304 of the Book. This concerns the acquisition of Yukos by the claimant.

   c. **Meaning 3**: pp. 357-359 of the Book. The concerns the initial public offering of the claimant's shares on the London Stock Exchange.

   d. **Meaning 4**: p. 436 of the Book. This concerns the proposed deal to fund Liga Nord.

31. I will take each meaning in turn. In doing so, I have set out each parties' case as to what they contend, in their proper context, the passages complained of mean, and would be understood to mean. I then deal with the parties' submissions, my conclusion and decision on each of the four meanings.

32. In doing so I have set out my initial view or impression in each case. This was the view I noted down before the hearing when having read the Book, I read the words complained of

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

in the particulars of claim, the claimant's meanings and the defendants' meanings, but before I had read the skeleton arguments, or heard any oral argument from Counsel.

33. The words complained of are contained in a total of 19 passages. I have to determine the impression that would have been conveyed to the ordinary reasonable reader reading those passages once.

**Meaning 1: The purchase price paid by the claimant for Severnaya Neft**

*The parties' meanings (passages (1) and (2))*

34. <u>Claimant's case</u>: There was strong reason to suspect that Rosneft had paid an inflated price for Severnaya Neft, namely twice the accepted valuation of $300 million, with the intention that the overpayment of $300 million should be corruptly paid to President Putin and his associates in the KGB.

35. <u>Defendants' case</u>: There were in 2003 grounds to investigate why Rosneft, the then Russian state-owned oil giant, had recently paid twice the accepted valuation for Severnaya Neft, an oil company with huge reserves, and, in particular, whether it had done so to trump competitive bids from privately owned oil companies (who had been eying the company for months) or with a view to Putin's men or state officials taking the excess for themselves.

*The parties' submissions*

36. The real dispute here was whether the words complained of contained a meaning "framed as between *Chase* level 2 and *Chase* level 1, strong reason for suspicion rather than actual guilt" on the claimant's part or, as the defendants contended, a *Chase* level 3 allegation.

37. Mr Browne, for the claimant, submitted that there is strong reason for suspicion, rather than actual guilt, on the part of the claimant of making a corrupt payment or "kickback" of $300 million. This is consistent with the statement that "if Putin's KGB men had pocketed a $300 million kickback", they had been able to enrich themselves. The strength of the suspicion is emphasised by the factual statement that the deal had been "structured through one of the initial owners of Severnaya Neft, Andrei Vavilov, a former deputy finance minister" (passage (2); p. 228) and that "one person familiar with the deal", described as "a person formerly close to Putin" (footnote 51; p. 545) said that "Vavilov had kicked the money back to Putin through Rosneft's President, Sergei Bogdanchikov". There is then a formulaic denial of kickbacks or irregularity, but the effect of the repetition rule is that the statement of the "person formerly close to Putin" is to be treated as a straightforward statement that the kickback to Putin of $300 million had been instigated on behalf of Rosneft by its President.

38. Mr Caldecott, for the defendants, submitted that the author's report of Mr Khodorkovsky's televised presentation on state corruption to President Putin and Russia's oligarchs is included in the narrative because it marked the beginning of the end for Mr Khodorkovsky and his Yukos oil empire. The immediate context is that the reader has been told that Mr Khodorkovsky was seeking to expand his business empire but, behind the scenes, President Putin and his former KGB associates wanted to re-establish control of the oil companies.

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

Severnaya Neft was an oil company that "sat on huge reserves in Russia's far north" and the reader is told that "the privately owned oil companies had been eyeing it for months, but Rosneft had trumped them by paying twice the accepted valuation". The claimant had paid $600 million to purchase Severnaya Neft. In his presentation Mr Khodorkovsky suggested the question "where did the $300 million overpayment go?" and then told the President "an <u>investigation</u> should be mounted … to pin down the reason for the overpayment" (<u>underlining</u> added by Mr Caldecott). Mr Caldecott argued that this was a request for an investigation as to whether there was corruption, the author then sets out the rival views and, at the time, there was a "whole web of political and commercial agendas in conflict". In that context it is a *Chase* level 3 allegation.

*Conclusion*

39. My initial impression was that the passages complained of contained a strong reason for suspicion on the claimant's part in respect of the matters alleged, although not in quite the terms advanced by Mr Browne.

40. The passages complained of appear in chapter 7, entitled "Operation Energy". The Russian oil sector was substantially privatised during the Yeltsin era and a large part of this chapter focusses on how President Putin and his inner KGB circle, the *siloviki*, set out about bringing the privatised oil companies back under state control. The most difficult company to deal with was Yukos on account of its vast size and integration in Western markets. Further, its owner, Mr Khodorkovsky, was Russia's richest man. He wanted to develop his oil business in accordance with Western standards and, in addition to his enormous fortune, had political ambitions as well. This put him on a collision course with President Putin and the *siloviki*. Mr Khodorkovsky was seen as a threat to President Putin.

41. The immediate context of the slide presentation is set out on p. 226. Mr Khodorkovsky knew in early 2003 that there was "a group of people in the Kremlin who want to take my company". However, he still hoped that President Putin had a "liberal" side to his personality. Mr Khodorkovsky had warned that Russia stood at a crossroads. The country could either go down the road of state bureaucracy or could take the path of Western economies, of increasing productivity and post-industrial societies. The reader is then told that, when the regular meeting between the Russian oligarchs and President Putin took place in February 2003, Mr Khodorkovsky "decided to frame the question of he gradually increasing state participation in the economy more starkly still". This was because he had decided to make a power point presentation about state corruption. He made general points about corruption and "then he raised the issue more pointedly still" (p227; passage (1)). The issue was the acquisition of Severnaya Neft by Rosneft, and what had happened to the $300 million overpayment. Mr Khodorkovsky raised this in the context that "Whispers had been circulating for weeks that the difference was a kickback pocketed by officials". The reader will understand that, at the very least, Mr Khodorkovsky suspected corruption with this overpayment, made by a state company, and he wanted an investigation to expose this. The presentation was, after all, about state corruption in Russia. I do not therefore accept Mr Caldecott's submission about the nature of the investigation sought by Mr Khodorkovsky.

42. The reader is then told that Mr Kondaurov, Mr Khodorkovsky's chief of analysis (and a former KGB General), told the author that "Putin's men had taken the $300 million for

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

themselves" (p. 227; passage (2)).  The author's second source, a person "familiar with the deal", said that "Vavilov [an initial owner of Severnaya Neft] had kicked the money back to Putin through Rosneft's president, Sergei Bogdanchikov" (p.228; passage (2)).  The author then records that Mr Vavilov denied any kickbacks; the Kremlin hotly denied any irregularity.  There is no other information provided to the reader as to where the $300 million overpayment went.  I agree with Mr Browne that these denials do not provide any antidote to the information provided by Mr Kondaurov or the anonymous source.

*Decision: meaning 1*

43. Applying the principles I have identified, my conclusion is that the natural and ordinary meaning of the words complained of, read in their proper context as they affect the claimant is:

> There is strong reason to suspect that Rosneft, then a state-owned Russian oil giant, paid $600 million to purchase Severnaya Neft, being twice the accepted valuation, so that the overpayment of $300 million would be paid to President Putin or his associates in the KGB for their own use.

44. This allegation relates to events 18 years ago.  However, it was a payment of $300 million, a very substantial amount of money, which there are strong grounds for suspecting ended up in the hands of President Putin or his "KGB men".  The claimant was then state-owned, but it is the same corporate entity today as it was then.  This imputation is, in my view, actionable as it has a tendency to cause a substantial adverse effect on people's attitudes to the company.  It is, of course, another matter as to whether the claimant can prove "serious financial loss" or its likelihood in respect of matters which happened a long time ago.  That, however, is not an issue before me.

45. Accordingly the meaning I have identified is defamatory of the claimant at common law.  The statements complained of are statements of fact.

**Meaning 2:  The acquisition of Yukos by the claimant**

*The parties' meanings (passages (3) to (17))*

46. Claimant's case:  In a strategy engineered by Rosneft amounting to organised theft, the Russian Government:

   a. with the connivance of several judges subjected to improper pressure, illicitly expropriated assets formerly held by OAO Yukos Oil Company ("**Yukos**") and its ultimate owners – Mr Khodorkovsky and his associates, and

   b. combined with Rosneft to allow the latter to purchase the Yukos assets at an unfair price in a farcically rigged auction.

47. Defendants' case:

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

a. The Kremlin and Mr Sechin with 'one of [Mr Sechin's] deputies' wrongfully interfered with the Russian Courts in his capacity as Mr Putin's 'closest associate' and 'deputy chief of staff' in relation to Mr Khodorkovsky's trial, and that Mr Sechin's personal pursuit of power drove many of these events concerned with the bankruptcy of Yukos, confiscation of its assets and imprisonment of Mr Khodorkovsky, and Mr Sechin acted in league with 'Putin and his men' in negotiating with Yukos (implicitly in bad faith) and personally oversaw these various outcomes in his own interest, and in the interest of the Kremlin (there being no suggestion of any material input from the rest of Rosneft's board).

b. The Russian government used tax claims to undermine Yukos and that the low opening sale price of Yukos' assets was fixed by the justice ministry in an example of 'government-organised theft' and the chief orchestrators of the legal campaign to bring down Yukos' [*sic*] were the *siloviki* representing President Putin's inner circle of trusted advisors, being for the most part members or former members of the Russian Security Services.

*The parties' submissions*

48. Mr Browne, for the claimant, submitted that the strategy whereby the claimant became the owner of Yukos had two essential elements. First, the illicit expropriation of Yukos' assets with the connivance of judges subjected to improper pressure on behalf of the claimant. Second, the participation of the claimant in acquiring those assets at an unfairly low price in a rigged auction. This, the claimant contends, is the strategy it is alleged to have engineered amounting to organised theft, which it combined with the Russian government in giving effect to.

49. As to the first element, Mr Browne pointed to the references in the Book showing the control that Mr Sechin had over the court process (eg pp. 281 and 299; passages (3) and (14)) and the pressure he put on the judges in Mr Khordorkovsky's trial and on the appeal (pp. 301, 302; passages (15) and (16)). Mr Browne submitted that the reader is left in no doubt that Mr Sechin, in behaving as he is alleged to have done, was acting as "chairman of Rosneft" (p. 284; passage (5)). In his oral submissions Mr Browne explained that it is because the claimant and Mr Sechin are "inextricably intertwined", they are "alter egos" and, as Mr Sechin is the claimant's controlling and directing mind, what he does affects the claimant. Further, once Mr Sechin became the claimant's chairman in July 2004, there is no suggestion anywhere in the Book that he was "on a frolic of his own" in relation to the attack on Yukos.

50. As to the second element, Mr Browne pointed to the low sale price of the Yugansk plant at $8.65 billion, which is described as "government-organised theft" (p.287; passage (7)); that Baikal Finance Group ("**Baikal**") was the only bidder when Yugansk was sold at auction, and was a device used by the claimant to acquire Yugansk: "Overnight, Rosneft grew from being a minnow worth no more than $6 billion to an oil giant of global stature with assets worth nearly $30 billion, strengthening Sechin's hand along the way" (p. 292; passage (11)); and that the claimant's active participation in the strategy used to acquire Yukos' assets is further underlined by the mention of the bankruptcy auctions in 2007 when "though the Western banks had filed the bankruptcy petition, it was Rosneft – and the Kremlin – that was in the driving seat" (p. 297; passage (13)).

MRS JUSTICE TIPPLES
Approved Judgment

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

51. Mr Caldecott, for the defendants, submitted that the passages selected for complaint, both taken alone and in their wider context, do not refer to the claimant as engineering any of the matters involving the attack on Yukos. Rather, the passages complained of are very specifically targeted at the Russian government/Kremlin and Mr Sechin in his capacity as Mr Putin's "closest associate" and "deputy chief of staff" (ie as agent for the Kremlin, not as chairman of the claimant) (see, for example, pp. 275, 279, 281 (passage (3), 292 (passage 11)). Further, Mr Caldecott submitted that the *siloviki's* plan to seize Yukos for the Russian state started well before Mr Sechin became the chairman of the claimant and, in the context of the Book, it was an "astonishing" proposition to argue that the passages complained of meant that this was a plan which had been "engineered" by the claimant who was then telling the Russian government what to do.

*Conclusion*

52. The passages complained of are in chapter 9, which is entitled "Appetite Comes During Eating". This chapter tells the story of how Mr Khodorkovsky was jailed in 2005, and how his Yukos empire was sold off, with the extremely valuable Yugansk plant ending up in the hands of the claimant. My initial impression was that these events were masterminded by the *siloviki* and, in particular, Mr Sechin as part of President Putin's inner circle. I did not form the impression that it was the consequence of any strategy devised or pursued by the claimant, in conjunction with the Russian government.

53. By the time the reader gets to chapter 9 he or she knows that, by dint of Mr Khodorkovsky's fabulous wealth and perceived political ambitions, he is seen as a potential threat to President Putin. The reader also knows that it is Mr Sechin who is behind the plan to bring down Mr Khodorkovsky and was instrumental in persuading President Putin to take on Yukos, and that Mr Sechin is the person who is closest to President Putin.

54. Mr Sechin is the first person the reader is introduced to in the dramatis personae (p. xi). He is part of Putin's inner circle, the *siloviki*, and is described as "Putin's trusted gatekeeper, a former KGB operative from St Petersburg who rose in power as deputy head of Putin's Kremlin to lead the state takeover of the Russian oil sector. Later [he] became known as 'Russia's Darth Vader' for his ruthless propensity for plots". The reader knows that Mr Sechin is the closest person to President Putin from the memorable description provided of him, and his relationship with President Putin, in chapter 6 (pp. 184-186). The impression on the reader is that Mr Sechin is President Putin's gatekeeper, and that he has a very close and long-standing relationship with him. That impression will not have been lost by the time the reader gets to chapter 9 and the story of Mr Khodorkovsky's trial and the break-up of Yukos.

55. The reader is told in chapter 9 how the downfall of Mr Khodorkovsky and Yukos was brought about, with the consequence that the Kremlin secured control over the Russian economy and the court system. This was all rooted in demands for retrospective tax against Yukos, running to many billions of dollars, together with charges of fraud and tax evasion against Mr Khodorkovsky. The size of the tax bills meant that Yukos was threatened with bankruptcy and then further demands, again running to billions of dollars, were made by Russian prosecutors. It was these demands for tax that triggered the break-up of Yukos. The jewel in Yukos' crown was its Yugansk plant, which produced vast quantities of oil.

MRS JUSTICE TIPPLES
Approved Judgment

*Public Joint Stock Company Rosneft Oil Company v
(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

Two state-owned purchasers were lined up, Gazprom and Rosneft.  However, Gazprom was ruled out as a purchaser as a result of Yukos filing for bankruptcy in a Houston court. This was because Gazprom owned assets outside Russia, and these assets were at risk of being seized if it purchased Yugansk in breach of an order of the American court.  When the Yugansk plant was auctioned, there was only one purchaser, Baikal, which no one had heard of.  The price paid was much less than the plant had been valued at and, within days, it was in the ownership of the claimant.  The reader is provided with a vivid description of Mr Khordorkovsky's trial, and his subsequent appeal.  Further, the reader is left in no doubt that it is Mr Sechin who was responsible for putting pressure on the judges to reach a verdict against Mr Khodorkovsky at trial and to dismiss his appeal.

56. The campaign which resulted in the break-up of Yukos and the jailing of Mr Khodorkovsky was one that was orchestrated by the Kremlin or, more particularly, the *siloviki* with Mr Sechin at the heart of it.  That is what the reasonable reader would understand.  It was not a strategy "engineered" by the claimant and it is fanciful to suggest that a reasonable reader would understand it was.  The claimant was, of course, a beneficiary of what happened, but that was a consequence of the plan driven by others.  The reference to the claimant being in the "driving seat" (p. 297) is to a much later point in time, namely 2007, by which time Mr Khodorkovsky had been in jail for 2 years, and the Yugansk plant had already been sold off and that is what the ordinary reasonable reader would understand.

*Decision: meaning 2*

57. Applying the principles I have identified, my conclusion is that the natural and ordinary meaning of the words complained of, read in their proper context as they affect the claimant is:

> The campaign to bring down Mr Khodorkovsky and Yukos was driven by the Kremlin and, in particular, Mr Sechin and the *siloviki* (President Putin's inner circle).  That campaign resulted in the imprisonment of Mr Khodorkovsky and the break-up of Yukos, with the extremely valuable Yugansk plant ending up in the ownership of the claimant. The Kremlin, through Mr Sechin and one of his deputies, wrongly interfered with the Russian court which heard Mr Khodorkovsky's trial, and subsequent appeal, to ensure that Mr Khodorkovsky could not win and would remain in prison.

58. The claimant became the owner of the Yugansk plant.  There is, however, no suggestion in the words complained of that the claimant was "implicated in the wrongdoing or suspicion of wrongdoing attributed to" Mr Sechin or the *siloviki* or that the claimant "merits investigation" for the same reasons as Mr Sechin.  In these circumstances, and in the light of the principles I have set out at paragraphs 13 to 27 above, I agree with the submissions of Mr Caldecott that the meaning I have identified is not defamatory of the claimant at common law.  The statements complained of are statements of fact.

**Meaning 3: IPO of the claimant's shares on the London Stock Exchange**

*The parties' meanings (passage (18))*

59. Claimant's case:  In an exercise amounting to major extortion Rosneft conducted an Initial Public Offering ("**IPO**") which in reality was not an IPO at all, since it was based on an

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

inflated valuation of the company, and the overpriced shares were only sold as a result of KGB operatives on behalf of Rosneft putting illicit pressure on potential investors.

60. <u>Defendants' case:</u>  <u>The Rosneft IPO in 2006 had less resembled a normal initial public offering than an overpriced private placement based on coerced participation of investors in order to satisfy the KGB men and Kremlin financial interests that lay behind and shaped it</u> for the following reasons:

    a. Foreign or state-controlled international oil majors <u>keen to curry favour with the Kremlin</u> had bought up almost half of the shares whilst US companies (and impliedly funds and retail investors) generally stayed away;

    b. KGB-connected Gazprombank bought $2.5 billion worth of shares;

    c. The Kremlin pressed Russian tycoons like Roman Abramovich to make very substantial purchases of shares;

    d. <u>Contrary to what might have been expected</u>, there were no contemporary investor concerns that the funds raised by the IPO would bypass the Russian budget, going instead towards paying down the $7 billion loan that a state special-purpose vehicle called Rosneftegaz had taken on from international banks when the state increased its stake in Gazprom the previous year.

61. It is the defendants' case that the <u>underlining</u> in their meaning indicates where the meanings comprise a statement of opinion, otherwise the meaning comprises statements of fact.

*The parties' submissions*

62. Mr Browne, for the claimant, submitted that it was the claimant who, in the summer of 2006, launched the $10.4 billion IPO of its shares on the London Stock Exchange (pp. 296, 356). The reasonable reader will understand that it was the claimant who was responsible for the share sale and, when the Book alleges that the IPO had "in fact not really been an IPO at all. Instead it was more like a private placement" (p. 358; passage (18)), the reader will understand that to be a statement of fact that the claimant "dressed up" a private placement as an IPO, when the IPO was nothing of the sort. Further, the sale is described to the reader as "a typical KGB operation", which one fund manager described as being "a major extortion exercise". The fund manager also said that "they leant on investors in true KGB fashion to make sure the offering was successful" (p. 359; passage (18)) which Mr Browne submitted that the reasonable reader would understand to be a reference to the claimant and the KGB operatives (said to be acting on the company's behalf) leaning on investors to purchase shares in the IPO.

63. Mr Caldecott, for the defendants, submitted that the claimant's meaning contrives to identify the claimant as the party sponsoring and controlling the IPO when the text makes it clear that the Russian government is responsible for the IPO strategy (pp. 357, 358). Then, on reaching the opinion that "... the IPO had in fact not really been an IPO at all" but was "more like a private placement", which is central to the claimant's meaning, the reasonable reader will be well aware that the claimant is not presented in the Book as the party "calling the shots" for the IPO. Further, the claimant's increased valuation is not the

result of any wrongdoing on the part of the claimant and it was the Kremlin, and not the claimant, who was responsible for leaning on investors to purchase shares. The criticism of the KGB cohort and the Kremlin is not a criticism of the claimant and is not defamatory of the claimant. In this context, Mr Caldecott referred to *Sharif v Associated Newspapers Ltd* [2021] EWHC 343 (QB) in which Nicklin J emphasised that, given the inter-relationship with truth defences, the meaning identified must focus on the conduct of the claimant and not third parties (see para. [33]).

*Conclusion*

64. The reader knows that the claimant is a state-owned oil company which has benefitted from the break-up of Yukos and has acquired the extremely valuable Yugansk plant. The passages complained of appear in chapter 11, which is entitled "Londongrad" and the reader has been told that Russian money is flooding into London and Russian companies wanted to be listed on the London Stock Exchange. The story then turns to how this happened in the case of the claimant, and the claimant's shares were floated on the London Stock Exchange.

65. The reasonable reader will understand from the context on pp. 356-358 that an initial public offering, or IPO, is a sale of the claimant's shares on the London stock exchange. The information in footnote 57 on page 358 tells the reader that it was a "$10 Billion Flotation", by reference to an article in the *Financial Times* on 17 July 2016 (which repeats the information on p. 296 that it is "a $10.4 billion initial public offering of [the claimant's] shares"). The reader also knows, and I agree with Mr Browne to this extent, that the IPO is conducted by the claimant. The reader is told of the vast scale of the IPO as it was "the third-biggest in the world that year" (p.357); there had been opposition to the IPO and the threat of lawsuits (pp. 357-8); that the sale nevertheless went ahead; and the sale was "presented as a triumph for Putin" (p. 358). The reader is then told that, at the time of the IPO, the claimant was valued at $80 billion, which was "an enormous transformation" since it had acquired the Yugansk plant for $9.4 billion, and was worth no more than $6 billion. This "vaulting valuation" is described as "testimony to the power of Putin's KGB cohort, and the knowledge that their backing for Rosneft was a guarantee of its future expansion" – the Kremlin's support for the claimant meant it would be able to buy up the rest of Yukos' assets cheaply in the future.

66. The author then goes on to explain why the IPO had succeeded. It is in that context that the reader is told that it was not really an IPO at all, but more like a private placement. That is, a private placement of shares, rather than an initial public offering of shares. The reader is then provided with the information on p. 358 of the narrative which explains why this is so.

67. Pausing there, the claimant's complaint in relation to this meaning is focussed on the sentence in the middle of p. 358 which says "But the IPO had in fact not really been an IPO at all. Instead, it was more like a private placement". This sentence struck me as a statement of opinion when I first read it in the immediate context of the description provided of the claimant's IPO in the narrative. That view was not changed by Mr Browne's submissions. This is because this statement is a deduction or inference by the author as to what actually happened in relation to the events surrounding the claimant's IPO and it is based on those events that the author has concluded that "it was more like a

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

private placement". Further, my initial impression on reading the text was that responsibility for this, and the success of the IPO, lay with the Kremlin, as the reader is told that it is the Kremlin that "couldn't allow the sale to fail" and had "pressed tycoons like Abramovich to take part in it" (p. 358). I did not read the narrative as meaning that the KGB or the Kremlin were acting on behalf of the claimant.

68. The claimant maintains that the words complained of mean that "in an exercise amounting to major extortion Rosneft conducted an [IPO] which in reality was not an IPO at all…", which is an allegation levelled directly against it as a result of its inflated valuation, and KGB operatives acting on its behalf to put illicit pressure on potential investors to buy overpriced shares. I do not agree that this is what the words complained of mean. That was not my impression when I first read them, and my initial impression was not changed by Mr Browne's eloquent submissions.

69. There are a number of reasons for this. First, the reader is told about the very substantial increase in the claimant's value to $80 billion and that this was "testimony to the power of Putin's KGB cohort". The reader is told that one fund manager said the sale was "way over-priced", but other investors were prepared to pay the price asked. The reader is not told that the claimant was responsible for inflating its value, rather the reader is told why it is that the valuation of the company had "vaulted" to $80 billion. Second, the reader is told that "foreign oil majors", such as BP, bought shares as they saw it as good for their business in Russia and they were "anxious to curry favour with the Kremlin". There is no suggestion that these investors considered the shares to be overpriced or that they had been pressed by the Kremlin to buy shares. Third, the reader is told that the Kremlin could not allow the sale to fail, and had pressed tycoons, such as Mr Abramovich, to take part. There is no suggestion that this was done on behalf of the claimant. Fourth, it was investors who did not participate in the share sale who complained that it was "a typical KGB operation" with one fund manager describing it as "a major extortion exercise". Further, the reader would understand that it was the KGB, and not the claimant, who were said to have leant on investors "in true KGB fashion to make sure the offering was successful". Fifth, the reference to the share sale being "more like a private placement" is because, rather than a large number of investors participating, the shares were purchased by a small number of investors, some of whom had been pressed by the Kremlin or KGB to participate or, in the case of Gazprombank, was connected with the KGB.

*Decision: meaning 3*

70. Applying the principles I have identified, my conclusion is that the natural and ordinary meaning of the words complained of, read in their proper context as they affect the claimant is:

> The claimant conducted an initial public offering ("**the IPO**") of shares on the London Stock Exchange which went ahead in the summer of 2006. The IPO was, in reality, not an initial public offering of the claimant's shares at all. It was successful because of the involvement of the Kremlin or the KGB, which meant the IPO was more like a private placement of the claimant's shares for the following reasons:

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

    i.   Half the shares on offer were bought by foreign oil majors including BP, Petronas (Malaysia's state oil company) and China National Petroleum Corporation, who were anxious to find favour with the Kremlin. BP said it was a good strategic investment for its position in Russia and its relationship with the Russian oil industry.

    ii.   Gazprombank, which was connected to the KGB, bought $2.5 billion in shares.

    iii.   The Kremlin pressed tycoons, like Mr Abramovich, to purchase shares, and he bought as much as $300 million worth of shares. The Kremlin did so as it could not allow the sale to fail.

    iv.   US investors and oil companies did not participate out of fear over legal risks. Other investors did not participate because they complained that the sale was a typical KGB operation, which was a major extortion exercise, with the sale of shares being very overpriced, with the KGB leaning on investors to make sure the offering was successful.

71. I agree with Mr Caldecott that any criticism in relation to the IPO is directed at the Kremlin or the KGB, and not at the claimant. The meaning I have identified is not defamatory of the claimant at common law. The statements complained of are statements of fact, save for the statements which are underlined that are statements of opinion.

## Meaning 4: Proposed deal to fund Liga Nord

*The parties' meanings (passage (19))*

72. <u>Claimant's case</u>: Rosneft was willing to discuss participation in a corrupt proposal whereby tens of millions of Euros (at least $65m) would be channelled to the Liga Nord in Italy by selling the company's oil at an artificially discounted price to an intermediary who would pay the difference between the discounted price and its true value to the Liga Nord.

73. <u>Defendants' case</u>: In 2014 Mr Savoini, an aide to the head of the Italian far-right Liga Nord party, proposed to the Russian government and/or Russian intelligence representatives a possible deal, which did not go ahead, as part of building relationships within the international right movement, whereby about $65 million could be channeled to the Liga Nord party via oil sales from Rosneft (which was not or at least was not said to have been party to the negotiations), to an intermediary at a discounted price (so enabling the intermediary to funnel the difference to Liga Nord).

*The parties' submissions*

74. Mr Browne, for the claimant, submitted that the immediate context for this passage is the allegation that, notwithstanding the imposition of sanctions by the US and Europe in March 2014, Russia "accelerated and intensified its efforts to split the West" and "alliances were deepened in Italy" (p. 435). The reader would naturally, and inevitably, infer that an Italian politician, like Mr Savoini, would not suggest channelling funds to Liga Nord through oil

sales from the claimant, unless he had good reason to suppose that the claimant would be willing to participate in such a dishonest or improper deal, using a method which was comparable to that employed in relation to Severnaya Neft.  Mr Browne also submitted that, although the proposed deal did not go ahead, it is significant that the reader is not told why.  The reader is not, for example, told that it was because the claimant was unwilling to participate in such impropriety.

75. Mr Caldecott, for the defendants, submitted that the reference to the claimant in chapter 14 is "fleeting" and there is no basis for the meaning alleged.  The immediate context is Russia's influence operations abroad directed by the Russian state (p. 428) and the activities of Mr Malofeyev and his associates.  The passage complained of is no more than a third party, Mr Savoini, putting the claimant's name forward to an associate of Mr Malofeyev (and not the claimant) as a possible way to siphon funds to a political party in Italy.  There is no suggestion that the deal went ahead, and Mr Salvini denies that it did.

*Conclusion*

76.  The passages complained of are in chapter 14, which is entitled "Soft power in an Iron Fist – 'I call them the Orthodox Taliban'".  This is the penultimate chapter in the Book and, at this stage, the reader has been told about how the KGB have siphoned billions and billions of dollars out of Russia and created vast slush funds abroad, to be used to influence and destabilise Western democracies.  This chapter tells the reader about Russia's influence operations in the West, including funding the war in Ukraine, making payments to far-right political parties in Italy, France, Greece and Hungary, and it is suggested that Russia had a hand in funding the Leave campaign in Britain.  The reader is told that one of the people at the heart of this is an oligarch called Konstantin Malofeyev, who has direct links with Putin and his inner circle of KGB men, and was promoter of Russian Orthodoxy through a charity called the Foundation of Saint Vasily the Great.

77. The reader is told that in 2014 another Malofeyev associate worked closely with Gianluca Savoini, the top aide to the head of Italy's far-right Liga Nord Party, Matteo Salvini, to create the Lombardy Russia Cultural Association, which began promoting "Kremlin-friendly right-wing views".  Footnote 79 (p. 583) explains that the Malofeyev associate is Alexei Komov "Russia's representative to the US 'pro-family' conservative movement, the World Congress of Families, and Malofeyev's right-hand man in his Vasily the Great charitable foundation".

78. The reader is told that "along the way" Mr Savoini explored "Kremlin-linked oil deals to fund Liga Nord's election campaign" (p. 435).  It is implicit, and the reader will understand, that Mr Savoini was exploring these Kremlin-linked oil deals with the Malofeyev associate, namely Mr Komov.  These exploratory discussions related to, first, "sales via a little-known oil company, Avangard" and, second, "a deal to channel tens of millions of euros to the party through oil sales from Rosneft, via an intermediary to Italy's Eni" (p. 436).  Footnote 82 (p. 583) tells the reader that Mr Savoini's conversation was tape recorded and was published by BuzzFeed in October 2018.

79. When I first read this passage I did not form any impression that the claimant was willing to participate in negotiations in relation to the deals Mr Savioni was exploring with the Malofeyev associate or was in any way involved in these discussions.

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

80. The text then explains that these deals were to be structured in the same way as the KGB-led Communist Party foreign financing deals of old, and BuzzFeed reported that the oil was going to be sold through a middleman at a discounted price, allowing the intermediary to keep the difference and funnel the proceeds (about $65 million over the course of a year) to Liga Nord. It is then denied, by Mr Salvini, that the deal ever went ahead.

81. The ordinary reasonable reader would understand that in these discussions it was Mr Savoini who was exploring Kremlin-linked oil deals with the Malofeyev associate, Mr Komov. It is not suggested that the claimant was willing to participate in any such deal. Further, it is not suggested that the claimant was involved in any of these discussions or had given Mr Komov any authority to enter into any such exploratory discussions with Mr Savoini. Further, the ordinary reasonable reader would understand that it was Mr Savoini who proposed structuring a deal through oil sales from the claimant as a means of raising funds for Liga Nord's election campaign, and therefore put the claimant's name forward. The reader is not told of any connection between Mr Savoini, or indeed Mr Komov, and the claimant.

82. In these circumstances, I do not accept Mr Browne's submission that the reader would infer that Mr Savoini had good reason to suppose that the claimant would be willing to participate in such a deal. The reader is not provided with any information in the immediate context to lead to such an inference from the text. Such an inference would be entirely speculation, and not one that a reasonable reader would reach. Further, in these circumstances the fact the reader is not told why the deal did not go ahead is neither here nor there.

83. I also disagree with Mr Browne that the passage complained of contains an echo back to the Severnaya Neft deal, which the reader was told about some 200 pages earlier in the Book. This, in my view, is entirely unrealistic. I do not consider there is any basis on which the reasonable reader would make any connection between the proposed deals set out here in the context of funding Liga Nord, and what he or she was told on pp. 227-228 in relation to Severnaya Neft.

*Decision: meaning 4*

84. Applying the principles I have identified, my conclusion is that the natural and ordinary meanings of the passage complained of, read in their proper context as it affects the claimant is:

> In 2014 Mr Savoini, an aide to the head of the Italian far-right Liga Nord party, proposed to Mr Komov, an associate of Mr Malofeyev a possible deal, which did not go ahead, whereby about $65 million would be channelled to the Liga Nord party via oil sales from Rosneft (which was not or at least was not said to have been party to the negotiations), to an intermediary at a discounted price (so enabling the intermediary to funnel the different to Liga Nord).

85. I therefore agree with Mr Caldecott that the words complained of do not mention or imply any discussion to which the claimant was a party. The meaning I have identified is not defamatory of the claimant at common law. The statements complained of are statements of fact.

———————————

MRS JUSTICE TIPPLES
Approved Judgment

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

# ANNEX

The specific passages of the Book of which the Claimant complains are set out below.

## Meaning 1

The passages complained of are as follows:

### Part Two, Chapter 7: 'Operation Energy'

(1) "Then he [Mr Khodorkovsky] raised the issue more pointedly still, turning his attention to a deal in which the state-owned oil giant Rosneft had made its first big acquisition of recent years, paying $600 million to acquire an oil company, Severnaya Neft, which sat on huge reserves in Russia's far north. The privately-owned oil companies had been eyeing it for months, but Rosneft had trumped them, paying twice the accepted valuation. The question was, Khodorkovsky suggested, where did the $300 million in overpayment go? An investigation should be mounted, he told the president, to pin down the reason for the overpayment.[48] Whispers had been circulating for weeks that the difference was a kickback pocketed by officials." [Page 227]

(2) "'When I saw this on TV I realised this was the end for us,' said Khodorkovsky's chief of analysis, former KGB general Alexei Kondaurov. 'We hadn't discussed it before. When he came out after the meeting, I said, "Mikhail Borisovich, why couldn't you give the corruption presentation to someone else?" He said, "How could I give this to someone else? There are so few fighters among us." And so we began to have problems. I knew he [Putin] would never forgive him for this. Putin's men had taken $300 million for themselves'.[50]

If Putin's KGB men had pocketed a $300 million kickback, it was the first major deal since he took the presidency in which they'd been able to enrich themselves. The deal had been structured through one of the initial owners of Severnaya Neft, Andrei Vavilov, a former deputy finance minister, who conceded he did not own all of it. (On paper, Severnaya Neft was owned by six obscure companies.) According to one person familiar with the deal, Vavilov had kicked the money back to Putin through Rosneft's president, Sergei Bogdanchikov.[51] When we spoke, Vavilov denied that any kickbacks were involved,[52] and the Kremlin hotly denied any irregularity too." [Pages 227-228]

## Meaning 2

The passages complained of are as follows:

### Part Two, Chapter 9: 'Appetite Comes During Eating'

(3) "He didn't mention, of course, that everything that happened in the courts was by then directly under the control of his closest associate, Igor Sechin, his deputy chief of staff, who had overseen and propelled the legal attack on Khodorkovsky since its start." [Page 281]

(4) "With the Yukos case, Sechin had an opportunity to expand his power base and create a fiefdom of his own. 'He understood that it was a chance for him to kill two birds with

MRS JUSTICE TIPPLES
Approved Judgment

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

one stone,' said Alexander Temerko, one of Yukos's former [print editions: significant] [audiobook edition: main] shareholders. 'To take the asset and to use the case to take control of law enforcement.'" [Page 282]

(5) "Just days after the announcement, Sechin, who was coordinating the attack behind the scenes, tipped his hand. He'd been appointed chairman of the state-owned oil company, Rosneft,[31] and rumours that Rosneft was pursuing Yukos's assets for itself suddenly gained weight.
 With each coordinated blow against Yukos, Sechin had been growing in power." [Page 284]

(6) "A leaked report said Dresdner Bank had valued the production unit at between $15.7 billion and $17.3 billion, which seemed in line with what the market believed was a fair price,[39] and led Yukos's Western managers to believe that there would be cash available to keep the rest of the company together after the sale of Yugansk. But at the end of November that year, any hope of that was irretrievably dashed when the justice ministry not only announced an opening price for the government auction of Yugansk of $8.65 billion, well below the Dresdner range, but also presented Yukos with two more enormous tax claims for 2002 and 2003.[40]" [Page 287]

(7) "The low sale price announced by the government for Yugansk, he said, represented 'government-organised theft to settle a political score'.[43]" [Page 287]

(8) "For Alexander Temerko too, it was finally apparent that the negotiations had been a road to nowhere, that Sechin, Putin and his men had been using them as cover for the takeover, as they'd needed to lull the market and foreign leaders into a belief that due process was being observed." [Page 288]

(9) "It had the backing of the more liberal-leaning technocrats in Putin's government, led by Alexei Kudrin, the finance minister, who were keen to ensure that the power of Sechin, as chairman of Rosneft and their biggest rival and the leading and most hawkish member of the security bloc, increased no further." [Page 289]

(10) "But the last-minute bankruptcy filing in the Houston court meant the sale ended in farce." [Page 290]

(11) "Putin's KGB allies had finally taken revenge on Khodorkovsky for squeezing them out of VNK … They seem to have hastily cobbled together Baikal Finance Group as a front company to minimise transparency over its participation in the sale and avoid legal consequences from the US court order. Within four days of the sale, Baikal Finance Group sold Yugansk on to Sechin's Rosneft.[59]
 Overnight, Rosneft grew from being a minnow worth no more than $6 billion to an oil giant of global stature with assets worth nearly $30 billion, strengthening Sechin's hand along the way. Instead of bringing a halt to the sell-off, Yukos's bankruptcy suit had resulted in creating a new powerhouse for the silovik who'd orchestrated much of the legal campaign to bring down Yukos." [Page 292]

(12) "For transparency – and for the Russian budget – it was undoubtedly a further loss. The sale that was to be financed by Western banks ended up being paid for through a murky deal that involved funding from the Russian budget. Although the Yugansk sale

MRS JUSTICE TIPPLES
Approved Judgment

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

had ostensibly been forced through to pay off billions of dollars in back taxes to the Russian budget, central bank data showed that the federal treasury ended up transferring $5.3 billion through the state-owned Vneshekonombank to Rosneft to help pay for the purchase.[61] One of the biggest scandals of the loans-for-shares sales of the nineties was the widespread belief that the oligarchs had dipped into federal treasury funds held in accounts in their banks to finance them. Now it appeared that Rosneft had done almost exactly the same. But this time there was barely the whiff of a scandal. Only one newspaper, the business daily Vedomosti, reported the scheme, and only one state official raised his voice. The funds were only paid back to the treasury in 2005, when Rosneft and Vneshekonombank clinched an emergency funding deal for $6 billion from Chinese banks as part of an oil-supply deal whose terms were never disclosed.[62]

The sole official within the Kremlin to protest against the sale, which he described as 'daylight robbery',[63] was Andrei Illarionov …" [Page 293]

(13) "When the rest of Yukos went under the hammer in a series of bankruptcy auctions in 2007, Western oil majors and financial institutions facilitated the process. In fact, they provided convenient cover for Putin's men. First, a consortium of Western banks led by France's Société Générale – and not the Russian state – filed a petition for bankruptcy on Yukos in 2006, over $482 million in outstanding loans.[73] Though the Western banks had filed the bankruptcy petition, it was Rosneft – and the Kremlin – that was in the driving seat. The London lawyer representing the interests of the beleaguered Menatep Group, Tim Osborne, said he believed the Western banks were acting at Rosneft's behest.[74] Sure enough, three days after they filed the suit, Rosneft bought out the Western banks' outstanding debt.[75]" [Page 297]

(14) "But though the trio of judges appeared to listen intently, scribbling down notes as he spoke,[83] their verdict had already been determined. An eyewitness account has emerged that details for the first time how Sechin and one of his deputies had tightly controlled the process every step of the way.[84] To remove any doubt about how the judges would rule, the Kremlin had arranged for them to be put up in a sanatorium fifty kilometres outside Moscow, all expenses paid, while they wrote their verdict. In those days, the Kremlin could still not be completely sure of the judges' loyalty, but this was the moment when the Russian court system fell under the Kremlin's sway. The Kremlin had been anxious to ensure that Khodorkovsky's business partners could not bribe the judges to rule in his favour. And at the sanatorium, security service agents could keep a close eye on them." [Page 299-300]

(15) "Sechin had piled the pressure on Yegorova to rush through the appeal, as the Kremlin was worried that the statute of limitations on the remaining fraud charge related to the privatisation of the Apatit research institute, which carried a maximum sentence of seven years, was about to run out. The other charges related to tax fraud carried sentences of only four, three, and one and a half years, and although there was one more fraud charge, with a seven-year sentence, related to the use of promissory notes in one of the tax schemes, the Kremlin – which in those days still worried about the appearance of due process – was concerned that it was far from solid.[92] The case against Khodorkovsky had to look legitimate, to strengthen Rosneft's takeover of Yugansk …

Once the appeal trial started, Sechin called Yegorova to his Kremlin office every day – she went there so often the guards knew her by sight.[93]" [Page 301]

MRS JUSTICE TIPPLES
Approved Judgment

*Public Joint Stock Company Rosneft Oil Company v
(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

(16) "A furious Sechin called her in to the Kremlin and ordered her to begin the trial without the defence." [Page 302]

(17) "The pressure Sechin had brought to bear on the judges, the speed of the appeal process, the lack of substance to the charges, had brought the court system irrevocably under the siloviki. If, previously, the judges' pitifully low wages had left them open to bribery by powerful oligarchs, now the Kremlin was taking over." [Pages 303-304]

## Meaning 3

The passages complained of are as follows:

### Part Three, Chapter 11: Londongrad

(18) "For those who'd watched in horror as Putin's KGB men had subverted the legal process to seize control of Yugansk just over a year before, the listing raised deep moral and ethical questions …

For other defenders of Yukos, it seemed that a successful IPO would be seen by the Kremlin as a seal of market approval. 'Western leaders must take a realistic and long-term view of the implications of appeasing the Russians on such issues of fundamental human rights and the rule of law,' wrote Robert Amsterdam, an attorney for Khodorkovsky, by then well into his first year in prison camp in Russia's far east. 'If not, those presently in power in Russia will take Western double-standards as a licence for impunity. To deny, dismiss or discount the gravity of the consequences is to turn a blind eye to the lessons of history.'[54]…

Despite all the protests and the threat of lawsuits, the IPO went ahead, presented as a triumph for Putin as he played host to the G8 group of developed nations in St Petersburg that summer. Rosneft was valued at $80 billion,[56] an enormous transformation since before its acquisition of Yugansk for a mere $9.4 billion, when Rosneft was estimated to be worth no more than $6 billion. The vaulting valuation was testimony to the power of Putin's KGB cohort, and the knowledge that their backing for Rosneft was a guarantee of its future expansion: the Kremlin's support meant it was certain to pick up the rest of Yukos's assets for a song in bankruptcy auctions to come.

But the IPO had in fact not really been an IPO at all. Instead, it was more like a private placement. Foreign oil majors including BP, Malaysia's state oil company Petronas, and China National Petroleum Corporation, anxious to curry favour with the Kremlin, had bought up almost half the total offering, while KGB-connected Gazprombank bought $2.5 billion in shares.[57] It was widely reported that the Kremlin, which couldn't allow the sale to fail, had pressed tycoons like Abramovich to take part in it. Abramovich was reported to have bought as much as $300 million worth of shares, a further indication that he was operating at the Kremlin's behest.[58]…

But other investors complained that the sale was a typical KGB operation, while US investors and oil companies stayed away out of fear over the legal risks. 'This was a major extortion exercise,' said one fund manager, claiming that the sale was way overpriced. 'They leant on investors in true KGB fashion to make sure the offering was successful.'[60]

But it seemed to matter little to investors that they were legitimising the state takeover by Putin's KGB men. Nor did they appear concerned that the funds raised would bypass the Russian budget, going instead towards paying down the $7 billion loan a murky state

**MRS JUSTICE TIPPLES**
**Approved Judgment**

*Public Joint Stock Company Rosneft Oil Company v*
*(1) HarperCollins Publishers Ltd; (2) Catherine Belton*
[2021] EWHC 3141 (QB)

special-purpose vehicle called Rosneftegaz had taken on from international banks when the state increased its stake in Gazprom the previous year." [Pages 357-359]

## Meaning 4

The passage complained of is as follows:

### Part Three, Chapter 14: Soft Power in an Iron Fist – 'I call them the Orthodox Taliban'

(19) "Savoini then discussed a deal to channel tens of millions of euros to the party through oil sales from Rosneft, via an intermediary, to Italy's Eni.[82] These deals were to be structured in the same way as the KGB-led Communist Party foreign financing deals of old. The oil was to be sold through a middleman at a discounted price, allowing the intermediary to keep the difference and funnel the proceeds (about $65 million over the course of a year) into the coffers of Liga Nord, BuzzFeed reported." [Page 436]

———————————

# Exhibit 5



Date:17 September 2025
Our Ref:PG/26354618

Glassdoor, Inc.
c/o CT Corporation
330 North Brand Boulevard
Glendale, CA 91203-2336

Also, by email: legalinquiries@glassdoor.com & DPO@Glassdoor.com

Dear Sirs,

**Re: Human Engine Limited – Removal of a Defamatory and Misleading Review**

1.  We act for Human Engine Limited ("our client").

2.  We write to request the removal of a review published on the Glassdoor.co.uk. The review is located at the following URL:

3.  https://www.glassdoor.co.uk/Reviews/Employee-Review-Human-Engine-UK-E8744692-RVW95528533.htm under the heading "*Avoid Like the Plague – Unless You Enjoy Chaos, Hypocrisy, and Casual Sexism - Anonymous employee Human Engine (UK) Employee Review*" ("the Review").

4.  The Review is defamatory at common law under section 1 of the Defamation Act 2013 as it has caused and continues to cause serious harm to our client's reputation. The allegations are also in clear breach of Glassdoor's own Terms of Use, which require content to be accurate and not misleading, and Community Guidelines, which prohibit defamatory, bad faith or false reviews. We are fully aware of the decision in *BW Legal Services Limited v Glassdoor Inc* [2022] EWHC 979 (QB), in which the High Court determined that Glassdoor Global Limited, based in London, is not the correct entity for service of proceedings and that, notwithstanding the commercial nexus between that

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL (Registered Office) Tel: 020 7183 4123 Email: helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority



entity and Glassdoor Inc, claims of this nature fall within the exclusive jurisdiction of the courts of California pursuant to the Terms of Use which users, including our client, are required to accept.

5.  In recognition of that judgment, and in order to avoid any suggestion of impropriety in jurisdiction or service, we make clear that we do not purport to commence proceedings in the courts of England and Wales against Glassdoor Inc by way of this correspondence. Rather, this letter is properly to be understood as a formal notice that unlawful and defamatory content is being published on your platform in breach of both English law and your own contractual policies.

**Background**

6.  Our client is a leading boutique management consultancy specialising in strategy, change, digital, commercial, procurement, and projects. Established in 2018 by an experienced team of former senior local government leaders, our client has since built a strong reputation for delivering transformative solutions to local authorities, central government departments, and NHS organisations across the UK.

7.  Our client's work is grounded in improving outcomes for customers and communities through the transformation of strategies, operations, and organisational cultures. This approach has earned our client national recognition, including being named by the Financial Times as one of the UK's leading management consultancies and being ranked among the top 25 firms in Organisational Change, Sustainability, and People & Performance. Our client's mission is to help individuals and organisations do the best work of their lives.

8.  Our client is a small but fast-growing firm, employing 12 professionals. Its success depends heavily on trust, repeat instructions from satisfied clients, and the recruitment of highly capable individuals in a competitive market. Any harm to its reputation has a direct and measurable impact on its ability to win new work, maintain client relationships, and attract and retain the talent necessary to continue its growth.

**The Review**

9.  Our client seeks the removal of the Review reproduced in Annex 1.

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL
(Registered Office) Tel: 020 7183 4123 Email:  helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority



10. The Review was posted on Glassdoor on 4 March 2025 and purports to have been written by an anonymous former employee. It is a highly defamatory review concerning the working environment of our client's business and how employees are treated. The defamatory statements complained of are:

"*Human Engine is an absolute masterclass in how not to run a company. If you're looking for guidance, mentorship, or even basic management competence, you won't find it here. Senior leadership knows nothing but expects juniors to figure out everything themselves—because why bother leading when you can just throw people into the deep end and watch them drown?*"

"*And let's talk about their charming relationship with clients. They hate them. Every single one. If Human Engine's leadership spent half as much time actually delivering value as they do badmouthing the people who pay them, they might have a half-decent reputation. But no, that would require basic professionalism, which is in short supply here.*"

"*Oh, and if you're a woman? Good luck. They are casually sexist to the point that women leave faster than they can hire replacements, and to top it off, they're racist without even realising it. Whether it's tone-deaf comments, complete cultural ignorance, or just flat-out failing to create an inclusive environment, they tick every box. But don't worry, they'll just gaslight you into thinking it's all in your head while the boys' club keeps patting itself on the back.*"

"*The "great culture" they love to brag about? Translation: a toxic mess where openly swearing about clients is normal, and the "great work-life balance" applies only to senior leadership. If you're anything under the director grade, expect to be overworked, undervalued, and then blamed for everything that goes wrong.*"

"*Promotion? That's a joke. The definition of "good performance" changes whenever it suits them, ensuring you never quite meet the standard. Unless, of course, you become a full-time member of the Senior Leadership Team fan club—worship them enough, and you might get a pat on the head.*"

"*So, unless you enjoy being gaslit, overworked, and stuck in a never-ending cycle of incompetence, run far, far away.*"

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL
(Registered Office) Tel: 020 7183 4123 Email: helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority

**Meaning of the Review**

11. The natural and ordinary meaning of the Review, when read by any ordinary reasonable reader, is that our client is an incompetent and unprofessional business, managed by an incapable and unethical senior leadership team, which mistreats its employees, engages in discriminatory practices against women and ethnic minorities, fails to maintain positive client relationships, and fosters a toxic and hostile workplace culture. The Review further conveys that our client manipulates promotion processes for improper purposes, mistreats junior staff, and engages in unprofessional and unethical conduct towards clients. Taken together, these meanings portray our client as a business unfit to operate in a professional sector, lacking integrity, and unsafe both as an employer and as a service provider. Each defamatory imputation is set out below.

12. The Review's statement that our client is a "masterclass in how not to run a company" and that its senior leadership "knows nothing" conveys the meaning that our client's business is wholly incompetent, that it is managed without the necessary knowledge, skill, or judgment required of a professional consultancy, and that it is fundamentally unfit to operate in its industry. To the ordinary reader, these words suggest that our client is incapable of discharging the most basic functions of management and leadership, and that those responsible for running the business are professionally inept. Such imputations strike directly at the heart of our client's professional credibility and suggest to prospective clients and employees alike that association with our client would be commercially and professionally damaging.

13. The suggestion that our client "hates" its clients and "badmouths" them conveys the meaning that our client is dishonest, untrustworthy, unprofessional, and engages in unethical conduct in its client dealings. The ordinary reader would understand this as imputing that our client lacks the most fundamental qualities of professionalism, namely respect for and loyalty to those who place confidence in its services. It further implies that our client deliberately undermines and disparages the very clients upon whom its business depends. Such an imputation is gravely damaging in a sector where reputation and client trust are paramount, and it carries the obvious risk of deterring existing clients from renewing relationships and discouraging prospective clients from engaging with our client at all.

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL
(Registered Office) Tel: 020 7183 4123 Email:  helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority



14. The assertions that our client is "casually sexist" and "racist without even realising it" impute that our client engages in systemic discrimination against women and ethnic minorities, and that such conduct is embedded in its organisational culture. These allegations suggest that our client breaches fundamental legal and ethical obligations relating to equality, diversity, and inclusion, thereby portraying the business as a hostile and discriminatory environment in which staff from minority groups are mistreated or marginalised. To the ordinary reader, this conveys that our client acts unlawfully and immorally, undermining both its standing as an employer and its reputation among clients who expect adherence to professional and ethical standards. These allegations are entirely false, yet their publication is particularly pernicious given the importance attached in modern professional environments to inclusivity and anti-discrimination.

15. The Review's description of our client's workplace as a "toxic mess" where staff are "overworked, undervalued, and blamed for everything" imputes that our client fosters a working environment characterised by exploitation, hostility, and mismanagement. The ordinary reader would take this to mean that our client mistreats its staff, fails to respect their wellbeing, and cultivates a culture of blame and fear. This meaning is profoundly damaging not only to staff morale but also to our client's ability to recruit and retain high-quality employees in a competitive sector where workplace culture is a decisive factor. It also suggests that our client fails to comply with its duties as an employer under employment law, further compounding reputational harm.

16. The allegation that performance standards are manipulated to prevent promotion unless an employee engages in close relations with leadership imputes that our client engages in corrupt, unfair, and discriminatory employment practices of the most serious kind. To the ordinary reader, this suggests that advancement within the company is not based on merit or performance but rather on inappropriate personal relationships or favouritism, amounting to abuse of power by senior management. This accuses our client of conduct that is both professionally improper and potentially unlawful, conveying the meaning that the company is corrupt and discriminatory. Such an allegation directly undermines confidence in our client as an employer and damages its ability to attract and retain high-calibre staff who would reasonably avoid association with an organisation depicted as corrupt and exploitative.

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL (Registered Office) Tel: 020 7183 4123 Email:  helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority



17. The Review as a whole, by combining the above allegations, conveys to the ordinary reader that our client is unethical, discriminatory, incompetent, and unprofessional in its dealings with both employees and clients. It paints a picture of a business led by incapable management, practising discrimination, mistreating employees, engaging in corrupt promotion practices, and failing to maintain integrity in client relationships. The cumulative effect is to suggest that our client is not only unfit to act as an employer but also unfit to provide professional services at all. These meanings are entirely false, baseless, and calculated to cause serious harm to our client's reputation in its sector.

18. Given our client's reliance on trust-based relationships with clients and its need to attract and retain highly skilled professionals in a competitive market, these allegations pose a serious and immediate risk to its goodwill, its commercial success, and its long-term viability.

**Truth**

19. All of the allegations contained within the Review are entirely false. Our client is a reputable and ethical management consultancy that has operated with integrity, professionalism, and a commitment to the highest standards of conduct since its incorporation in 2018. Our client has never received any complaints, been the subject of any investigation, or faced any employment tribunal proceedings relating to any of the matters alleged in the Review.

20. Our client employs a team of highly qualified consultants, all engaged on a PAYE basis, with extensive backgrounds in local government, procurement, and public sector delivery. Furthermore, our client focus is on helping public sector organisations achieve efficiencies and improvements in services for the benefit of communities, operating in accordance with the ethical and responsible use of public funds.

21. Allegations of sexism, racism, or any form of discrimination are categorically denied and if any were ever to arise they would be dealt with immediately. On the contrary, our client values inclusivity, diversity, and equality as core principles and fosters a collaborative environment in which all staff are treated with respect and encouraged to develop and grow.

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL (Registered Office) Tel: 020 7183 4123 Email:  helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority



22. Our client's relationships with its clients are based on trust, collaboration, and the consistent delivery of high-quality services. The allegation that our client or its leadership disparages clients is wholly unfounded and contrary to the culture, ethos, and professional practice of the business.

23. As a small but growing boutique consultancy, our client's reputation is critical to its ability to secure new work, maintain client relationships, and attract talented professionals in a competitive market. The false allegations contained in the Review are calculated to cause, and are causing, serious harm to that reputation.

**Impact/harm**

24. The continued publication of the Review is causing serious and ongoing harm to our client. Our client is a boutique consultancy of only twelve employees, whose success depends on its reputation for integrity, inclusivity, and collaborative engagement. These values are particularly significant in securing contracts from public bodies, regulators, NHS trusts, local authorities, and national charities, all of which demand the highest standards of conduct from their suppliers. The Review strikes at the heart of those values by making grave and unfounded allegations of racism, sexism, and mistreatment of clients. Given our client's small size and the fact that only five Glassdoor reviews exist in total, the presence of a single false and malicious posting exerts a disproportionately damaging effect on its online reputation.

25. Our client's Glassdoor page appears prominently in search engine results for our client's name therefore it is likely the Review will be encountered by potential clients, business partners, and prospective employees conducting even basic due diligence. The seriousness of the allegations cannot be overstated. Public sector organisations, in particular, are bound by procurement rules requiring them to avoid suppliers whose reputations might give rise to concern or controversy. The mere existence of an online review making allegations of discriminatory or abusive conduct would be sufficient to deter them from awarding contracts, regardless of its truth. Our client has already been told by one commissioner that supplier selection often comes down to cultural approach and treatment of client staff, even where technical qualifications are equal. The Review therefore directly undermines a key factor by which our client competes for work.

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL
(Registered Office) Tel: 020 7183 4123 Email: helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority



26. The harm also extends to recruitment. Our client has suspended all recruitment activity whilst the Review remains online, as prospective applicants are highly likely to encounter it. As a small business competing for talent against larger firms, our client relies heavily on its reputation for fairness, inclusivity, and culture to attract candidates. The presence of allegations that contradict this culture makes the company appear unattractive and unsafe to work for. This has immediate commercial consequences. For example, our client must rely on freelance workers, at approximately fifty per cent higher cost than permanent employees, to meet existing commitments. The suspension of recruitment prevents sustainable growth and undermines long-term prospects. Additionally, it has come to our client's attention that the Review is being read and discussed externally; at least one individual has commented upon it to current staff, spreading awareness and compounding reputational damage.

27. The Review has also had a grave effect on staff morale. A number of employees, particularly younger and more junior members, have expressed distress and concern that the vague nature of the allegations could tarnish their own professional reputations and future employability. They are unsettled by the fact that an anonymous posting can so easily cast doubt over their integrity as individuals. Senior management has had to devote considerable time to supporting staff and addressing their concerns in one-to-one meetings, diverting attention away from client delivery. The result has been a sustained and demoralising impact across the workforce.

28. The cumulative effect of these factors is acute. For a small business, the loss of even one client contract or recruitment opportunity has an outsized effect on operations, financial stability, and growth. The continued publication of the Review poses an immediate and ongoing threat not only to our client's reputation and goodwill but also to its staff wellbeing and commercial viability. This is particularly unjust given our client's seven-year unblemished record including the fact that no grievance has ever been raised by an employee, no complaint has ever been made under its Equality and Diversity or Conduct procedures, and no tribunal or external proceedings have ever been brought against it. The allegations are therefore not only harmful but demonstrably unfounded.

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL
(Registered Office) Tel: 020 7183 4123 Email: helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority

**Defamation**

29. Section 1 of the Defamation Act 2013 provides that a statement is defamatory if its publication has caused or is likely to cause serious harm to the reputation of the claimant. In our client's case, the statements published on the Glassdoor website clearly meet this threshold.

30. To satisfy the legal test, the statement must be such that it would tend to lower the claimant in the estimation of right-thinking members of society. This was affirmed in Monroe v Hopkins [2017] EWHC 433 (QB) at [51] and earlier in Thornton v Telegraph Media Group Ltd [2010] EWHC 1414 (QB), which confirmed that such a statement must adversely affect the way in which individuals treat the claimant.

31. The allegations made against our client are not only defamatory, but egregious. The Review falsely brands our client as incompetent, unethical, and discriminatory, and accuses its leadership of mistreating employees, disparaging clients, and fostering a toxic workplace. The accusations of sexism, racism, and deliberate mistreatment of women and minority employees are serious and, if believed, would cause severe reputational harm. They suggest that our client engages in immoral conduct, is unfit to work with, and cannot be trusted either as an employer or as a service provider.

32. A reasonable person reading such statements are likely to believe that our client's business lacks basic professionalism, engages in discriminatory practices, and is unfit to contract with or work for. It is beyond dispute that these statements would diminish our client's standing in the eyes of any right-thinking individual, including potential employees, clients, and business partners.

33. The defamatory content has been published on a publicly accessible platform with significant reach and influence in the employment market. Glassdoor reviews frequently appear prominently in search engine results for an organisation's name, meaning the Review will be seen by prospective employees, clients, and other stakeholders conducting even the most basic online due diligence. Given our client's small size and reliance on recruitment in a competitive market, the impact of the Review is disproportionate and severely damaging.

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL (Registered Office) Tel: 020 7183 4123 Email: helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority



34. Additionally, the Review has the potential to deter talented professionals from applying for roles at our client's company and to dissuade potential clients, particularly public sector bodies, from engaging our client's services. Each new view of the Review perpetuates the reputational and economical harm.

35. Accordingly, the Review satisfies the requirement under Section 1 of the Defamation Act 2013. It comprises public statements that are likely to lower our client in the estimation of right-thinking individuals and, moreover, have caused and continue to cause serious and demonstrable harm to our client's reputation, professional standing, and ability to operate effectively in its sector.

36. For the avoidance of doubt, we emphasise that under section 5 of the Defamation Act 2013, a website operator such as Glassdoor may only rely on a statutory defence in respect of defamatory content posted by third parties where it acts expeditiously to remove such material upon being put on notice. Should Glassdoor fail to act promptly, the continued publication of the review after receipt of this letter will constitute evidence that Glassdoor has been notified of the defamatory nature of the content yet has chosen to persist in knowingly maintaining its publication. We further stress that Glassdoor's position as an international platform with global reach does not insulate it from liability where it elects to facilitate and maintain the circulation of demonstrably false and defamatory allegations once placed on notice of their character and their impact upon the reputation of an identifiable individual.

**Breach of Terms of Use and Community Guidelines**

37. The Review breaches both Glassdoor's Terms of Use [Terms of Use | Glassdoor](Terms of Use | Glassdoor) and its Community Guidelines. Glassdoor expressly prohibits the posting of knowingly false, or misleading content, and requires that reviews reflect the poster's honest opinion and authentic personal experience. The Review fails to meet these standards in multiple respects as it contains demonstrably false allegations, misrepresents our client's business culture and practices, and presents a distorted and damaging picture of our client that does not reflect reality.

38. Glassdoor's stated promise is to be *"the most trusted and transparent place for candidates to search for jobs, research companies, and engage with our communities of professionals."* This commitment is supported by its Community Guidelines and Terms of

10

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL (Registered Office) Tel: 020 7183 4123 Email:  helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority



Use, which require all content to be honest, opinion-based, and reflective of a user's own authentic experience. These policies explicitly prohibit misinformation and the posting of knowingly false statements.

39. The Review in question is in clear breach of these requirements. Specifically, it:

- Contains wholly false statements about our client, including allegations of incompetence, sexism, racism, and mistreatment of clients and employees. These statements are untrue and unsupported by any factual basis, amounting to misinformation contrary to the Community Guidelines.

- Does not reflect any genuine or authentic experience with our client, which has never received complaints or faced investigations relating to such conduct. This is inconsistent with Glassdoor's requirement that reviews reflect the poster's own honest opinion and experience.

- Contains serious defamatory statements that fall squarely within the prohibition in Clause 4.3 of Glassdoor's Terms of Use, which states that users must not *"submit Content that is defamatory, libellous, or fraudulent; that you know to be false or misleading; or that does not reflect your honest opinion and authentic experience."*

- Under Clause 4.4 of Glassdoor's Terms of Service, Glassdoor reserves the right to *"remove, refuse to distribute, or limit distribution or visibility of any Content on the services"* and to *"suspend or terminate users"* who breach its rules. Clause 6.1 further affirms that Glassdoor may, in its sole discretion, remove any content that violates its policies or that it deems inappropriate.

40. In this case, the Review breaches both the Glassdoor's Terms of Use and Community Guidelines. It is defamatory, false, and misleading; it does not reflect an honest or authentic personal experience; and it is inconsistent with Glassdoor's own stated commitment to trust and transparency.

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL (Registered Office) Tel: 020 7183 4123 Email: helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority



**What we are requesting**

41. In light of the above, we kindly request that Glassdoor remove the Review in its entirety from its platform without delay to confirm in writing that removal has taken place, and to preserve all records capable of identifying the author of the review, including account details, IP addresses, metadata, and internal communications, pending further potential legal action. The Review is demonstrably false, defamatory, misleading, and in breach of Glassdoor's Terms of Use and Community Guidelines. Its continued publication is causing, and will continue to cause, harm to our client's reputation and professional standing.

42. We wish to resolve this matter amicably and without the need for escalation. However, should Glassdoor refuse to remove the Review, our client reserves all rights to pursue every available remedy in law, including but not limited to issuing proceedings in the State of California pursuant to the jurisdiction clause contained in your Terms of Use, seeking disclosure orders to identify the individual responsible for the posting, and pursuing claims in defamation, misuse of private information, and interference with economic interests against both the author and Glassdoor as the publisher of the content.

43. You should be under no misapprehension that, once placed on notice of the defamatory nature of the review, Glassdoor will be deemed to have elected to publish such content knowingly should it decline to act expeditiously, thereby exposing itself to liability under both domestic and international legal frameworks and prejudicing any statutory or contractual safe-harbour defences that might otherwise be available to it. In addition to the direct reputational harm suffered by our client, continued publication aggravates the damage by perpetuating and disseminating false allegations to prospective employers, business partners, and members of the public, all of which will be taken into account by any court assessing liability and damages.

44. Our client will also be entitled to rely on this letter and the supporting evidence as proof of Glassdoor's actual knowledge of the falsity of the material and its refusal to act in circumstances where removal was plainly warranted. Accordingly, if Glassdoor fails to remove the review, preserve the relevant data, and provide confirmation within the time specified, we will advise our client to escalate this matter without further notice, and Glassdoor will bear full responsibility for the consequences of such inaction.

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL (Registered Office) Tel: 020 7183 4123 Email: helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority



45. While our preference is to resolve this issue promptly and cooperatively, our client will not hesitate to proceed with such action should it prove necessary. We therefore ask that Glassdoor confirm, in writing, that the Review will be removed from its platform within 14 days of the date of this letter.

46. We request your response within 14 days of the date of this letter in view of the serious ongoing damage being caused to our client's reputation and the serious nature of the allegations made. Please address all correspondence to Cohen Davis at our postal address or to helpline@cohendavis.co.uk quoting our reference PG/26354618.

Yours faithfully,

*Cohen Davis*

**Cohen Davis Solicitors**

Cohen Davis. Company No. 08009327. Offices: London: 48 Dean Street, W1D 5BF ; Essex: Warlies Park House, Horseshoe Hill, Upshire, EN9 3SL (Registered Office) Tel: 020 7183 4123 Email: helpline@CohenDavis.co.uk Website: www.InternetLawCentre.co.uk

Authorised and regulated by the Solicitors Regulation Authority

# ANNEX 1



# **Exhibit 6**



Cohen Davis Solicitors
48 Dean Street,
W1D 5BF, London

October 10, 2025

Email: helpline@cohendavis.co.uk
Your Ref: PG/26354618

**RE: Human Engine Limited - removal of a Defamatory and Misleading Review**

To Whom It May Concern,

We are writing in response to your letter dated September 17, 2025.

We have taken another look at the cited content and it remains on the site at this time. Glassdoor doesn't take sides in factual disputes. Our contributors verify that they believe their reviews to be truthful. And we are generally unable to determine that content is false or otherwise clearly unlawful on the basis of a removal request. So unless we find some other violation of our policies, if a review appears to constitute the contributor's opinion or personal experience of the workplace, we allow the contributor to stand by their review. For further explanation on this policy see here.

We have received your preservation request, which does not include a court order. Glassdoor is aware of no relevant authority or case precedent requiring it, as a third party, to preserve user information absent a court order. We will therefore adhere to our standard retention practices. If you are aware of any such authority or precedent, please notify us by return email.

Absent such a requirement, Glassdoor will not take additional steps in this instance (beyond existing practices) as this is potentially intrusive to our users and burdensome to Glassdoor.

If you do serve us with a court order, Glassdoor must be properly served via our registered service agent, CT Corporation at: Glassdoor LLC, c/o CT Corporation, 330 N Brand Blvd., Glendale, CA 91203.


2261 Market Street, #10389
San Francisco, CA 94114

'GLASSDOOR

We trust that this closes the matter.

Kind regards,

Glassdoor Legal Team


2261 Market Street, #10389
San Francisco, CA 94114

# Exhibit 7

Case 3:26-mc-80022-AMO   Document 1-2   Filed 02/02/26   Page 99 of 156

# 'GLASSDOOR' (https://help.glassdoor.com/s/?language=en_US)

# How can we help you today?

Search for help topics here…



[Help Center Home](#)

## I wrote a Glassdoor review. Will Glassdoor protect my identity if an employer asks or if someone takes legal action to find out who I am?

Updated 15 April, 2025

Glassdoor is committed to providing a constructive platform for people to share their opinions about their jobs and companies anonymously - without fear of retaliation and intimidation. **So, if someone asks us to tell them who wrote a review, we say no.**

If someone takes legal action to try and find out who wrote a review, we fight for that user's First Amendment right to post opinions anonymously. We explain more about that process in How does Glassdoor respond to legal requests (https://help.glassdoor.com/article/How-does-Glassdoor-respond-to-legal-requests-or-legal-action-to-find-out-who-posted-a-review/en_US). Thus far, courts have almost always ruled in favor of Glassdoor and its users (https://help.glassdoor.com/article/Tell-me-about-some-of-Glassdoor-s-successful-legal-efforts-to-defend-user-anonymity/en_US) when we've fought to protect anonymity.

But, please understand that while anonymous speech enjoys protection under the US and State Constitutions (http://itlaw.wikia.com/wiki/Anonymous_speech) and under various international laws, it is not an absolute right. If someone takes legal action to identify you and they can show that your review violated someone's legal rights, a court won't permit you to remain anonymous. In these circumstances, if the deciding court has jurisdiction over Glassdoor, we may be obligated to disclose user information. We suggest you read Tips on writing a review to avoid defamation (https://help.glassdoor.com/article/Tips-on-writing-a-review-to-avoid-defamation/en_US) for an explanation on how the law works in this area and for tips on how to avoid liability when writing your review.

If you are the subject of legal action relating to your review on Glassdoor, the process described in these FAQs covers how we generally respond, but we can't offer you legal advice on your own next steps. We want you to know there are several advocacy and resource organizations that offer assistance in providing free legal advice and/or representation. We invite you to look into the free legal resources listed below.

14/01/2026, 10:08                                                         I wrote a Glassdoor review. Will Glassdoor protect my identity if an employer asks or if someone takes legal action to find out …

Case 3:26-mc-80023-AMO   Document 2   Filed 02/02/26   Page 100 of 156

## For Users in the US:

- Electronic Frontier Foundation (https://www.eff.org/)
- Public Citizen (https://www.citizen.org/our-work/litigation/internet-free-speech)
- Harvard Law School's Digital Media Project (http://www.dmlp.org/legal-guide/responding-subpoenas)

## For Users in Canada:

- Canadian Bar Association, Pro Bono Resources (https://www.cba.org/Sections/Pro-Bono/Pro-Bono-Resources-in-Canada/Resources)
- Online Rights Canada (http://onlinerights.ca/)
- Canadian Internet Policy and Public Interest Clinic (http://www.cippic.ca/)
- Pro Bono Students Canada (http://www.probonostudents.ca/)
- Canadian Civil Liberties Association (https://ccla.org/contact/)
- British Columbia Civil Liberties Association (https://bccla.org/contact/)

## For Users in the EU:

- UK
  - Open Rights Group (https://www.openrightsgroup.org/ourwork/legal/legal-panel)
- Germany
  - Pro Bono Deutschland e.V. (http://www.pro-bono-deutschland.org/en/)
  - Student Law (https://student-law.de/)
- France
  - Pedagogical guide about freedom of expression (https://www.reseau-canope.fr/fileadmin/user_upload/Projets/Je_dessine/pdf/Jedessine_LiberteExpression.pdf)
- Belgium
  - NURPA (Net Users' Rights Protection Association) (https://nurpa.be/)
- EU
  - European consumer centres network (https://ec.europa.eu/info/live-work-travel-eu/consumers/resolve-your-consumer-complaint/european-consumer-centres-network_en)
  - La Quadrature du net (https://www.laquadrature.net/)
  - Guide to human rights for Internet users (https://rm.coe.int/16804d5b31)

*Remember*: This FAQ is provided for informational purposes only and does not constitute legal advice. You should not rely upon this information without seeking advice from an attorney who is competent in the relevant field of law.



Legal FAQs



Legal FAQs

**Was this helpful?**  Yes  No



# Exhibit 8

[1987]                                                                                           24
A.C.

Original Printed Version (PDF)

[HOUSE OF LORDS]

SOUTH CAROLINA INSURANCE CO.                                            RESPONDENTS

AND

ASSURANTIE MAATSCHAPPIJ "DE ZEVEN                                        APPELLANTS
PROVINCIEN" N.V.

SOUTH CAROLINA INSURANCE CO.                                            RESPONDENTS

AND

AL AHLIA INSURANCE CO. AND ANOTHER                                       APPELLANTS

1986 May 6, 7; July 29                           Lord Bridge of Harwich, Lord Brandon of Oakbrook,
                                                      Lord Brightman, Lord Mackay of Clashfern and
                                                                        Lord Goff of Chieveley

*Injunction - Jurisdiction to grant - Foreign proceedings - Action brought in England - Defendants lodging petition in United States court for pre-trial discovery - Whether defendants to be restrained from proceeding with petition under court's inherent jurisdiction*

   The plaintiffs were an American insurance company, and, having reinsured the liability of another American insurance company, U.N.I., they reinsured the risk with the defendants in London. The plaintiffs claimed under the contract of reinsurance and, when the defendants disputed liability, they brought proceedings in the Commercial Court. Before the defence was served, the defendants lodged a petition in a United States district court seeking, inter alia, an order for pre-trial discovery of documents relevant to the claim and the plaintiffs' contract of reinsurance with U.N.I., against persons resident in the United States, who were not parties to the English action. On the plaintiffs' application in the Commercial Court, the judge made an order restraining the defendants from taking any further step in the American proceedings or enforcing any order made therein. On appeal by the defendants, the Court of Appeal dismissed the appeal.

---

[1987]                                                                                           25
A.C.                          **South Carolina Co. v. Assurantie N.V. (H.L.(E.))**

   On appeal by the defendants:-
   *Held,* allowing the appeal, that although the power of the High Court to grant injunctions, which was a statutory power conferred by section 37 (1) of the Supreme Court Act 1981, was very wide it was limited, save for two exceptions irrelevant to the present proceedings, to the situations (Lord Mackay of Clashfern and Lord Goff of Chieveley dubitante) (i) where one party to an action could show that the other party had either invaded, or threatened to invade, a legal or equitable right of the former for the enforcement of which the latter was amenable to the jurisdiction of the court, and (ii) where one party to an action had behaved, or threatened to behave, in an unconscionable manner, that in the circumstances the plaintiffs had failed to show either that the defendants' conduct towards the plaintiffs was amenable to the jurisdiction of the court, or that it was unconscionable in the sense that it interfered with the due process of the High Court's jurisdiction, and that, accordingly, the injunctions granted would be discharged (post, pp. 31C-D, 39H - 40D, 41A-D, 44A-B, C-D, E, F).
   Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A. [1979] A.C. 210, H.L.(E.), Castanho v. Brown & Root (U.K.) Ltd. [1981] A.C. 557, H.L.(E.) and British Airways Board v. Laker Airways Ltd. [1985] A.C. 58, H.L.(E.) applied.
   *Per* Lord Goff of Chieveley. I am reluctant to accept the proposition that the power of the court to grant injunctions is restricted to certain exclusive categories. That power is unfettered by statute and it is impossible at the present time to foresee every circumstance in which it may be thought right to make the remedy available (post, p. 44G).
   Decision of the Court of Appeal [1986] Q.B. 348; [1985] 3 W.L.R. 739; [1985] 2 All E.R. 1046 reversed.

The following cases are referred to in their Lordships' opinions:

*Bank of Tokyo Ltd. v. Karoon (Note), post, p. 45;* [1986] 3 W.L.R. 414; [1986] 3 All E.R. 468, C.A.
*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984] 3 W.L.R. 413; [1984] 3 All E.R. 39, H.L.(E.)
*Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; [1980] 3 W.L.R. 991; [1981] 1 All E.R. 143, H.L. (E.)
*Court of Commissioner of Patents for Republic of South Africa, In re* (1980) 88 F.R.D. 75
*Deere (John) Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F. 2d 132
*MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795; [1978] 2 W.L.R. 362; [1978] 1 All E.R. 625, H.L.(E.)
*Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; [1977] 3 W.L.R. 818; [1977] 3 All E.R. 803, H.L (E.)

The following additional cases were cited in argument:

*Armstrong v. Armstrong* [1892] P. 98
*Erhmann v. Ehrmann* [1896] 2 Ch. 611, C.A.
*Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)* [1980] 2 Lloyd's Rep. 546, C.A.
*North Carolina Estate Co. Ltd., In re* (1889) 5 T.L.R. 328

---

**[1987]**                                                                                                    **26**
**A.C.**                               **South Carolina Co. v. Assurantie N.V. (H.L.(E.))**

*Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262
*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2), In re* [1978] A.C. 547; [1978] 2 W.L.R. 81; [1978] 1 All E.R. 434, H.L.(E.)

APPEAL from the Court of Appeal.

This was an appeal by leave of the House of Lords (Lord Scarman Lord Templeman and Lord Mackay of Clashfern) dated 19 November 1985 by the defendants, Assurantie Maatschappij "De Zeven Provincien" N.V., in the first action, and by the first defendants, Al Ahlia Insurance Co., and by the second defendants, Arabian Seas Insurance Co. Ltd., in the second action brought by the plaintiffs, South Carolina Insurance Co. from the judgment dated 23 May 1985 of the Court of Appeal (Griffiths, Slade and Lloyd L.JJ.) which affirmed orders made on 25 April 1985 by Hobhouse J., the effect of which was to restrain the defendants from taking any further steps in proceedings before a Federal District Court of the United States for production and inspection of documents against a number of companies and individuals not party to the present actions.

The facts are set out in the opinion of Lord Brandon of Oakbrook.

*Robert Alexander Q.C.* and *Jonathan Sumption Q.C.* for the defendants. The point raised by this appeal is novel. The question can be stated in this way: in what circumstances (if any) may the English courts restrain a party to an English action from availing himself of the process of a foreign court for the purpose of obtaining evidence relevant to the English action? The most authoritative decisions in this branch of the law are those of this House in *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557 and *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58.

In the present case the defendants against whom injunctive relief is sought availed themselves of a right open to them under the federal law of the United States and applied to a United States district court for an order requiring persons resident in the United States, but who were not parties to the English proceedings, to give pre-trial discovery of documents relevant to the English action. The particular issue, therefore, in this appeal is whether in the present circumstances it is right for the English court to restrain the defendants from prosecuting further the proceedings in the United States district court.

The rules of procedure in England provide a means whereby discovery can be obtained between parties to an action and witnesses can be subpoenaed to appear at the trial with relevant documents in their possession. The rules of procedure do not provide an exhaustive or exclusive code which prohibit a party from obtaining documents in any way other than those provided by the rules. For example, if a stranger to the action is prepared to give documents voluntarily to a party, that party is entitled to receive them without obtaining a subpoena. Further, a party may use the facilities of the courts of a friendly foreign state if that state is willing for them so to do. The defendants concede that

there are limits to this principle. Thus, it is inapplicable where it would be unconscionable for a party to obtain discovery, for example, of documents which in this country are subject to professional privilege.

The documents sought are relevant to the defences pleaded in the action which in turn reflect enquiries which were pursued before the action was brought. The plaintiffs obtained the injunction in spite of refusing the defendants consent to have access to the documents in question. Since then they have granted the defendants access but it is the view of the defendants' solicitors that the strangers to the action have not made proper disclosure. The documents are not in the power or possession or control of the plaintiffs; therefore it is difficult to see why they object to disclosure. If the strangers to the action were in this country they could be required to produce the documents by subpoena duces tecum. As to any suggestion that the defendants could have applied for letters rogatory under R.S.C., Ord. 39, r. 2, the procedure is cumbersome and expensive and they can be issued only where other efforts have been made to obtain the documents in question.

As stated previously, after the Court of Appeal gave judgment the plaintiffs did arrange for the defendants to have controlled access to certain documents in the possession of certain third parties resident in the United States. This was a facility which the defendants hoped would make the prosecution of the present appeal unnecessary. However, the restrictions imposed upon the defendants' inspection of documents made the facilities which were offered to them most unsatisfactory. They have therefore with regret concluded that certain documents have been withheld in a manner which can be remedied only by the compulsory procedure of the United States district court.

28 United States Code, section 1782, is a clear provision enabling parties to an English action to obtain from the courts of the United States documents for use in proceedings in this country. That being the rule, the question then arises: on what principle should the English court prevent disclosure where the United States courts would allow disclosure directed to a company which is subject to the jurisdiction of the United States courts? It is the plaintiffs' contention that in the circumstances it is unconscionable for the defendants to apply for disclosure of these documents. The Court of Appeal held that in principle a party to litigation in this country should not avail itself of 28 United States Code, section 1782, against non-parties resident in the United States.

Reliance is placed on the following propositions: (i) In principle it is open to the defendants to seek material to enable them to conduct their case and to obtain that material as early as possible. A party can gather evidence for use in litigation either through the use of English procedures or through other means. (ii) There is no objection to these other means including means provided by United States proceedings. This does not, as the Court of Appeal suggested, deprive the English court of control over the proceedings. (iii) Caution is required before the conduct of any foreign proceedings is restrained. (iv) The use of the United States processes could be restrained by injunction if it involved the breach of some legal or equitable right of the party claiming the injunction or was unjust or unconscionable to that other party but not otherwise. The

defendants dissent from the general approach of the Court of Appeal in the present case.

As to the authorities, reliance is placed on *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210, 211C-D, 255F-G, 256E-257, *per* Lord Diplock. As to *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, see *per* Lord Scarman, at pp. 572F-G, and 574D. It is to be noted that that was a forum conveniens case. In *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58, the observations of Lord Diplock at pp. 80A-B et seq., and Lord Scarman at p. 95C, show that the category of cases there under discussion have no relevance to the issue in the present case. The defendants would apply by analogy to the present case the observations of Dunn L.J. in *Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)* [1980] 2 Lloyd's Rep. 546, 551.

On the facts of the present case it is not unreasonable or unjust for the defendants to apply for the documents in question. It is said that the documents would be obtained earlier than if they were obtained by subpoena in the English proceedings. But this is only a quirk of English procedure. The advantage of being able to obtain the documents at an earlier stage of the proceedings is in no way unconscionable to the plaintiffs. This is particularly so since otherwise they are not likely to be obtained at all. The defendants do not accept that the procedure by way of letters rogatory is open to them. Further, it is an expensive procedure. It cannot be unjust or unconscionable for the defendants to take the "direct route" for obtaining these documents.

As to the United States authorities cited by Griffiths L.J. [1986] Q.B. 348, 357, those authorities are not contemplating the situation which has arisen in the present case. The principles laid down by the Court of Appeal

here it may be said to act unconscionably against the defendants rather than the plaintiffs. [Reference was also made to *In re North Carolina Estate Co. Ltd.* (1889) 5 T.L.R. 328; *Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262, and *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45.]

*Kenneth Rokison Q.C., Christopher Symons* and *Thomas Weitzman* for the plaintiffs. Attention is drawn to the width of the inquiry requested by the defendants in the United States proceedings. They are seeking third party discovery which would not be allowed at all in England. The United States court will not allow that which would not be allowed by the court hearing the substantive issue between the parties. The defendants are in effect seeking to take part of the English proceedings out of the jurisdiction and control of the English court. The difference between the disclosure of documents as a result of letters of request and the present case is that the defendants here have first gone to the foreign court and requested that court to make an order in English proceedings.

*In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, is the antithesis of the present case. The House there held that an English court will not, even when so requested by a foreign court, make an order in respect of an English person or company requiring that person or company to give

---

documentary or testamentary discovery for the purposes of the foreign proceedings. The present case is the reverse position since although the American court is being asked to assist the English court, the American court is being asked to admit a wider class of documents than is allowable under English procedure. It is thus an even stronger case than the *Westinghouse* case. The correct way for the defendants to proceed in the present issue is under R.S.C., Ord. 39, r. 1. Further, Ord. 38, r. 9 specifically relates to depositions in any cause or matter and links them to those under Ord. 39, r. 1.

The approach of Griffiths L.J. in the Court of Appeal is adopted. The plaintiffs are prejudiced by the American procedure because the defendants can obtain documents which could not be obtained under English procedure. Further, the plaintiffs are necessarily prejudiced by the costs and expense of the American proceedings for they are bound to take part in those proceedings to protect their interests. The question also arises whether, if the English court would not make an order for third party discovery as sought by the defendants, the American court would make any order at all. It is plain from the American decisions in *In re Court of Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D. 75, 77, and *John Deere Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F. 2d 132, 135, 136, that a United States court will only grant an applicant an order under 28 United States Code, section 1782, if it is satisfied that an order of the same nature would be made in like circumstances by the foreign court seised of the dispute at that stage of the proceedings. The effect of those decisions is that any American court properly advised as to English law on discovery would deny the defendants' request as being for third party discovery which is not allowable under English procedure. If it be said that this question can be left for the United States district court to decide, the answer is that it is better for the English court to deal with the matter and "nip it in the bud." It may be that the United States court would not be properly advised as to the relevant English law.

The English court has jurisdiction to restrain a party to proceedings pending in England from seeking or continuing to seek interlocutory orders in a foreign jurisdiction for the purposes of those proceedings. The English court has an inherent jurisdiction to control its own proceedings. Further, it is well established that where proceedings are pending before the English court, and proceedings are brought in a foreign jurisdiction which concern the same issues, the English court has a discretionary jurisdiction either to stay the English proceedings or to restrain by injunction a party to those proceedings from continuing to proceed in the foreign court. This jurisdiction was recognised by this House in *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58, 80D-F *per* Lord Diplock. This jurisdiction is commonly invoked in the so-called "forum conveniens" cases, where there is a choice of forum for determination of substantive issues between the parties. See *per* Lord Scarman, at p. 95D. This jurisdiction must also exist where the foreign proceedings are of a purely interlocutory nature, but which overlap with the normal interlocutory processes before the English court. Indeed, it is an obvious and an "a fortiori" case. Thus here the United States

---

proceedings are only ancillary proceedings and therefore there is no reason why the English court should not have granted the injunction appealed against.

*The Lisboa* [1980] 2 Lloyd's Rep. 546 is distinguishable because that was a case where proceedings were started in Venice in order to obtain security if the action was subsequently instituted in Italy. That case cannot be described as one of a foreign court's interlocutory jurisdiction being invoked in English proceedings. It was not an interlocutory application for the purposes of English proceedings. The line of cases cited by Robert Goff L.J. in *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45, is closer to the present case. The present case is one where it is proper to grant an injunction to protect the jurisdiction of the English court.

*Armstrong v. Armstrong* [1892] P. 98 lays down the correct approach to the present problem; the principles stated there are applicable to the present case. The essential question is: who should have control over the present matter? The true answer is that it should be the English court which should have control.

Suppose that in the present case the plaintiffs had attempted in the United States Court to obtain pre-trial depositions from the defendants' employees. Such an application would surely be restrained because it would be so alien to English procedure. So also third-party discovery is alien to English procedure. The matter can be tested by the following example. If a party went to an English court and asked it to issue letters rogatory in relation to third parties' documents under Order 39, such an application would be dismissed. If the party then went to the United States court and requested it under 28 United States Code, section 1782, the English court should intervene on the ground that it was vexatious; the party having failed before the English court, it cannot obtain the evidence by utilising a foreign jurisdiction. But the answer cannot be any different merely because the party in question goes to the United States court first as in the present case.

*Erhmann v. Ehrmann* [1896] 2 Ch. 611, shows that the English court will not grant letters rogatory except in relation to evidence which is directly relevant to the issues in the case. Wider "discovery" will not be made the subject of letters rogatory - let alone in respect of documents held by a third party.

In conclusion, it is the plaintiffs' contention that they have a legal or equitable right which it is appropriate for the English court to protect by injunction, namely the right, as parties to proceedings in the English court, to have those proceedings conducted in accordance with the procedural laws and practices of England, and of no other jurisdiction. Moreover, it is their contention that the defendants' application for interlocutory relief in the United States is unconscionable and unjust to the plaintiffs. If granted, it would allow the defendants to take advantage of procedural steps and remedies available under English procedural law, while at the same time avoiding some of the restrictions on those steps and remedies which would nevertheless continue to impinge upon the plaintiffs.

*Symons* followed.

---

[1987]                                                                                                      31

A.C.                      **South Carolina Co. v. Assurantie N.V. (H.L.(E.))**

*Alexander Q.C.* in reply. In the present case it is accepted that there is an advantage under the foreign proceedings which cannot be obtained in the English proceedings. It is this factor which distinguishes the present case from *Armstrong v. Armstrong* [1892] P. 98, as applied by Robert Goff L.J. in the *Tokyo Bank* case (*Note*) [1987] A.C. 45. The defendants rely on the principle on which they opened this appeal, namely, that the plaintiffs can only succeed if they can show that the defendants' application before the United States court is unconscionable. As to the principle adumbrated by Griffiths L.J. below, the manner in which a party gathers evidence is for that party. It may gather it voluntarily or in pursuance of a contract. These methods do not deprive the English court in any way of control of its own proceedings.

[Reference was also made to *In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, 562B-F.]

Their Lordships took time for consideration.

29 July. LORD BRIDGE OF HARWICH. My Lords, for the reasons given in the speech of my noble and learned friend, Lord Brandon of Oakbrook, with which I agree, I would allow this appeal.

LORD BRANDON OF OAKBROOK. My Lords, the question for decision in this appeal is a novel one and can be stated in this way. An action between A and B is pending before an English court. While it is pending B, exercising a statutory right potentially available to him under the federal law of the United States, applies to a district court of the United States for an order that persons resident in the United States, who are not parties to the action before the English court, should give him pre-trial discovery of documents relevant to the issues in that action. In those circumstances, is it right for the English court, on the application of A, to grant an injunction against B prohibiting him from prosecuting further his proceedings in the United States district court? Hobhouse J. at first instance, and the Court of Appeal (Griffiths, Slade and Lloyd L.JJ.) on appeal from him, have held that it is right for such an injunction to be granted. The parties enjoined (for in the instant case there are three of them) now bring a further appeal with the leave of your Lordships' House.

The background of the case is to be found in what can conveniently be described as a three-tier insurance arrangement. The company which first insured the relevant risks was a United States company, United National Insurance Co. ("United National"). United National re-insured the risks which it had insured with another United States company, South Carolina Insurance Co. ("South Carolina"). South Carolina in turn re-re-insured the risks which it had re-insured with a number of other insurance companies in the London market. These other insurance companies included a Dutch company, Assurantie Maatschappij "De Zeven Provincien" (Seven Provinces) and two Middle or Far Eastern companies, Al Ahlia Insurance Co. ("Al Ahlia") and Arabian Seas Insurance Co. ("Arabian Seas"). In or about 1984 South Carolina called

---

upon Seven Provinces, Al Ahlia and Arabian Seas to pay substantial sums which South Carolina claimed to be due from them under the contracts of re-re-insurance concerned. Seven Provinces, Al Ahlia and Arabian Seas refused to make the payments asked for, denying that they were liable to do so.

As a result South Carolina brought two actions in the Commercial Court here in order to recover the sums which they claimed to be payable, together with interest on such sums. In the first action, which was begun on 12 December 1984, Seven Provinces is the sole defendant. In the second action, which was begun on 28 February 1985, Al Ahlia is the first defendant and Arabian Seas is the second defendant. It was the original intention of the solicitors acting for South Carolina to seek summary judgment in both actions under R.S.C., Order 14. However, at an application to fix a date for the hearing of the Order 14 proceedings against Seven Provinces, counsel for the latter indicated that a number of substantial defences would be raised to South Carolina's claim. These defences included (1) misrepresentation or non-disclosure regarding the retention position on the part of South Carolina; (2) non-disclosure of a previous bad loss record on the business concerned; (3) excessive deductions from premiums; and (4) payment of claims outside the limits of the relevant treaty.

The underwriting agent for United National through whom business was placed with it was Pacific General Agency Inc. ("P.G.A."). The loss adjusters who investigated the claims made against United National were Arthur Campbell-Husted and Co. ("Campbell-Husted"). The principal place of business of both P.G.A. and Campbell-Husted is in the State of Washington.

My Lords, Seven Provinces, Al Ahlia and Arabian Seas ("the re-re-insurers") are, by reasons of their position, remote from the facts in dispute, and obliged to rely for detailed information about them on such documents as they can obtain from South Carolina or P.G.A. and Campbell-Husted. The latter two, however, were not the agents of South Carolina in connection with the relevant transactions; it follows that discovery of documents by South Carolina in the two actions in England would not extend to relevant documents held by them. In this situation, if the re-re-insurers are to achieve their legitimate object of inspecting and copying where necessary, relevant documents held by P.G.A. and Campbell-Husted, some other means have to be found to enable them to do so.

In November 1984, after South Carolina had put forward its claims against the re-re-insurers, but before the two actions in England were begun, the latter had asked P.G.A. if they could inspect the documents in which they were interested at Seattle on 7 December 1984. P.G.A. referred the request to their principal, United National, which in turn consulted South Carolina. It appears that, on the advice of South Carolina's English solicitors, the request for inspection was, in effect, refused. The two actions in England were subsequently begun.

My Lords, 28 United States Code, section 1782, provides:

"Assistance to foreign and international tribunals and to litigants before such tribunals. (a) The district court of the district in

---

which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which

may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure."

On 28 March 1985, before the re-re-insurers had served their points of defence and counterclaim in the two actions against them in England they applied by motion to the district court of the United States, Western District of Washington, at Seattle, for an order under section 1782 above. The motion, the title of which referred to the two actions in England, asked for an order against P.G.A. and Campbell-Husted involving two matters. The first matter was the production and inspection of numerous specified classes of documents of the kind which could reasonably be expected to have come into being in the course of the transaction of the insurance business which had led to United National, having settled claims itself, to recover from South Carolina as its reinsurers, and to South Carolina then claiming to recover over from the re-re-insurers. The second matter was the appearance of three named persons from P.G.A. and Campbell-Husted to give testimony by deposition. The motion was supported by a memorandum and an affidavit.

Notice of the re-re-insurers' motion was served on P.G.A. and Campbell-Husted. South Carolina was also served with notice of the motion, or otherwise made aware of its having been lodged. Neither P.G.A. nor Campbell-Husted appeared before the district court to resist the application. South Carolina, however, did so appear, and having indicated their objection to it, was given until 29 April 1985 to file its affidavit in opposition. It is to be inferred from the foregoing that neither P.G.A. nor Campbell-Husted objects to producing the documents listed in the motion for inspection, and where necessary for copying, by the re-re-insurers, and that it is only the objection of South Carolina that has stood in the way of their doing so.

On 24 April 1985, before the date fixed for filing its affidavit in opposition in the United States district court, South Carolina issued summonses in the two actions in England. By their summonses South Carolina sought (1) an order that the re-re-insurers should withdraw their application to the United States district court, (2) an injunction

---

restraining the re-re-insurers from proceeding further with such application, and (3) a declaration that the application was an abuse of the process of the English court.

My Lords, the summonses were heard by Hobhouse J. on 25 April 1985. He declined to make the declaration asked for, but granted South Carolina injunctions restraining the re-re-insurers until further order from taking any further steps in their motion before the United States district court and from enforcing any order made by that court on such motion. The main ground on which Hobhouse J. decided to grant such in functions appears from pp. 10 and 11 in Appendix I to the printed case. Having set out what he called the framework of the matter, he said:

"It involves a question of principle as to whether or not the English court should retain the control of its own procedure and the proceedings that are before it. I have no doubt that the answer to be given to that question is that the English court should retain that control."

The decision of Hobhouse J. was, as I indicated earlier, affirmed by the Court of Appeal [1986] Q.B. 348. Griffiths L.J. gave the principal judgment, with which Slade and Lloyd L.JJ. both agreed. The main reason which Griffiths L.J. gave for his decision was similar to that relied on by Hobhouse J. He said, at p. 358:

"Once the parties have chosen or accepted the court in which their dispute is to be tried they must abide by the procedure of that country and that court must be master of its own procedure. Litigation is expensive enough as it is, and if a party fighting a case in this country has to face the prospect of fighting procedural battles in whatever other jurisdiction his opponent may find a procedural advantage it may impose intolerable burdens, and encourage the worst and most oppressive form of procedural forum shopping. We should set our face against any such situation developing.
"Severe dislocation to the timetable of the English litigation is a readily foreseeable consequence of unrestrained access to foreign procedural remedies. This is likely to cause hardship or inconvenience not only to the other party to that litigation but will also affect other litigants whose cases are listed upon forecasts dependent upon litigation being conducted in accordance with our own rules of procedure. As the judge said, the court will lose control of its own proceedings. Furthermore, one party might be able to gain a very unfair advantage in the English procedure if he was able to take the deposition of and cross-examine a witness whom

he would never call on his own behalf at the trial, for example, the employees or business associates of his opponent. I think Mr. Sumption [counsel for the re-re-insurers] recognised this when he said he would be content to accept the stay in respect of his application to take the depositions of the witnesses from P.G.A. and Arthur Campbell-Husted & Co. I am therefore satisfied that as a matter of principle the court must have an inherent jurisdiction to make any necessary

order to ensure that the litigation is conducted in accordance with its own procedures."

My Lords, before examining the question whether Hobhouse J. and the Court of Appeal were right or wrong to grant the injunctions now appealed against, it is necessary to draw attention to a number of preliminary matters.

The first matter to which attention needs to be drawn is the existence of an essential difference between the civil procedures of the High Court in England on the one hand, and of courts of the United States on the other, with regard to what may be compendiously described as pre-trial discovery. Under the civil procedure of the High Court in England, pretrial discovery may take two forms. The first form, which is far and away the more common, is by way of disclosure and inspection of relevant documents under R.S.C., Ord. 24. The second form, which is comparatively rare, is by way of the asking and answering on oath of interrogatories under R.S.C., Ord. 26. Such discovery is, however subject to two important limitations, one relating to its scope and the other to the stage of an action at which it normally takes place. So far as the scope of discovery is concerned, it is limited to the disclosure and inspection of documents in the possession or power of the parties to the action, or to the asking and answering on oath of interrogatories as between such parties. So far as the stage of an action at which discovery normally takes place is concerned, it is the general rule that the two forms of discovery to which I have referred do not take place until the formal pleadings by both sides have been completed and the issues in disputes thereby fully and clearly defined. In this connection, however, it is right to say that the court has power to order either form of discovery at any stage of an action, including a stage earlier than the completion of pleadings; but such power is rarely exercised and then only on special grounds, for instance when discovery is needed in order that justice may be done in interlocutory proceedings.

Because of the first limitation to which I have referred, there is no way in which a party to an action in the High Court in England can compel pre-trial discovery as against a person who is not a party to such action, either by way of the disclosure and inspection of documents in his possession or power, or by way of giving oral or written testimony. I would, however, stress the word "compel" which I have used in the preceding sentence, for there is nothing to prevent a person who is not a party to an action from voluntarily giving to one or other or both parties to it either disclosure and inspection of documents in his possession or oral or written testimony.

The procedure of the High Court in England, while not enabling parties to an action to compel pre-trial discovery as against a person who is not a party to such action, nevertheless affords ample means by which such a person, provided that he is within the jurisdiction of the court, can be compelled either to give oral testimony, or to produce documents in his possession or power, at the trial of the action itself. Under R.S.C., Ord. 38, Part II, such a person may be compelled to give oral testimony at the trial by the issue and service on him of a subpoena

ad testificandum, or to produce documents in his power or possession (so long as they are adequately described and defined) by the issue and service on him of a subpoena duces tecum. The issue of such subpoenas is in the first instance a ministerial rather than a judicial act, and a party may therefore issue subpoenas of either kind as he thinks fit; the court, however, has power to set aside any subpoena on proper grounds, for instance, irregularity of form, irrelevance, oppressiveness or abuse of the process.

The procedure of the High Court in England includes a further power of the court, conferred on it by R.S.C., Ord. 38, r.13, to order any person to attend any proceedings in a cause or matter and produce any document to be specified or described in the order, the production of which appears to the court to be necessary for the purpose of that proceeding. It has, however, long been established that this rule is not intended to be used, and cannot properly be used, to enable a party to an action to obtain pre-trial disclosure and inspection of documents in the

possession or power of a person who is not a party to such action. It is a rule of limited application, involving the production of a document or documents to the court itself rather than to either of the parties to an action.

My Lords, the civil procedure of courts in the United States differs essentially from that in the High Court in England in that under it parties to an action can compel, as against persons who are not parties to it, a full measure of pre-trial discovery, including both the disclosure and production for inspection and copying of documents, and also the giving of oral or written testimony. This power of compulsion can be, and regularly is, used at an early stage of an action.

The second matter to which attention needs to be drawn is that 28 United States Code, section 1782, as appears from its terms which I set out earlier, expressly provides that an order made under it may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing; and that, to the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Procedure.

Reference was made in the two courts below and again in your Lordships' House to certain United States authorities which bear on the exercise of a district court's powers under section 1782. In a decision of the United States District Court of Pennsylvania, *In re Court of the Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D. 75, 77, Judge Newcomer said:

"[1, 2] It is of great concern to this court that counsel for opponent has not been able to represent to this court that the documents and testimony for which opponents request a discovery order are discoverable under South African law. Indeed, discussions with counsel lead this court to suspect that these materials would *not* be available through South African procedures. Clearly, this court should not by its exercise of the discretion allowed it under section

---

1782 allow litigants to circumvent the restrictions imposed on discovery by foreign tribunals. Few actions could more significantly impede the development of international co-operation among courts than if the courts of the United States operated to give litigants in foreign cases processes of law to which they are not entitled in the appropriate foreign tribunals."

Further in *John Deere Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F.2d 132, 135, Judge Garth, giving the judgment of the United States Court of Appeals for the Third Circuit, said:

"As a co-operative measure, section 1782 cannot be said to ignore those considerations of comity and sovereignty that pervade international law. A grant of discovery that trenched upon the clearly established procedures of a foreign tribunal would not be within section 1782."

My Lords, it was contended for South Carolina, on the basis of these authorities, that the re-re-insurers' application to the district court of the United States was bound to fail. The ground relied on was that, since the procedure of the High Court in England did not enable parties to an action to compel pre-trial discovery against persons not parties to it, the district court would not permit the re-re-insurers to circumvent that limitation by granting them an order for such discovery under section 1782.

It appears to me that there may well be considerable force in this contention. It is not possible, however, for your Lordships, on the limited material before you, to decide for yourselves in advance how the United States district court would see fit to exercise the discretion conferred on it by section 1782, in the particular circumstances of this case, and having regard to the characteristics of civil procedure in the High Court in England which I endeavoured to summarise earlier.

The third matter to which attention needs to be drawn concerns certain changes in the positions of the parties which have occurred since the original hearing of South Carolina's two summonses before Hobhouse J. The first change of position relates to the memorandum lodged in support of the re-re-insurers' application to the United States district court, in which they asserted:

"As evidenced by the attached affidavit of Francis Otley Mackie the petitioners herein are seeking this court's assistance in obtaining information and documentation which is necessary, material and relevant to litigation pending in the courts of England for use in those proceedings. The affidavit further establishes that were all the parties residents of England, the requested discovery would be permitted pursuant to the rules of procedure and

discovery in England. Accordingly, the petitioners' motion for taking of testimony and the production of documents should be granted."

Mr. Mackie, whose affidavit is referred to at the beginning of the above passage, is a partner in the firm of solicitors acting for the re-re-insurers in the two actions in England. The relevant part of that affidavit is paragraph 12, in which Mr. Mackie deposed, inter alia, as follows:

---

| [1987] | | 38 |
|---|---|---|
| A.C. | South Carolina Co. v. Assurantie N.V. (H.L.(E.)) | Lord Brandon of Oakbrook |

"Discovery of such documentation and testimony is permitted according to the English rules of procedure. ... Petitioners would be able to obtain writs of subpoena duces tecum issued by the High Court of England ... directing these entities to produce the documents requested and directing them individually to appear and give testimony at depositions."

These statements in the re-re-insurers' memorandum and Mr. Mackie's affidavit were criticised by Hobhouse J. and by Griffiths L.J. in the Court of Appeal as giving such an incomplete and inaccurate account of the procedure of the High Court in England with regard to discovery as seriously to mislead the United States district court. Griffiths L.J., however, expressly acquitted Mr. Mackie of any deliberate intention to mislead. Before your Lordships Mr. Robert Alexander, who appeared as leading counsel for the appellant re-re-insurers, accepted unreservedly that the passages in question were incomplete and inaccurate, and as a consequence liable to mislead. The main error, as will be apparent, is the failure to distinguish clearly between compelling a person not a party to an action to give pre-trial discovery on the one hand, and compelling him to give oral evidence and produce documents at the trial itself on the other hand. I think that it is right for your Lordships to say that the criticisms of that error made by the two courts below were fully justified and that it is most unfortunate that it should ever have occurred. That said, however, having regard to the admission of such error freely made by Mr. Alexander for the re-re-insurers, and having regard further to the summary which I endeavoured to give earlier of the relevant procedure of the High Court in England, it seems to me that the error is no longer of significance in the consideration of this appeal.

The second change of position concerns the scope of the re-re-insurers' application to the United States district court. As I indicated earlier, that application as originally framed covered two distinct matters: first, the production and inspection of specified classes of documents; and, secondly, the appearance of three named persons from P.G.A. and Campbell-Husted to give testimony by depositions. On the face of the motion it appeared that what the re-re-insurers were seeking in relation to the second of these matters was the taking of oral evidence from the persons named relevant to the issues in the English actions, such evidence to be recorded in depositions. Before the Court of Appeal, however, Mr. Sumption for the re-re-insurers expressly abandoned any intention to achieve this end, and before your Lordships Mr. Alexander made it clear that the appearance of the named persons was only sought for the purpose of their producing and identifying the relevant documents held by P.G.A. and Campbell-Husted, and in no way for the purpose of their giving oral evidence to be recorded in depositions with regard to issues of fact arising in the English actions.

The third change of position arises from the stage which the two actions in England have now reached. At the time when South Carolina's applications first came before Hobhouse J. the re-re-insurers had not yet served their points of defence and counterclaim, so that the issues between the parties had not yet been defined by pleadings and no

---

| [1987] | | 39 |
|---|---|---|
| A.C. | South Carolina Co. v. Assurantie N.V. (H.L.(E.)) | Lord Brandon of Oakbrook |

discovery of documents as between the parties had yet taken place. Hobhouse J. regarded this as a significant matter in exercising the discretion to grant injunctions which he held that he had. During the hearing before the Court of Appeal, however, the re-re-insurers served points of defence and counterclaim, and since then discovery of documents as between the parties has taken place. The actions in England are, therefore, much further advanced than they were when South Carolina's applications first came before the judge.

The fourth change of position is this. Following the decision of the Court of Appeal South Carolina arranged for the re-re-insurers to have controlled access to certain documents held by P.G.A. and Campbell-Husted. According

to the re-re-insurers, however, substantial restrictions were imposed by South Carolina on the documents which they were allowed to inspect under this arrangement. It is the re-re-insurers' case, therefore, that their application to the United States district court remains necessary in order to enable them to have inspection of other documents to which, by reason of the control exercised by South Carolina, they have not so far had access. Your Lordships were not asked to go into the details of these matters, which are in dispute between the parties, and it is right, I think, for the purposes of this appeal for your Lordships to proceed on the basis that the re-re-insurers have at least an arguable case with regard to them.

The fifth and final matter to which attention should be drawn is that the judge of the United States district court before whom the re-re-insurers' application under section 1782 is pending has helpfully directed that further proceedings in that application should be stayed until the determination first of the re-re-insurers' appeal to the Court of Appeal, and then of their further appeal to your Lordships' House.

My Lords, having drawn attention to these various preliminary matters, I turn to consider whether the injunctions granted by Hobhouse J. and affirmed by the Court of Appeal should be allowed to stand. I put the question in that form because of the various ways described by me above in which the positions of the parties have changed since the original hearing before Hobhouse J.

As appears from the passages from the judgments of Hobhouse J. and Griffiths L.J. which I set out earlier, both courts below treated South Carolina's applications for injunctions as raising matters of principle for decision. I have no doubt that they were right so to treat them. Putting the point differently, the question which your Lordships have to decide is whether the circumstances of the case are such as to give the court power to grant the injunctions at all, and not whether, there being such power, it was a proper exercise of discretion to grant them rather than to refuse them.

In considering the question which I have formulated, it will be helpful in the first place to state certain basic principles governing the grant of injunctions by the High Court. The first basic principle is that the power of the High Court to grant injunctions is a statutory power conferred on it by section 37 (1) of the Supreme Court Act 1981, which provides that "the High Court may by order (whether interlocutory or final) grant an injunction in all cases in which it appears to the court to

---

be just and convenient to do so." That provision is similar to earlier provisions of which it is the successor, namely, section 45 (1) of the Supreme Court of Judicature (Consolidation) Act 1925 and section 25 (8) of the Supreme Court of Judicature Act 1873. The second basic principle is that, although the terms of section 37 (1) of the Act of 1981 and its predecessors are very wide, the power conferred by them has been circumscribed by judicial authority dating back many years. The nature of the limitations to which the power is subject has been considered in a number of recent cases in your Lordships' House: *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; and *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58. The effect of these authorities, so far as material to the present case, can be summarised by saying that the power of the High Court to grant injunctions is, subject to two exceptions to which I shall refer shortly, limited to two situations. Situation (1) is when one party to an action can show that the other party has either invaded, or threatens to invade a legal or equitable right of the former for the enforcement of which the latter is amenable to the jurisdiction of the court. Situation (2) is where one party to an action has behaved, or threatens to behave, in a manner which is unconscionable. The third basic principle is that, among the forms of injunction which the High Court has power to grant, is an injunction granted to one party to an action to restrain the other party to it from beginning, or if he has begun from continuing, proceedings against the former in a foreign court. Such jurisdiction is, however, to be exercised with caution because it involves indirect interference with the process of the foreign court concerned.

The latter form of injunction may be granted in such circumstances as to constitute an exception to the second basic principle stated above. This may occur where one party has brought proceedings against another party in a foreign court which is not the forum conveniens for the trial of the dispute between them, as that expression was defined and applied in *MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795. In such a case the party who has brought the proceedings in the foreign court may not by doing so, have invaded any legal or equitable right of the other party, nor acted in an unconscionable manner. The court nevertheless has power to restrain him from continuing his foreign proceedings on the ground that there is another forum in which it is more appropriate, in the interests of justice, that the dispute between the parties should be tried. The present case, however, is not concerned with a choice between two competing forums for the trial of a dispute, and the exception to which I have just referred is therefore not relevant to it.

The power of the court to grant *Mareva* injunctions may also, before it was statutorily recognised, have been a further exception to the second basic principle stated above. That power, however, has now been expressly recognised by section 37 (3) of the Supreme Court Act 1981, and again the present case is in no way concerned with it.

Ignoring these exceptions, therefore, and applying the basic principles which I have stated to the present case, the first question for consideration is whether South Carolina has shown that what I have

---

described above as situation (1) exists. Has South Carolina shown that the re-re-insurers, by beginning and intending to prosecute their application to the United States district court, has invaded, or threatened to invade, a legal or equitable right of South Carolina for the enforcement of which the re-re-insurers are amenable to the jurisdiction of the court? It was contended by Mr. Rokison on behalf of South Carolina that South Carolina did indeed have such a legal or equitable right, but it appeared to me that he had great difficulty in formulating the legal or equitable right on which he relied. Neither of the courts below decided as they did on the basis that the re-re-insurers had by their conduct invaded a legal or equitable right of South Carolina, and I cannot see how such a case can be made out. I would therefore hold that South Carolina has not shown that situation (1) exists.

The second question for consideration is whether South Carolina has shown that what I have described above as situation (2) exists. Has South Carolina shown that the re-re-insurers, by beginning and intending to prosecute their application to the United States district court, have acted in a manner which is unconscionable? It is difficult, and would probably be unwise, to seek to define the expression "unconscionable conduct" in anything like an exhaustive manner. In my opinion, however, it includes, at any rate, conduct which is oppressive or vexatious or which interferes with the due process of the court.

Although neither Hobhouse J. at first instance, nor Griffiths L.J. in the Court of Appeal, stated in terms that they thought it right to grant injunctions on the ground that the conduct of the re-re-insurers in making their application to the United States district court was unconscionable, it seems to me to be implicit in their reasons that they regarded it as being so. Hobhouse J. based his decision expressly on the need for the court to retain control of its own process, with the necessary implication that the re-re-insurers' conduct was an interference with such control and therefore an interference with the due process of the court. Griffiths L.J. based his decision on three grounds: first (like Hobhouse J.), that the court must retain control of its own process; secondly, that the civil procedure of United States courts is significantly different from that of English courts, and the parties, by submitting to the jurisdiction of an English court, must be taken to have accepted its procedure; and, thirdly, that unrestricted access to foreign procedural remedies was liable to produce hardship in the form of increased costs and inconvenience. I shall consider each of these grounds in turn.

I consider, first, the ground that the re-re-insurers' conduct was an interference with the court's control of its own process. It is not clear to me why this should be so. Under the civil procedure of the High Court the court does not, in general, exercise any control over the manner in which a party obtains the evidence which he needs to support his case. The court may give him help, certainly; for instance by discovery of documents inter partes under R.S.C., Ord. 24; by allowing evidence to be obtained or presented at the trial in various ways under Orders 38 and 39; and by the issue of subpoenas under Part II of Order 38, to which I referred earlier. Subject, however, to the help of the court in these various ways, the basic principle underlying the preparation and

---

presentation of a party's case in the High Court in England is that it is for that party to obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are used. It was not in dispute that, if P.G.A. and Campbell-Husted, uninfluenced by the control exercised over them by South Carolina on the advice of the latter's English solicitors, had freely and voluntarily allowed the re-re-insurers to inspect, and where necessary to copy, all the documents referred to in the latter's application, it could not possibly have been said that there had been any interference with the English court's control of its own process. That being so, I cannot see why, since the Federal law of the United States authorises an application of the kind made by the re-re-insurers in this case, the making of such application, which may or may not succeed in

whole or in part, should be regarded as being such an interference either. I cannot, therefore, agree with the first ground of decision relied on by the Court of Appeal.

I consider, secondly, the ground that the procedure of United States courts is significantly different from that of English courts, and the parties, by submitting to the jurisdiction of an English court, must be taken to have accepted its procedure. It is, no doubt, true that the re-re-insurers, by entering unconditional appearances in the two English actions, can be said in a certain sense to have accepted the procedure of that court. Your Lordships were not, however, informed of any ground on which the re-re-insurers could, with any prospect of success, have contested the jurisdiction of the High Court in England in respect of the disputes which are the subject matter of the two actions concerned. Be that as it may, I cannot see that the re-re-insurers, by seeking to exercise a right potentially available to them under the Federal law of the United States, have in any way departed from, or interfered with, the procedure of the English court. All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case. It was said that the re-re-insurers could have applied to the High Court under R.S.C., Ord. 39, r. 2, for letters of request to issue to the proper judicial authorities in the United States. But 28 United States Code, section 1782, allows an application to be made either indirectly by the foreign court concerned or directly by an interested party, and I can see no good reason why the re-re-insurers should not have chosen whichever of these two alternatives they preferred. It is, I think, of the utmost importance to appreciate that the reason why English procedure does not permit pre-trial discovery of documents against persons who are not parties to an action is for the protection of those third parties, and not for the protection of either of the persons who are parties to the action. I cannot, therefore, agree with the second ground of decision relied on by the Court of Appeal.

I consider, thirdly, the ground that unrestrained access to foreign procedural remedies was liable to cause hardship in the form of increased costs and inconvenience. So far as increased costs are concerned, Griffiths L.J. was referring to increased costs incurred or to be incurred

---

by South Carolina in contesting the proceedings in the United States district court. If, however, the re-re-insurers are right in their contention that they have not yet, by reason of the control exercised by South Carolina, had access to all the documents to which they believe that they need access in order to prepare their case in the two English actions, it can reasonably be said that any liability for increased costs incurred by South Carolina is in a sense self-imposed. If they had been willing to permit P.G.A. and Campbell-Husted to allow the re-re-insurers to inspect, and where necessary copy, all the documents to which the latter had sought access, the making or prosecution of the re-re-insurers' application to the United States district court would not have been necessary. In this connection it is right to stress what I have already stated earlier, that P.G.A. and Campbell-Husted, left to themselves, would voluntarily have given the re-re-insurers permission to inspect, and where necessary copy, all the documents to which the latter sought access. It was said for South Carolina that the documents not so far disclosed were not relevant to the issues in the two English actions. If that is so, I cannot help asking myself why South Carolina has gone to such lengths to prevent the disclosure of such documents. So far as inconvenience is concerned, it is apparent that Griffiths L.J. had two kinds of inconvenience in mind: first inconvenience in relation to the two actions immediately concerned in the form of delay in getting them tried and possible prolongation of the trial when it took place; and, secondly, inconvenience to other litigants by reason of the consequent dislocation of the time-table for the trial of other cases in the congested list of the Commercial Court. So far as delay is concerned, it is perhaps ironical that the only result of South Carolina seeking to obtain injunctions against the re-re-insurers has been to increase greatly whatever delay the re-re-insurers' application, if allowed to proceed unopposed, might otherwise have caused. I recognise that the re-re-insurers' application may result in some increased costs to South Carolina, but these could, as I indicated earlier, have easily been avoided by a different attitude on South Carolina's part. I recognise also that some inconvenience of the two kinds to which I have referred may arise from the re-re-insurers' application; but, if there is a reasonable possibility that such inconvenience is the price of justice being fully done at the trial of the two English actions, then it seems to me to be a price which must necessarily be paid. In any event, I cannot see how the re-re-insurers' application, made in what may prove to be a just cause, can, solely on the ground that it occasions the extra costs and inconvenience under discussion, be categorised as an interference with the court's control of its own process. The court can control any excessive delay by fixing such date for the trial of the two actions as may be just, and nothing which the re-re-insurers can do can take away or interfere with the court's control in this respect. As to increased costs these will, no doubt, be a matter for the consideration of the Commercial judge at the conclusion of the trial, and I

do not think it would be right for your Lordships to express any views, one way or the other, about such matter. For these reasons I cannot agree with the third ground of decision relied on by the Court of Appeal.

My Lords, the result of the views which I have expressed is that there was, in my opinion, no such interference with the procedure of the English High Court by the re-re-insurers as would amount to unconscionable conduct on their part, and so justify, in accordance with the basic principles which I stated earlier, the exercise of the court's power to grant injunctions against them. It follows that I would allow the appeal and set aside the orders of Hobhouse J. dated 25 April 1985 and of the Court of Appeal dated 23 May 1985. As regards costs in your Lordships' House, I have no doubt that South Carolina should pay the costs of the re-re-insurers. As regards costs in the two courts below, different considerations may apply, first, because of the breadth of the re-re-insurers' application to the United States district court as originally framed, and, secondly, because of the misleading nature, in the respect to which I referred earlier, of the memorandum and affidavit lodged in support of such application. I therefore think it desirable that, in relation to those costs, your Lordships should have the assistance of further argument from counsel on either side.

LORD BRIGHTMAN. My Lords, in this appeal I respectfully differ from the conclusion reached by the Court of Appeal. I have had the privilege of studying in advance the speech of my noble and learned friend, Lord Brandon of Oakbrook, and I find myself wholly convinced by his reasons for moving that this appeal should be allowed. I agree with the orders that he proposes should be made.

LORD MACKAY OF CLASHFERN. My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Brandon of Oakbrook and Lord Goff of Chieveley. I agree that it would be wise to make the reservation on the matter to which Lord Goff of Chieveley has drawn attention but, like him, I agree with the conclusion reached by Lord Brandon of Oakbrook and with the reasons he has given for reaching that conclusion.

LORD GOFF OF CHIEVELEY. My Lords, I find myself to be in respectful agreement with the conclusion reached by my noble and learned friend Lord Brandon of Oakbrook, on this appeal, and with the reasons given by him for reaching that conclusion. I wish, however, to draw attention to one matter upon which I have certain reservations, and to which I attach importance.

I am reluctant to accept the proposition that the power of the court to grant injunctions is restricted to certain exclusive categories. That power is unfettered by statute; and it is impossible for us now to foresee every circumstance in which it may be thought right to make the remedy available. In particular, I do not regard the exercise of the power to restrain a person from commencing or continuing proceedings in a foreign forum as constituting an exception to certain limited categories of case in which it has been said that the power may alone be exercised. In my opinion, restraint of proceedings in a foreign forum simply provides one example of circumstances in which, in the interests of justice, the power to grant an injunction may be exercised. I have

elsewhere explained in detail, for reasons which it is unnecessary for me to repeat in the present case, why, on the basis of a line of established authority, I am at present inclined to the opinion that an injunction has generally been granted in such circumstances for the purpose of protecting the English jurisdiction, and why I doubt, with all respect, whether the speech of my noble and learned friend, Lord Scarman, in *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, contains the last word on the subject. I refer, in this connection, to my judgment in *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45.

Even so, I can see no basis for the grant of an injunction in the present case. In particular, in agreement with my noble and learned friend Lord Brandon of Oakbrook, and respectfully differing from Hobhouse J. and the Court of Appeal, I do not consider that the grant of the injunction can be justified as necessary to protect the English jurisdiction on the facts of the present case. In this, I find myself entirely in agreement with the reasons expressed

in the speech of my noble and learned friend, Lord Brandon of Oakbrook. I therefore agree that the appeal should be allowed.

*Appeal allowed with costs.*

*Solicitors: Clyde & Co.; Herbert Smith & Co.*

J.A.G.

# Exhibit 9



<u>Neutral Citation Number:</u> [2025] EWHC 3153 (TCC)

<u>Claim No:  HT-2025-000178</u>

## <u>IN THE HIGH COURT OF JUSTICE</u>
## <u>BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES</u>
## <u>TECHNOLOGY AND CONSTRUCTION COURT (KBD)</u>

<u>Date:  3 December 2025</u>

B e f o r e :

### <u>MR JUSTICE WAKSMAN</u>

### (1) BHP GROUP (UK) LTD
### (2) BHP GROUP LIMITED

<u>Claimants</u>

**- and -**

### PGMBM LAW LTD
### (trading as Pogust Goodhead)

<u>Defendant</u>

**ANDREW SCOTT KC** and **ANDREW TROTTER** (instructed by Slaughter and May Solicitors) for the Claimants
**OLIVER CAPLIN KC** and **ALICIA LAWSON**  (instructed by Orrick, Herrington & Sutcliffe (UK) LLP, Solicitors) for the Defendant

# <u>JUDGMENT</u>

**Hearing date: 22 October 2025**

# Table of Contents

**INTRODUCTION** ........................................................................................................... 3

**BACKGROUND** ............................................................................................................... 4

    THE MAIN CLAIM ............................................................................................................ 4

    MR DE FREITAS ............................................................................................................... 5

    PG'S LIEN CLAIM ............................................................................................................ 6

    THE JUDGMENT OF JUDGE BAKER AND THE SUBPOENAS ................................................ 9

    PG'S RECOURSE CLAIM ................................................................................................ 10

    THE COURSE OF THE SECTION 1782 APPLICATION IN ARKANSAS ................................. 12

    BACKGROUND TO THE MAKING OF THE ASI CLAIM ...................................................... 14

**THE PARTIES' POSITIONS** ...................................................................................... 16

**THE LAW** ...................................................................................................................... 18

    SOUTH CAROLINA ........................................................................................................ 18

    BANKERS TRUST ........................................................................................................... 20

    OMEGA ......................................................................................................................... 21

    NOKIA ........................................................................................................................... 24

    BENFIELD ...................................................................................................................... 24

    DREYMOOR .................................................................................................................... 26

    JONES ............................................................................................................................ 28

    SORIANO ....................................................................................................................... 29

    ECOBANK ...................................................................................................................... 29

**ANALYSIS: VO** ............................................................................................................. 30

    INTRODUCTION ............................................................................................................. 30

    THE CONTEXT ............................................................................................................... 31

    THE RISK OF PREJUDICE TO BHP .................................................................................. 33

    THE UNDERTAKINGS OFFERED ...................................................................................... 34

    MR DE FREITAS'S THREE PREVIOUS WITNESS STATEMENTS .......................................... 34

    THE WIDTH OF THE SUBPOENAS .................................................................................... 34

    MISLEADING STATEMENTS MADE BY PG TO THE ARKANSAS COURT ............................. 35

    THE USE OF 1782 TO AID ENGLISH PROCEEDINGS IN PRINCIPLE, AND IN THIS CASE ..... 35

    CONCLUSION ................................................................................................................ 35

**ANALYSIS: DISCRETION** ........................................................................................ 36

**CONCLUSION** ............................................................................................................. 38

## INTRODUCTION

1.    This is a Part 8 Claim made by the Claimants, BHP Group (UK) Ltd and BHP Group Limited (collectively "BHP") for an anti-suit injunction ("ASI") against the Defendant firm of solicitors, PGMBM Law Ltd (trading as Pogust Goodhead) ("PG"). The claim was made on 13 June 2025. The injunction sought is (a) to restrain PG from taking any further steps (including by way of enforcement)  in respect of the application it made on 13 November 2024 to the United States District Court for the Eastern District of Arkansas ("the Arkansas Court") under Case No. 4:24-mc-00011-KGB, for subpoenas against Mr André de Freitas to obtain discovery and a deposition from him pursuant to Section 1782 of Title 28 of the United States Code ("the 1782 Application") and (b) to withdraw the 1782 Application.

2.    BHP's claim for the ASI is supported by a witness statement ("WS") from Efstathios Michael, a partner in Slaughter and May, BHP's solicitors, dated 13 June 2025. This is responded to on behalf of PG by Anna Varga, an employed barrister and partner in PG, in her WS dated 25 July 2025.

3.    Section 1782 ("1782") is a well-known and well-used federal provision which enables evidence to be taken in the US to assist proceedings in other jurisdictions. It provides that:

> "…The district court of the district in which a person resides or is found may order him to give his testimony or statement ... for use in a foreign or international tribunal. The order may be made ... upon the application of any interested person and may direct that the testimony or statement be given ... before a person appointed by the Court... To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken ... in accordance with the Federal Rules of Civil Procedure…"

4.    It is common ground that 1782 can be invoked either in relation to proceedings outside the US which are actually underway or those which are contemplated and intended to be commenced at some time in the future.

5.    The present position is that (as permitted) PG, through its US lawyers, made the 1782 Application *ex parte* and following an 8-page reasoned judgment and order dated 13 January 2025 from Chief United States District Judge Kristine G Baker ("Judge Baker"), two subpoenas were served on Mr de Freitas on 24 February 2025. However, as the result of an administrative error by the Arkansas Court, the court file was sealed, which meant that the grant of the order was not made public. PG asked the Arkansas Court to unseal the court file, which it did on 21 February 2025. BHP says that it became aware of the 1782 Order in late February 2025.

6.    On 14 March 2025, BHP filed a motion to intervene in the proceedings relating to the 1782 Application. This was unopposed and later granted. On 4 April 2025, Mr de Freitas filed a motion to quash ("MTQ") the subpoenas, as did BHP.  Further evidence and submissions were filed by them in relation to the MTQs, and then, on 25 April, PG filed its opposition to the MTQs, with responses thereto being filed by BHP and Mr de Freitas on 9 May. PG filed a surreply on 15 May.

7.    On 6 June 2025 there was a (remote) oral hearing before Judge Baker. In the course of that hearing, she was made aware of BHP's claim here, but did not pause her consideration of the MTQs to await its outcome. However, the subpoenas issued pursuant to her order have been put on hold, pending her judgment, which is awaited. It is expected by the end of this year.

8.    Mr de Freitas has said that he has no relevant documents and so the evidence-taking will be limited to the taking of a deposition from him over the course of one day in Little Rock, Arkansas where he presently lives.


## BACKGROUND

**The Main Claim**

9.    The background to these events is the litigation in the TCC in relation to the collapse of the Fundão tailings dam in Brazil on 5 November 2015. In action numbered HT-2022-000304, around 613,000 Claimants have sued BHP for billions of pounds of losses which they claim to have suffered as a result of the collapse of the dam, which had been owned and operated by Samarco Mineração SA ("Samarco"), a joint venture between Vale SA ("Vale") and BHP Billiton Brasil Ltda ("BHP Brasil"). BHP Australia is the ultimate owner of BHP Brasil. The Claimants are represented by PG. There is litigation funding in place. I refer to this as "the Main Claim".

10.    At an early stage in the proceedings, BHP challenged the court's jurisdiction and sought to have the proceedings struck out as an abuse of process. At first instance, Turner J agreed, but his decision was reversed by the Court of Appeal on 8 July 2022 ([2022] EWCA Civ 951).

11.    The first trial of these claims, dealing with various aspects of liability (the Stage One Trial") took place between October 2024 and March 2025. The judgment of the trial judge, O'Farrell J, was handed down on Friday, 14 November 2025.

**Mr de Freitas**

12.   Mr de Freitas is a Brazilian national. His relevance is that between January 2019 and July 2023 he was a director and then CEO of a Brazilian non-profit legal entity known as the Renova Foundation ("Renova"). This had been set up on 30 June 2016 pursuant to a settlement agreement known as the "TTAC" and which was made in order to provide compensation for losses arising from the collapse of the dam. The TTAC was entered into between Samarco, BHP Brasil, Vale and others, including the Brazilian Federal Government. Renova's purpose was to administer  the various compensation schemes which had been created pursuant to the TTAC. Those schemes were (a) the Programme for Mediation Compensation ("PIM") which operated between 2017 and 2021, (b) the Extraordinary Expenses programme, (c) the Novel System, which was created by the 4th Federal Court in Brazil in July 2020 and (d) the Repactuation Agreement ("the Repactuation") made on 25 October 2024 between BHP Brasil, Samarco, Vale and various Brazilian public authorities. I refer to the first three of these settlement schemes as "the Historic Settlement Schemes".

13.   Pursuant to the Repactuation, Renova was dissolved. Although Mr de Freitas had left Renova in 2023, PG contends that the Repactuation had been under discussion and negotiation for 2 years before his departure.

14.   One issue which arose in the jurisdiction/strike-out application made by BHP was the adequacy or otherwise of the Historic Settlement Schemes in Brazil. BHP contended that a system of full redress for the claimants here was already in operation there. To that end, BHP filed an 87-page WS from Mr de Freitas on 28 November 2019 and a further, 110-page WS on 10 June 2020 ahead of the hearing of the application before Turner J in July 2020. The third WS was served after his judgment had been given and in the context of the appeal from that judgment, on 10 December 2021. This evidence did not deal with the Repactuation at all. As is usual in relation to interlocutory applications of this kind, Mr de Freitas was not cross-examined on any of his WSs.

15.   In reversing the decision of Turner J, the Court of Appeal rejected the notion that it was clear that full redress was being provided by the Historic Settlement Schemes and took issue with some of the statements made by Mr de Freitas which had suggested that it was.

**PG's Lien Claim**

16.    Since November 2018, PG has threatened claims in its own right against BHP in respect of the settlements made in Brazil, insofar as made by its clients who are claimants in the Main Claim here. At this early stage, there were few details of the basis of the claims, save that PG contended that it had a lien over settlement monies received in Brazil, and that those settlements had been wrongfully procured by BHP to the detriment of PG. On 29 November 2018, BHP sought to clarify how an equitable lien was said to arise where the settlement payments were said to have been made by Renova, not BHP, and where PG had not suggested that the terms of its retainers entitled it to any part of the payment by Renova to its clients. No response was received for nearly four years, when correspondence resumed on 29 September 2022 in the form of a letter from PG. This stated that PG had an interest in any funds paid to its clients on terms which compromised the proceedings here, by virtue of its retainers. It said that BHP was aware of this interest from at least November 2019 when its solicitor made reference in a witness statement to PG's conditional fee agreement by which it could recover up to 30% of any damages awarded or settlement amount. PG went on to say that it had a solicitor's equitable lien against the assets of BHP or third parties associated with them to the value of amounts which would have been recoverable by it under the retainers, had such funds been paid by way of damages or settlement in the normal way. In the event that any amount was or was to be paid to any of its clients out of funds originating with BHP on the condition that such clients withdraw from or discontinue any of their claims here, PG reserved the right to assert its equitable lien against BHP's assets. There then followed some further correspondence in which BHP sought copies of the retainers between PG and the relevant clients, whose terms, it alleged, had been broken as a result of the relevant settlements, at the instance of BHP. PG did not provide copies of those retainers and did not expand further on the nature of the claim.

17.    The way that PG described the Lien Claim (as it was then called) in its initial memorandum for the 1782 Application was as follows:

## II.    BHP Is Surreptitiously Negotiating Settlements Directly with Pogust Goodhead Clients in Brazil without Applicant's Involvement.

The English Dam Litigation was instigated partly because of Renova's failures to provide redress. And while Applicant has spent the past six years litigating that case against BHP on behalf of Pogust Goodhead Clients, BHP was covertly negotiating settlements in Brazil directly with Pogust Goodhead Clients without Applicant's knowledge or involvement. *Id.* ¶ 24. Applicant understands that settlements have been and are being negotiated directly with Pogust Goodhead Clients in Brazil by BHP, Renova, and Samarco, to be paid under the auspices of Renova. *Id.* ¶ 25. These negotiations and settlements are contrary to Applicant's retainer agreements with Pogust Goodhead Clients and contrary to English law. *Id.* ¶¶ 26-27; *see also* Discussion, *supra*, at 1-2.

On October 25, 2024, Samarco, BHP Brasil, Vale, Renova, the Federal Union, the governments of Minas Gerais and Espírito Santo, and several Brazilian justice institutions reached an agreement (the "**Repactuation Agreement**") to resolve multiple actions in Brazil arising from the Dam collapse. Varga Decl. ¶ 23. The Repactuation Agreement introduces various compensation schemes intended to compensate those affected by the Dam collapse, many of whom are Pogust Goodhead Clients. Many of the standard compensation agreements provided for by the Repactuation Agreement include provisions that purport to waive Pogust Goodhead Clients' right to pursue claims in the English Dam Litigation. *Id.*

Applicant claims an equitable lien and charge over any settlements negotiated with Pogust Goodhead Clients without Applicant's involvement, which may compromise Pogust Goodhead Clients' right to pursue their claims in the English Dam Litigation. *Id.* ¶ 31. Accordingly, Applicant intends to file a case in the High Court of Justice in London, England, seeking an equitable lien and charge against BHP for its role in negotiating settlement agreements directly with Pogust Goodhead Clients without Applicant's knowledge or involvement. *Id.* ¶ 32. Applicant intends to

7

show that it is entitled to an equitable lien because, among other reasons, its services to the Pogust Goodhead Clients, in particular, in the English Dam Litigation have significantly contributed to their recovery of settlements negotiated directly with BHP, Renova, and Samarco, and to any recovery under the Repactuation Agreement or other related settlements. *Id.* ¶ 33.

### III.    Applicant Seeks Testimony from Mr. de Freitas Relevant to Its Lien Claim.

Mr. de Freitas resides or is found in the Eastern District of Arkansas. *Id.* ¶ 34. Applicant seeks testimony from him relating directly to its Lien Claim against BHP. *Id.* ¶¶ 39, 50. This evidence will assist Applicant in filing and proving its claim. *Id.* ¶ 50.

Mr. de Freitas is an important witness and uniquely well positioned to address several key issues in the Lien Claim. *Id.* ¶ 35. He held senior positions with Renova and was on its board for four years. He was Renova's CEO for the last three of those years. *Id.* ¶ 36.

While Mr. de Freitas was CEO of Renova, the foundation inserted requirements into settlement agreements with Pogust Goodhead Clients and others that they withdraw from the English Dam Litigation or waive their right to participate in the English Dam Litigation. *Id.* ¶ 37. Renova also set up client centers in an attempt to lure Pogust Goodhead Clients and others to settle directly with Renova. *Id.* ¶ 38.

Accordingly, Applicant wishes to depose Mr. de Freitas on his personal knowledge concerning, among other things:

(1) The impact of Applicant's work for the Pogust Goodhead Clients on settlement negotiations in Brazil;

(2) The involvement of BHP in Renova;

(3) The involvement of BHP in Renova's settlement negotiations and, in particular, its settlements with Pogust Goodhead Clients;

(4) The timing and content of Renova's settlement agreements with Pogust Goodhead Clients.

18.    Further on in this memorandum, PG stated that:

> Ex. B. Mr. de Freitas's testimony likely will be central to the Applicant's ability to plead, and prove, that BHP improperly intruded on Applicant's attorney-client relationship with the Pogust Goodhead Clients by surreptitiously negotiating settlements with them. *See* Varga Decl. ¶ 50.

19.    Page 15 of this memorandum added that PG wished to depose Mr de Freitas "on topics tailored to the Lien Claim, knowledge of which he obtained through his corporate role with Renova… to plead, and prove, that BHP improperly intruded on the applicants attorney-client privilege with the Pogust Goodhead Clients by surreptitiously negotiating settlements with them…"

**The Judgment of Judge Baker and the Subpoenas**

20.    The judgment of Judge Baker on the original 1782 application accepted that the basic requirements for the operation of 1782 were met, namely that discovery was sought from a person found in the court's district (i.e. Mr de Freitas), that it was for use in a proceeding in a foreign tribunal (i.e. PG's putative claim here) and that PG was an "interested person" in such proceedings, in this case, of course, as claimant.

21.    Once those basic requirements have been met, it is a matter of discretion whether or not to make the order sought. The decision of the US Supreme Court in *Intel Corp v Advanced Micro Devices Inc* 542 US 241 (2004) states that there are 4 factors to consider at this point. These are whether the person from whom discovery is sought is a participant in the foreign proceedings, the nature of the foreign tribunal and the character of the proceedings underway abroad and the receptivity of the foreign court to US federal-court judicial assistance, whether the 1782 application conceals an attempt to circumvent foreign proof-gathering restrictions of a foreign country or the United States, and whether the discovery sought is unduly intrusive or burdensome.

22.    On those discretionary factors, Judge Baker recited that PG would probably not be able to obtain any testimony from Mr de Freitas without the Arkansas Court's help because he would be outside the English courts jurisdiction. Further, there was no indication that the English court would not be receptive to evidence obtained in the United States. Nor was there any attempt to circumvent restrictions on foreign evidence-gathering. Nor, finally, was the discovery sought unduly intrusive or burdensome. The scope of the subpoenas was tailored to information which

Mr de Freitas would likely have known or been in control of while employed as CEO and director of Renova. So all the discretionary factors pointed in favour of granting the order.

23.    The subpoenas ordered relate to:

(1)    Mr de Freitas's communication with, or among, Renova or its employees, BHP, Vale, and Samarco's employees concerning the oversight or involvement in Renova activities;

(2)    his communication with, or among, Renova or its employees, BHP, Vale and Samarco's employees concerning the collapse of the dam, the litigation here, PG, its clients and affiliates;

(3)    all documents concerning BHP's and Vale's oversight or involvement with Renova's settlement negotiations with victims of the dam collapse and PG's clients; and

(4)    all settlements entered into between Renova and PG's clients and related documents.

**PG's Recourse Claim**

24.    On 24 July 2025, some time after the submissions on the MTQs had been completed, PG's own solicitors here, Orrick, Herrington & Sutcliffe (UK) LLP ("Orrick") sent to BHP a 57-page letter before action ("the LBA"). I can summarise the LBA by reference to how PG has described it at paragraph 14 of its Skeleton Argument:

(1)    BHP, and others, have wrongfully instrumentalised the Historic Settlements (as PG described them) and the Repactuation to their own financial benefit, and to the detriment of PG.

(2)    With respect to the Historic Settlements and Repactuation, BHP was or should have been on notice that the Retainers precluded a direct settlement by a Fundão Claimant of its claims arising out of the Collapse without (i) PG's knowledge and consent, and (ii) provision for PG's fees. Nevertheless, BHP engaged in conduct which led to just such direct settlements taking place. This has resulted in the whole of the settlement sums being paid to a Fundão Claimant without provision being made for PG's contingency fee share of any settlement sum, to which it would have been entitled under the relevant Retainer (the settlement sum properly to be viewed as a fruit of PG's labour in advancing the Fundão Claimants' claims in the Main Proceedings);

10

(3)     With respect to the Repactuation, in addition to the same conduct as with the Historic Settlements, BHP engaged in conduct which led to the Repactuation effectively requiring adhering Fundão Claimants to dis-instruct PG and, in some instances, explicitly prohibiting any settlement sums paid under it to a Municipality Fundão Claimant from being used to pay a contingency fee to PG;

(4)     The Historic Settlements and Repactuation also contain a series of liability waivers in favour of BHP and others to which a Fundão Claimant must agree in order to receive the relevant compensation (the "Waivers"). There is a dispute between the Fundão Claimants and BHP, to be resolved in the Main Proceedings in due course, about the legal effect and/or construction of the Waivers in the Historic Settlements. If BHP's case is correct, the result could be that various Fundão Claimants are no longer able to pursue claims for loss in the Main Proceedings, reducing the overall value of the Main Proceedings claim, and as a corollary the level of contingency fee to which PG would in principle be entitled.

(5)     BHP's conduct has injured PG to the extent it has prevented or will prevent PG from being paid, or will diminish the global value of, the contingency fees to which it otherwise would have been entitled under its Retainers;

(6)     PG claims £1.3bn from BHP.

25.     The monetary claim made arises, according to PG, because if its allegations are proved, then BHP must pay to it the contingency fees that should have been paid out of the Historic Settlement Schemes and the Repactuation or damages representing the diminished value of PG's contingent fee entitlement under its retainers. The LBA refers to various causes of action, including unlawful means conspiracy, inducement of breach of contract (i.e. the Retainers) and enforcement of its claimed lien.

26.     The production of the LBA had in fact been presaged by PG in the course of the MTQ submissions. At paragraphs 22 and 23 of Ms Varga's Supplemental Declaration dated 25 April 2025 ("the Supplemental Declaration"), she said that Orrick had been instructed to prepare and file the Lien Claim in October 2024 and they were now in the process of preparing a letter before action. PG intended to send the letter before action within 60 days (ie by the end of June 2025) and file (i.e. issue) the Lien Claim by approximately the end of this year.

27.     PG now refers to its putative claim against BHP as its "Recourse Claim".

**The Course of the Section 1782 application in Arkansas**

28.     I have set out the basic chronology at paragraph 5 and the *ex parte* judgment of Judge Baker at paragraphs 20 - 22 above. I now add some further detail. There had in fact been eight earlier occasions on which PG had made 1782 applications in which BHP had successfully intervened. PG did not notify BHP of the instant 1782 application although, as noted, it was not obliged to do so. There are, of course, orders which can be made by the court here which are, at least initially, granted on an *ex parte* basis, subject to the right of the other party concerned to apply to set them aside.

29.     Prior to May 2025, Mr de Freitas' key points made in his MTQ were that the scope of the discovery and depositions sought was far too wide,  they were not necessary in order for PG to be able to articulate its claim against BHP here, and in any event he had already supplied three WSs. He also said in his Declaration that during his time at Renova, he did not have any direct involvement in its negotiation of individual settlements including any involvement in the negotiation of provisions restricting the ability of certain of PG's clients to pay legal fees out of its settlement funds, and that given his departure in July 2023, he was also not involved in negotiating the Repactuation.

30.     While PG had said that it probably would not be able to obtain the testimony of Mr de Freitas, save through the subpoenas, it had not in fact asked him whether he would testify voluntarily in England.

31.     However, on 7 May 2025 and by an email from his lawyer, Mr de Freitas offered to appear voluntarily in the UK and testify in connection with the Lien Claim, provided that he gave testimony only once on those issues. So his voluntary appearance in England would be subject to PG's agreement to stay the current 1782 proceedings and forego the depositions at this stage. Once Mr de Freitas appeared in England and gave his evidence, the 1782 proceedings would be dismissed. That proposal was supported by BHP, but was rejected PG's lawyers on the basis that this would not allow PG to have its pre-suit discovery and Mr de Freitas' testimony would not be available to PG to plead out the Lien Claim. Further, the English court could not enforce his promise. All of this was recounted in a Declaration filed by Mr de Freitas' lawyer on 9 May. On the same day, his lawyer filed Mr de Freitas' Reply submission referring to this offer. It also said that Mr de Freitas had never argued that sitting for a deposition in an Arkansas conference

room would itself be unduly burdensome. Rather it was a question of the wide scope of the subpoenas. This submission sought the quashing of the subpoenas, or at least the stay of proceedings pending the giving of evidence in England by Mr de Freitas, or, as a further alternative, that the scope of the subpoenas should be significantly narrowed by the court.

32.     According to paragraph 52 of Mr Michael's WS, in a conference call on 26 May 2025 with Mr de Freitas' lawyers, the latter explained (again) that Mr de Freitas was only prepared to give evidence once and his preference was for this to be by way of witness statement and oral evidence at trial here. They also said that he had no intention of moving outside the reach of the Arkansas District Court.

33.     On 3 June 2025, PG's US lawyers wrote to BHP's US and English lawyers in relation to the offer by now made by BHP to use its best endeavours to obtain his testimony at a trial of the Lien Claim here. Such best efforts would involve BHP calling him as a witness and offering to pay him for his time and expense in testifying, with him voluntarily flying to London so to do. BHP's offer was refused on the basis that it would mean that PG could not use his testimony to plead its Lien Claim and no English court would be able to compel his attendance here if he chose not to attend.

34.     Through the extensive written and oral submissions made before Judge Baker, BHP effectively made the same sort of points as have been made before me in the ASI claim, in the context of saying why the 1782 subpoenas should be quashed, to which PG then had to respond. Indeed, BHP made reference to the English law position on ASIs and cited, for example, *Omega Group Holdings Ltd & Ors v Kozeny & Ors.* [2002] CLC 132 (to which I refer in detail below)*,* in its original MTQ dated 4 April. See, in particular, paragraphs 39-42 of Mr Michael's Declaration in support.

35.     In the course of the hearing before Judge Baker on 6 June, BHP's lawyers informed her that a claim for the ASI was about to be made here, again referring to *Omega*, among other things. Although she queried initially whether she should wait for the outcome of that claim before ruling on the MTQs, she concluded that she should determine the MTQs on the basis of the materials before her, observing that they were "ripe" for her to rule on. She did, however, ask to be kept informed of the progress here of any ASI claim.

**Background to the making of the ASI Claim**

36.   On 12 March 2025, Slaughter and May wrote to PG about its 1782 Application, stating that it was defective in many ways, and that pursuit of it was unconscionable. One of the points made was that the Declaration of Ms Varga which accompanied the application had stated that:

> "While Applicant has been actively litigating the English Dam Litigation in the United Kingdom, BHP has been surreptitiously negotiating settlement in Brazil directly with Pogust Goodhead Clients without Applicant's knowledge or involvement and contrary to the retainer agreements between Pogust Goodhead and Pogust Goodhead Clients."

37.   This was said to have been misleading because at all times, PG was in fact aware of the existence and operation of the settlements in Brazil.

38.   The letter concluded by inviting PG to withdraw the subpoenas by 19 March and that BHP's rights were reserved. There was no express reference to applying for an ASI but this must have been what Slaughter and May was intending to refer to, because in this jurisdiction, that would be the only way to prevent PG from relying on the subpoenas if it did not agree to withdraw them. Further, there was express reference to Ms Varga contending in her Declaration that the authority relating to double cross-examination (i.e. *Omega*) was distinguishable.

39.   By its letter in reply dated 19 March 2025, PG took issue with all the points made about the 1782 Application. In particular, it said that Ms Varga had been justified to use the word "surreptitiously" because while PG was aware of the settlement negotiations (and indeed had complained about them) they were being undertaken with PG's clients but without PG's consent and involvement. The latter is obviously correct, but to my mind, the way Ms Varga first put it was somewhat misleading, because it suggested that PG did not know about the settlements at all. That said, it was also plain to the reader of her Declaration that PG was by then aware of the settlements, otherwise Ms Varga could not have referred to them. Further, in her Supplemental Declaration, Ms Varga explained precisely what PG did and did not know about the settlements and the extent to which it had sought information about them from BHP which was not forthcoming. See paragraphs 25-32.

40.   PG's letter invited BHP to withdraw its criticisms of the 1782 application and did not confirm that PG would withdraw it. Notwithstanding PG's refusal to withdraw the subpoenas, BHP took no steps here to apply for an ASI until 13 June. Instead, what BHP did on 14 March (and thus in advance of the deadline given to PG of 19 March) was to apply to intervene in Arkansas as already noted, and thereafter engaged fully there by issuing its own MTQ. Indeed, the

14

arguments made by BHP in its submissions on its MTQ covered very much the same ground as it now covers in its ASI claim – see paragraphs 90-92 of Ms Varga's WS here.

41.     On 31 March, BHP's US lawyers, Jones Day, wrote to PG's lawyers, Weisbrod, Matteis & Copley, saying that Mr Matteis of the latter firm had violated Rule 11 (of the Arkansas Civil Procedure Rules) in that the 1782 application was frivolous because of the three WSs already supplied by Mr de Freitas and the reference to BHP's "surreptitious" conduct referred to above. This elicited a firm response from Mr Matteis on 21 April, denying this, and it does not appear as if the Rule 11 point was taken any further.

42.     I do not think anything turns on the suggestion of misrepresentation for present purposes. If there is, it is a matter for Judge Baker, having been ventilated fully in the MTQ submissions.

43.     On 9 May, Slaughter and May wrote to PG's US lawyers, saying that they should now agree to stay the 1782 Application, pending the giving of evidence by Mr de Freitas at any trial here, following which it should be withdrawn. If PG did not agree by 16 May, then BHP intended to apply here for an ASI. PG did not agree. Hence the intimation to Judge Baker on 6 June that it would be seeking an ASI.

44.     On any view there was a delay of just under four months between BHP learning of the subpoenas and applying here for the ASI. There was no good reason for that delay. Indeed, BHP effectively threatened an application for an ASI in its letter of 12 March but then did nothing about it. Paragraph 48 of Mr Michael's WS seeks to explain why an ASI now is appropriate but it does not explain the delay in seeking it. In argument it was suggested that there was no point in applying prior to becoming aware in early May that Mr de Freitas was offering to testify here if the subpoenas were stayed. There is nothing in this point. Back in March, Slaughter and May was making the point that PG had not investigated whether Mr de Freitas would in fact be prepared to testify in England. To the extent it did not do so, BHP could have made the same enquiry then, and discussed in detail with Mr de Freitas the basis on which he might be prepared to testify later, in England, and making the offers which were in fact made much later.  It is not suggested that BHP had no means of contacting Mr de Freitas once it had learned of the subpoenas, and of course he and they had a previous line of communication and he had produced three WSs for BHP.

15

45.    Another point made by BHP is that it was reasonable to wait until it had PG's response (given on 3 June) to its offer to undertake to use its best endeavours to have Mr de Freitas give evidence here. As to that, PG suggested that there was no point in waiting because it would obviously refuse. I do not set much store by that; however, the real answer is that, again, all of that could have been considered with Mr de Freitas at a much earlier stage. Once more, it is important to note that *Omega* featured in BHP's MTQ submissions from the outset, this of, course, being the case where an undertaking was offered (see below).

46.    In truth, there was nothing stopping BHP from seeking an ASI on an urgent basis in March 2025. It could have done so without seeking to intervene in Arkansas or making its own MTQ. Mr de Freitas' own MTQ was not made until 4 April, by which time the Court here would certainly have been able to hear an urgent ASI application or claim.

47.    I should add that even if PG should have informed BHP at the outset that it was making the 1782 application, all that would mean is that, BHP could and should have (on its case) sought an ASI here even earlier. It certainly does not assist it on the question of delay.

## THE PARTIES' POSITIONS

48.    BHP contends that PG's conduct is vexatious and oppressive ("VO") and the court in its discretion should grant an ASI. This is for the following summary reasons:

(1)    the evidence sought from Mr de Freitas cannot be described as critical to PG's evaluation as to whether it has claims against BHP; whatever the position may have been when the 1782 application was first made, PG has now been able to articulate its putative claim in considerable detail in the LBA;

(2)    as it so happens, Mr de Freitas has already provided three substantial WS, dealing with the settlements in Brazil, as part of BHP's jurisdiction application, which PG has;

(3)    the only proper characterisation of PG's 1782 application is as a speculative fishing expedition;

(4)    the present stance of Mr de Freitas is that he is prepared to give evidence either at the deposition contemplated by the subpoenas issued by Judge Baker or at the trial of any claims, if made, by PG against BHP, not both. As he lives abroad, he is not compellable

16

by the English Court to attend as a witness and he would refuse to do so, if deposed in Arkansas;

(5)    on the basis of that stance, it would be an unfair interference with BHP's litigation interests here in respect of any putative claim for him to be deposed in Arkansas and then not be available to be called as a witness at the trial;

(6)    in order to give some assurance that, absent the deposition in Arkansas, Mr de Freitas would indeed attend the trial of any claim made by PG against BHP and give evidence, he is prepared to undertake to this Court that he would attend and BHP is prepared to undertake to use its best endeavours that he does so;

(7)    in this particular context, where the foreign court is involved, not because there are substantive proceedings before it which might compete with any proceedings here, but simply because of a facility whereby the foreign court can order evidence to be taken to assist proceedings elsewhere, there are no considerations of comity which would be adverse to the grant of an ASI;

(8)    PG, through its lawyers in Arkansas, made misleading statements in its original 1782 Application.

49.    PG's position in summary is as follows:

(1)    while it is correct that it has now been able to set out details of its putative claim in the LBA, Mr de Freitas is likely to have useful evidence to give which bears upon how PG may plead and prove its claim;

(2)    the matters on which he is to be deposed are within a relatively narrow compass, as indicated by the fact that the deposition is not to take longer than one day; if Judge Baker considers, having heard the MTQ, that the areas on which he is to be disposed need to be more tightly drawn, that is classically a matter for her; it certainly cannot be said that the deposition process is itself inherently burdensome or inconvenient for Mr de Freitas;

(3)    the three WSs already provided by Mr de Freitas do not go to the issues for the deposition now raised; rather, they deal with more general features of the various settlement schemes managed by Renova;

(4)     it is not in fact certain that if deposed in Arkansas, and then BHP wanted to call Mr de Freitas as a witness, that he would refuse to attend the trial here of any putative claim brought by PG;

(5)     while Mr de Freitas has offered an undertaking it is effectively unenforceable unless he was in breach of it and then entered this jurisdiction; as for BHP, its undertaking adds little, because in practice there can be no breach unless it has failed to use its best endeavours to secure Mr de Freitas' attendance and it would be difficult for PG to show this; in any event, PG wants to have evidence from Mr de Freitas now, not at some later trial, so that it can assist with its pleading and proving its case (or not, as the case may be);

(6)     there has in fact been a substantial delay on the part of BHP in making its claim for the ASI, which occurred only recently, given when it first knew of the making of the order by Judge Baker early this year; over the period of the delay, what BHP did was to engage substantively with the court in Arkansas by bringing its own MTQ which in practice, even if not as a matter of strict law, means that it has effectively submitted to the jurisdiction of the Arkansas court as a forum for complaining about the orders made there;

(7)     PG did not make any misleading statements to the court in Arkansas but in any event if there was any question of misleading that court, a point which has been raised with Judge Baker, this is a matter for her, not for this Court.

## **THE LAW**

50.    It is common ground that the species of ASI with which we are concerned is where the respondent's pursuit of the foreign proceedings sought to be restrained is unconscionable because it is VO. We are not concerned with the other main manifestation of the ASI which is where the foreign proceedings have been brought in breach of an exclusive jurisdiction clause.

### South Carolina

51.    The leading case which expresses the VO principle is *South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" NV* [1987] 1 AC 24. In this case, the claimant reinsurer claimed against its three re-reinsurers in the Commercial Court. After those proceedings commenced and before the re-reinsurers had served their points of defence, they applied by

motion to the United States district court, being Western District of Washington, Seattle for orders under 1782. They sought depositions and discovery from the relevant underwriting agent and loss adjusters both of whose businesses were located in Washington State. South Carolina then applied in the Commercial Court here for an ASI to restrain the re-reinsurers from proceeding with the 1782 application.

52.    The first instance Judge granted the ASI and this was confirmed by the Court of Appeal. The matter then went to the House of Lords. The leading judgment was given by Lord Brandon. Here, at page 40D, and as to the basis for such an ASI, he referred, among other things, to the situation where one party to an action had behaved or threatened to behave in a manner which was unconscionable. At page 41C, he said that it would probably be unwise to define the expression "unconscionable conduct" in anything like an exhaustive manner but it included at any rate "conduct which is oppressive or vexatious or which interferes with the due process of the court."

53.    Lord Brandon considered that in the instant case, the conduct of the re-reinsurers in making their 1782 application was not thereby interfering with the English court's control of its own process. This was in a context where he recognised that in general, the English High Court did not have an equivalent of the procedure in courts of the USA where there is pre-trial discovery and depositions at an early stage. Nonetheless, the High Court does not generally exercise any control over the manner in which a party obtains the evidence needed to support his case. It is up to that party how it obtained such evidence provided that its use in litigation here is lawful. As he put it at page 43A-E:

> "all they have done is what any party preparing his case and the High Court here is entitled to do, namely to try and obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case."

54.    Nor did Lord Brandon see that the 1782 application would cause hardship to South Carolina by reason of inconvenience or the incurring of additional costs. This was a case where neither the underwriter nor the loss adjuster themselves objected to the order being sought in the Washington court.

55.    In the event, the House of Lords reversed the earlier decisions and declined to grant the ASI. It should be pointed out that by the time the case had reached the House of Lords, the re-reinsurers were no longer seeking depositions but only discovery of documents. So far as the documents were concerned, they would not have been disclosable by South Carolina as they were in the

19

possession of the loss adjuster and the underwriter, who were foreign non-parties to the litigation here. That said, it seems to me that Lord Brandon was disagreeing in principle with the views expressed by the first instance Judge and by the Court of Appeal at pages 41-43. The only slight caveat to this is that Lord Brandon, while awarding the re-reinsurers their costs of the appeal before the House of Lords, was not prepared without further argument to awards their costs below because different considerations might apply because of the breadth of their application under 1782 as originally framed, and because they had made misleading statements about the position under English law in their original memorandum for which they now apologised.

56.    Numerous subsequent cases have referred to the statements of principle enunciated by Lord Brandon set out above. It is further common ground between the parties that even if the course of action under 1782 is regarded as VO, it is then a matter for the discretion of the court whether or not to grant the ASI sought.

57.    Finally, PG seeks to make a distinction between an ASI, properly so called, and what it refers to as an Anti-Enforcement Injunction ("AEI") which has to be sought when there is already a concluded judgment ready for enforcement locally, in the foreign jurisdiction. Again, I will deal with this in context below, but for present purposes my reference to an ASI cover both situations.

58.    There are only three cases where an ASI has been granted by the English Court in the context of 1782. In other cases, it did not. As both sides have made references to such cases in some detail it is worth setting them out at this stage. I have added one case, also referred to, which is on the subject of delay in the context of ASIs though not in relation to 1782 applications.

**Bankers Trust**

59.    In *Bankers Trust International plc v PT Dharmala Sakti Sejahtera* [1996] C.L.C. 252, the trial in England had taken place in July 1995 and judgment was reserved. In the course of these proceedings, the defendant had made a number of largely unsuccessful applications for discovery in relation to the claimant's transactions with other clients. In August 1995, it sought to amend its pleadings to allege systematic fraud on the part of the claimant on the basis of an article published in the Washington Post relating to a different action in the USA which the defendant suggested showed that the claimant had been operating a fraudulent system of conduct in relation to other clients. That application to amend was refused here. The defendant

then applied to the US District Court under 1782 for an order for disclosure against the claimant and its parent and associated companies, and the order was granted. The defendant hoped that, as a result of that order, further relevant information would emerge which would enable it to re-apply to the English Judge to amend its case. This then prompted the claimant's claim for an ASI to stop the 1782 process.

60.    In his judgment, granting the ASI, Mance J referred to *South Carolina*. While accepting the principles set out by Lord Brandon, he distinguished the case before him on the basis that the discovery sought in South Carolina was against non-parties to the English proceedings and although some disclosure had been given, the issue was whether it was sufficient without the execution of the 1782 order which the two entities did not now resist. The discovery sought by the defendant in the instant case was against the claimant as opposed to a non-party. Second, the application in South Carolina was at an early stage with a view to providing evidence at the eventual trial. In his case, however, the trial was over and judgment was awaited. Third, many of the precise categories of documents sought to be obtained under 1782 had already been sought, unsuccessfully, in discovery applications in the English case. The overlap was very considerable.

61.    Further, the ambit of the proposed exercise under the 1782 order in New York would extend potentially to the whole subject matter of numerous transactions and many other customers. Mere matters of disposition or credit disclosed by those exercises were unlikely to be admissible at all in the English case and some of the evidence to be obtained appeared to be of no real significance. Also, it would not be appropriate to burden this case with a full investigation involving discovery in relation to the American problems affecting Bankers Trust companies. The case would become unmanageable if there had to be such further investigation. Finally, there had to be an end to the litigation and there was a legitimate expectation that the trial already concluded would be an end of the matter.

**Omega**

62.    In *Omega*, Peter Gross QC (as he then was), sitting as a deputy High Court Judge, granted an ASI in the following circumstances: there were extant proceedings in the Commercial Court where damages were claimed by the claimants against the defendants for breach of fiduciary duty, breach of contract and conspiracy relating to an investment in the privatisation process in Azerbaijan. Worldwide freezing orders had been granted here and there was satellite litigation

in other jurisdictions concerning assets which were the subject of those orders. The defendants alleged, among other things, that the claimant's investments were accompanied by substantial corrupt payments so that the claims made were tainted by illegality.

63.    Ahead of the trial of the action here, the first defendant obtained orders from various US District Courts under 1782 in relation to 10 employees and former employees of and investors in the claimant, to make witness statements by way of depositions. These were all witnesses who were due to give evidence for the claimant at the trial in any event. The relevant applications had been made without notice to the various witnesses or to the claimants. There was also a question of documentary disclosure but that was stood over, so that the Judge here was dealing only with the depositions. The relevant witnesses had all confirmed in writing their willingness to submit witness statements in the English proceedings and attend trial to give evidence. In those circumstances, the claimant said that the use of 1782 so as to depose those same witnesses ahead of trial was unconscionable and an abuse of process.

64.    The Judge considered that the first question was whether the first defendant's conduct was unconscionable; if it was, the question was then whether the Judge should grant an ASI as a matter of discretion. As to the first question he made extensive reference to *South Carolina*. Notwithstanding what Lord Brandon said, the Judge did not read *South Carolina* as authority for the proposition that it can never be unconscionable for a party to English litigation to apply for orders under Section 1782. I would add that PG does not advance such a proposition here. Rather it says that there is no unconscionability on the facts of this case.

65.    The Judge noted that *South Carolina*, in the event, did not address the question of pre-trial depositions although he did not think it was permissible to read into that decision an inference that the result in the House of Lords would have been different if the depositions part of the Section 1782 application there had not been abandoned.

66.    The Judge concluded that it would be unconscionable, in the sense of being oppressive, vexatious and an interference with the due process of the English court for the first defendant to pursue the 1782 applications in respect of witnesses who were going to be called to give oral evidence at the trial here. In particular, he said this at paragraph 23:

> "…As it seems to me, in the case of such witnesses and as a matter of practical justice and good sense, the hybrid procedure produces the worst of all worlds:
> (1) If the relevant witnesses (i) give English witness statements, (ii) are then deposed in the US, (iii) thereafter attend to be cross-examined in the English trial, they will have been subjected to unwarranted

22

double cross-examination and the trial will suffer from unnecessary duplication. I am not persuaded to reach a contrary view by the fact that the witnesses are or may be familiar with US deposition procedures in the context of US litigation. In any event, I accept Mr Mortimore's submission in this regard that, here, oppression must be judged by English standards.

(2) Conversely, accepting as I do that there is a real, if unquantifiable, risk that a witness once deposed in the US may be discouraged from attending the trial in England in order to be cross- examined a second time, the S. 1782 applications pose a risk of interference with the trial itself. It would be most unsatisfactory for the trial court to be left with depositions from witnesses in such circumstances and to be deprived of their live testimony at the trial itself.

(3) For the reasons already discussed, I do not think that South Carolina precludes the conclusion which I have reached. In this case and in respect of witnesses who are intended to come and give oral evidence at trial here, depositions are different and unconscionable. I should add that each party addressed me on the apprehended consequences of a ruling adverse to its case; the claimants submitted that if I was against them, the use of pre-trial depositions would become commonplace whenever witnesses were located in the US; for Mr Kozeny, it was argued that an unfavourable decision would render S. 1782 of little use. I am not sure that it is right to view the matter in this way; individual cases ultimately turn on their own facts. So far, however, as a decision of this court, necessarily subject to South Carolina, may have wider policy ramifications, then I do not shrink from saying that the use of S.1782 to depose the selfsame witnesses who will give witness statements and attend to give oral evidence here, has, in general, little to commend it.

(4) The conclusion that the pursuit of the S. 1782 applications is unconscionable is not displaced by Mr Kozeny's concerns, to which I have given anxious consideration. These concerns are addressed more fully in para. 24 below; to the extent that they go to the threshold inquiry of unconscionability rather than the balance of convenience, then my reasoning in para. 24 is applicable here. I accordingly conclude that there is jurisdiction to grant the injunction sought by the claimants."

67.   Having thus concluded, the Judge then went on to say that as a matter of discretion, the ASI should indeed be granted. This was partly because of the reasons which rendered the first defendant's conduct unconscionable, but also because, since the relevant witnesses would be giving evidence at trial here anyway, the first defendant would not gain any legitimate advantage by using the depositions procedure. Nor could the first defendant point to any specific concrete matter which would be covered by the depositions but which would not also be covered at trial. If in fact one or more of the putative witnesses did not attend trial, then the first defendant could apply to lift the injunction. There was presently a genuine intention on the part of the claimant' solicitors and the witnesses themselves to produce witness statements and attend trial to give oral evidence.

68.   The ASI would be accompanied by an undertaking from the claimants to use best endeavours to produce the relevant witness statements and call them to give evidence at trial and to notify the first defendant if there was any reason to believe that this could not be achieved.

69.   BHP here says that the case before me is on all fours with *Omega*, and of course it has offered undertakings which in fact go beyond the undertaking from the claimants in that case because there is an undertaking from Mr de Freitas as well. PG says that the position in *Omega* is different from that pertaining here and does not support BHP's case for an ASI.

**Nokia**

70.    *Nokia v Interdigital Technology* [2004] EWHC 2920 (Pat) involved patent proceedings here. The claimants made a 1782 application in a US District Court for another telecoms company to produce one or more of its officers to be deposed with regard to a number of matters which were expressed very broadly. Having referred to the case law (including *South Carolina* and *Omega*) Pumphrey J first said that it could not be said that material obtained pursuant to the 1782 order sought could not be deployed in the proceedings here. Second, the English court should not seek to circumscribe the discretion by imposing its own view as to the appropriateness of the classes of documents sought. The question of whether the 1782 order should be made was a matter for the District Court alone and the English Court should only interfere, among other things, where the invocation of that jurisdiction is oppressive or vexatious or tends to interfere with the due process of the English court. As for depositions, he said that cases suggest that if the deposition evidence was not focused on the issues in the English proceedings it would not be of any practical utility at all. However, the possibility that the material obtained under the 1782 order sought would be useful in the action here could not be excluded. What would have to be shown is that obtaining the material amounted to an abuse of process. But he could not find that there was abusive behaviour in the sense that the order sought was intended to or at least would have the effect of causing unfair prejudice to the opposing party in the present proceedings. So he declined to grant the ASI.

71.    I should add that it is said by BHP (but not accepted by PG) that in *Nokia* it must have been the case that the relevant witness was not otherwise going to be giving evidence here, otherwise Pumphrey J would have granted the injunction. I am not in a position to read that into his decision, whose significance lies in the fact that he considered that the English Court should not circumscribe the discretion of the US court, as noted above.

**Benfield**

72.    In *Benfield v Richardson* [2007] EWHC 171 (QB), certain companies in the Benfield insurance group brought proceedings against companies in the Aon insurance group along with a Mr Richardson. The allegation was that the Aon companies and Mr Richardson conspired to poach a specialist reinsurance group, Mr Richardson being based and working in London. The trial of the English proceedings was expedited and at the date of the hearing before Langley J was about six weeks away. There were also similar, but narrower, proceedings commenced by different Benfield companies against different Aon companies in New York. These had started a month

earlier than the English proceedings but were now at a much less advanced stage, with no trial date yet having been fixed. Various pre-trial steps had been taken including discovery and depositions but one of the Benfield claimants in England now sought an order from the New York District Court to depose four Aon executives, ostensibly for the purpose of the proceedings in New York. All of those individuals were based in London and worked out of Aon's office there. No order for their deposition had yet been made by the New York court.

73.    The evidence from Aon was that it was "practically certain" that two of the individuals would be called to give evidence at the English trial and would give witness statements. In the case of the other two, they were "practically assured" to be produced as witnesses and would also give witness statements. All of them confirm their ability for the trial here and their willingness to give evidence at it.

74.    In upholding the original *ex parte* order for an ASI, which only prevented the taking of the depositions in New York pending the English Trial, Langley J observed as follows:

> "19. Plainly, the jurisdiction has to be exercised with caution. Although any injunction is directed only against the party restrained, it cannot be ignored that it may interfere with the due processes of the overseas court and particularly so where, as here, it is the procedure of that court which may be affected. No doubt the New York court had just such considerations in mind when Mr Richardson was restrained from pursuing his application in these courts. There are many warnings in the authorities against a prescriptive approach to these questions. Each case provides its own features and factors to be taken into consideration in deciding whether or not conduct is unconscionable such as to justify a restraint."

75.    Then, having referred to *Omega*, Langley J went on to say:

> "23. In my judgment the material factors to be considered on this application are that:
> i) These proceedings are the lead proceedings in which the liability disputes between the parties can expect to be resolved. The parties recognise that England is the natural forum for the resolution of those disputes.
> ii) The trial is to take place on an expedited basis in the near future. Whilst "both" parties are extensively represented there is serious pressure of work for them to be ready for that trial which should not be disrupted save for compelling reasons.
> iii) There is no reason at all to doubt that the four witnesses in question will provide witness statements and give oral evidence at the trial. They are compellable.
> iv) English procedure provides for documentary disclosure which it has not been suggested is any less extensive than New York procedure.
> v) English procedure provides for witness statements (verified by a statement of truth) which must contain "the evidence which that person would be allowed to give orally" CPR 32.4. If the evidence is to be relied upon it must (subject to very limited exceptions) be in the statement. Thus, very shortly, Benfield will know what oral evidence is to be given by the four witnesses at the trial.
> vi) Like any other litigant, Benfield will then be able to prepare what cross-examination is considered appropriate, but in a context in which, as English procedure requires, they have also given documentary disclosure and have also properly performed their own obligation to serve by exchange the witness statements upon which they intend to rely.
> vii) I think Aon has made a compelling case that Benfield do not require the depositions for any immediate or real purpose of the New York proceedings. Moreover, they will have disclosure and witness statements in these proceedings for which, if there is substance in any need to use them in New York, they can apply to this court for an order permitting them to do so.

25

viii) It follows that I see no prejudice to Benfield if they are restrained in the limited manner sought by Aon.

ix) There is a real forensic unfairness both to the witness and to Aon if Benfield is in effect permitted to have a pre-trial cross-examination of witnesses whom Benfield can hardly expect to be helpful to their real cause, when that would not be permitted by English procedures and there is and can be no reciprocity.

Conclusion

24. In my judgment the factors to which I have referred all point in the same direction. No good reason has been shown for seeking depositions, certainly not before the March trial, from the four witnesses. To do so would be disruptive of these proceedings and procedurally and forensically unfair and oppressive to Aon… Nor, as stated, is there any urgency. The very fact that Benfield put forward the proposal to delay depositions until after service of witness statements (letter of 18 January) betrays both the lack of urgency and that use of depositions in this jurisdiction is a, if not the real, target."

76.    It is plain from his judgment that key factors for Langley J were the disruption which would be caused to the preparation of an imminent trial here by depositions of witnesses who were going to be called here in any event and in circumstances where he considered that the stated purpose of the depositions in New York, that they were to assist the proceedings there, was disingenuous. The real purpose was to have an opportunity to cross-examine those witnesses first by way of deposition prior to their cross-examination in the trial here.

**Dreymoor**

77.    In *Dreymoor Fertilisers Overseas Pte Ltd v EuroChem Trading GmbH & Anor.* [2018] EWHC 2267 (Comm), the defendants to an ASI application here had obtained a 1782 order for discovery and depositions from a former director of the claimant applicant who was now employed by its US affiliate. The 1782 order, which had been confirmed by the relevant court on review, was for the purpose of obtaining documents and evidence for use in the BVI and Cyprus, where there were extant proceedings between the parties in which the defendants alleged that the relevant contracts had been vitiated by substantial bribes paid by the claimant to two of the first defendant's senior employees. In addition, however, the first defendant had brought two London arbitrations dealing with the same matters. It was common ground that the information, once obtained under the 1782 orders could also be used in the arbitrations here and indeed the first defendant intended to use them for that purpose as well.

78.    The claimant sought the ASI so as to prevent the discovery and depositions until after the arbitration hearings which were due to take place 7 months hence, because it would be burdensome for the former director to comply with it when he was going to give evidence in the arbitrations. It also submitted that if he was deposed in the meantime, he might then be unwilling to attend as a witness in the arbitrations which would mean that the claimant would

26

be deprived of the benefit of his live evidence and in any event for him to be cross-examined twice would be oppressive unfair and one-sided.

79.    Males J (as he then was) characterised the injunction sought as one to prevent enforcement of an order already made abroad. He referred to *South Carolina* and also *Omega*. As to the latter, he said at paragraph 63 that he did not read this as a decision that in all circumstances the pre-trial deposition of a witness who is intended to produce a witness statement and give live evidence in proceedings in this country will be unconscionable. I agree with that. If *Omega* had so suggested (which was not necessary for the actual decision) it was clearly wrong.

80.    Males J also referred to *Benfield*, noting that Langley J had there observed that it was important that in his case, there were no current orders of the New York courts requiring depositions of the witnesses, with the injunction sought being aimed at Benfield's expressed intention to seek such orders. In the light of that, Males J further observed that if there had been any such orders this would appear to be a factor counting against an injunction.

81.    He went on to hold that the case before him was different from both *Omega* and *Benfield* for various reasons. First, the 1782 order in his case was essentially obtained for the purpose of evidence in proceedings in third countries not here, i.e. the BVI and Cyprus. Second, that order had been made after a fully reasoned decision had been given by the US Court, and it would be a serious breach of comity if the English court was now effectively to second-guess the correctness of the US Court. Third, although the timing of the enforcement of the 1782 order would have an impact on preparation for the hearing in the London arbitrations this was a problem caused entirely by the claimant which left it very late to seek the injunction. Had it done so much earlier, which it should have done, there would be no timing problem in relation to the arbitrations. Further, lateness was a separate factor against the grant of the injunction, the arbitrations here were not the lead proceedings, and the depositions and discovery may produce information which went further than that which could be produced within the arbitrations which would be useful to the first defendant. The arbitration hearing was 7 months away, compared with the trial in *Benfield* which was 7 weeks from when the injunction was first granted. He then said this:

> "80. Eighth, I accept that there is a risk that if Mr Chauhan is deposed in the United States and finds the experience uncomfortable, he may be discouraged from giving live evidence in the arbitrations. That is a factor which I take into account. However, Mr Chauhan's own evidence is that he intends to make a witness statement in the arbitrations and to attend for cross examination at the hearing. That is, he says, subject to the caveat that he is 'not able to discount wholly the possibility of "walking away"' if the process causes him undue stress. While this is a risk that cannot be discounted wholly, it seems to me that in view of Mr Chauhan's position within the Dreymoor group it is a relatively small one in the circumstances.

81. Ninth, I accept that there is an element of potential unfairness in the fact that Dreymoor will have the opportunity to cross-examine Mr Chauhan twice. This was a factor which weighed heavily in the Omega and Benfield cases. It is a factor in favour of the grant of an injunction in this case. However, the weight which it carries is affected by three considerations. The first is that Dreymoor accepts before me that Mr Chauhan will eventually have to be deposed pursuant to the 1782 Order. The only question is whether that should happen in advance of the arbitration hearing. Second, the fact that there are proceedings on the merits in both London and the BVI is likely to mean that witnesses on both sides will face double cross-examination, so that the absence of reciprocity does not apply to the same extent as it did in Benfield. Third, as Mr Fenwick accepted, it will be for the arbitrators to decide whether or to what extent any documents or evidence provided pursuant to the 1782 Order can be used or deployed in the arbitrations. The arbitrators therefore retain control of their procedure, which goes a long way (I accept not the whole way) to mitigate any unfairness caused to Dreymoor."

82.   For those reasons, Males J declined to grant an injunction on the VO basis because there was no such conduct, and in addition, had the question of discretion arisen, he would have exercised it against the grant of the injunction.

**Jones**

83.   *Jones v Treasury Wine* [2016] FCAFC 59 is a decision of a Full Court of the Federal Court of Australia exercising original jurisdiction. The context was an ongoing class action in Australia. Without notice to the docket judge in that class action the applicant and another sought depositions under 1782. The court here held that its proceedings and its pre-trial processes were subject to supervision by the Court, especially where one was dealing with a class action which invoked the court's supervisory role. This required that there be notice to the other parties and the prior knowledge and endorsement by the court in Australia, before a party could be permitted to commence proceedings in a US court. The depositions sought would go further than materials which could be obtained under local law in Australia. It would be exceptional for the Australian court to endorse the seeking of such orders abroad. Moreover the recent reforms to the discovery procedure together with the regime of judicial case management would be undermined by the application to the US District Court. The observations made in *South Carolina* that the court does not generally control the manner in which a party lawfully obtains evidence which he needs to support his case were no answer here because any such right could not be exercised in a way designed to circumvent the Australian Court's control and supervision of the proceedings before it. Had it been necessary, the court would also have found that the seeking of the 1782 order was vexatious and oppressive to the respondent to it because of the considerable expense and inconvenience caused to it by the proceedings in the US.

84.   I do not accept that English courts take the same view in relation to the control of their processes when it comes to obtaining evidence abroad (notwithstanding BHP's references to the CPR and PD57AD and PD57AC at paragraph 28 of its Skeleton Argument), and in any event, particular

emphasis was given in *Jones* to the role of the supervising judge in a class action. This was a very different case to that before me but in any event, it is not a binding authority.

### Soriano

85. *Soriano v Forensic News* [2023] EWCA Civ 223 was a decision of the Court of Appeal in the context of a defamation claim, where the defendants applied to the Southern District of New York court for documents pursuant to 1782. Mr Soriano then claimed an ASI here. The Court of Appeal first held that the general principles applicable to 1782 applications and ASI's applied equally to libel claims, and the judge who had refused the ASI at first instance was entitled to take into account that any party to a High Court action here is entitled to try to obtain in a foreign country by lawful means documentary evidence which they believe they need in order to prepare and present their case. It may be abusive to bring 1782 proceedings or it may not; it all depended on the circumstances, and it may also depend on the purpose for which the 1782 application was brought. Although the breadth of the order sought was of apparently undesirable width, that was a matter for the US court to decide although it was noted that such a broad order was unlikely to be granted here.

86. The Court of Appeal said that the injunction in *Omega* was granted there because the witnesses would be subjected to unwarranted double cross-examination and the prospective English trial would suffer from unnecessary duplication. That case, and *Bankers Trust*, demonstrated the factual nature of the evaluation which the English court would undertake on an application or claim of this kind. It reiterated that when considering the 1782 application, it was well open to the US court to narrow the scope of the discovery if it thought this was appropriate, making reference to the *Intel* factors. For those reasons, the Court of Appeal rejected the appeal from the decision of the first instance Judge.

### Ecobank

87. Finally, *Ecobank Transnational Inc v Tanoh* [2015] EWCA Civ 1309 was a case where the Judge at first instance refused to grant an injunction to restrain enforcement of two judgments already obtained abroad on the basis that their subject matter was covered by a binding arbitration clause, because of the serious delay in seeking the injunction. This was referred to as an anti-enforcement injunction because the proceedings abroad had already resulted in otherwise enforceable judgments. In upholding the decision of the Judge, the Court of Appeal said that ASI's had to be sought at an early stage and the longer the action abroad continued

without any attempt to restrain it, the less likely a court was to grant an injunction. An application for an injunction after judgment had been given abroad was unlikely to succeed unless it could be shown that the applicant could not have applied for relief before judgment. In this context, the court would have regard to all relevant considerations including the extent to which the respondent had incurred expense prior to any application for the injunction being made, the interests of third parties including the foreign court and the effect of granting an anti-enforcement order.

88.    In particular, Christopher Clarke LJ said this:

> "129 Further the tenor of modern authorities is that an applicant should act promptly and claim injunctive relief at an early stage; and should not adopt an attitude of waiting to see what the foreign court decides. In The Angelic Grace [1995] 1 Lloyds Rep 87 Leggatt LJ said that it would be patronising and the reverse of comity for the English court to decline to grant injunctive relief until it was apparent whether the foreign court was going to uphold the objection to its exercising jurisdiction and only do so if and when it failed to do so. Whilst those observations related to the approach of the court it seems to me that they are a guide to what should be the approach of a would-be applicant for anti-suit or anti-enforcement relief.

> 130 The proposition that delay in this field is immaterial in the absence of prejudice and that there is necessarily no prejudice if the respondent is aware of the challenge to the jurisdiction of the foreign court which is being pursued there would have curious consequences. Firstly it would revolutionise the approach that has previously been taken in respect of the need for applicants to act promptly. Secondly it would mean that applicants could have two bites at the cherry. They could, without seeking or threatening any injunctive relief in this country, resist the foreign proceedings on the ground that the issue should be arbitrated and, provided they had not submitted to the jurisdiction, they could then, if the challenge failed, seek an anti-enforcement injunction. The impunity which Mance J had thought "never [to have] been the law" or something very like it would have arrived."

89.    I appreciate that these observations were made in a context where judgments had already been obtained abroad. Nonetheless, the notion that the applicant for an ASI should not be able to have "two bites at the cherry" has some relevance here.

## ANALYSIS: VO

**Introduction**

90.    In my judgment, the core question is whether the relevant English court process would be interfered with, or prejudiced, in some material way if there was no ASI. This is essentially how BHP have framed its case by reference to PG's conduct which it says is VO. I deal with that point, along with others made by the parties on VO, below.

91.    Mr Caplin KC made a preliminary submission to the effect that the injunction sought by BHP is in fact an AEI because there already is a reasoned judgment for the original *ex parte* 1782 order. On that basis, he says that there is or should be a significantly higher burden in showing VO. However, for the most part, in the 1782 context the distinction between an ASI and AEI

has not been drawn. Thus, in *Omega*, the deposition orders had been made whereas in *Nokia*, *Benfield* and *Soriano*, they had not. Only in *Dreymoor* did Males J emphasise the fact that the application was to prevent enforcement of the order which had been made after a fully reasoned decision and in that context he referred to a breach of comity. See paragraph 81 above.

92.   The situation is not quite the same here because while there was the original *ex parte* decision, albeit reasoned, which by definition BHP could not have known and was not forewarned about, and while there will no doubt be a fully-reasoned judgment on the MTQs, that has not yet been delivered. At least for the purposes of determining VO, I approach the claim on conventional ASI principles. However, when it comes to discretion, I consider that I am fully entitled to consider as part of that exercise if there is, in reality, any question of second-guessing the decision to be made by Judge Baker, the involvement of BHP in the 1782 process in Arkansas, and matters of that kind. In that context, matters of comity can still arise.

**The Context**

93.   As the cases referred to above demonstrate, whether there is VO conduct, is a highly fact-sensitive question. Context, therefore, is highly important.

94.   In my judgment, the context here is entirely different from that in *Omega*. In that case, there were existing proceedings which had been fully pleaded out and where it was already intended by one party that the subjects of the depositions were going to provide witness statements and then give evidence for it at trial. There were 10 such subjects in *Omega*. The depositions were being sought by the other party, which, in the normal course of things would be cross-examining such witnesses at the trial. However, that party was now seeking to expose them to depositions as well, leading to the prospect of double cross-examination and effectively giving that party two bites at the cross-examination cherry, as it were, and was not able to point to any particular matter that might arise from the depositions that would not be covered by cross-examination at trial. There was no further justification for having the depositions. That is made plain by the fact that the defendant appears to have simply chosen all of the witnesses which the claimant was going to call, or at least all in a particular group, being employees, ex-employees and investors.

95.   Instead, the case before me involves a situation where, albeit that PG has now articulated its claim in detail in the LBA, it wants to depose Mr de Freitas at an early (but not illegitimate) pre-trial stage in order to obtain evidence from him which may assist it in pleading its case and

31

later proving it. On any view, Mr de Freitas may have useful evidence to give, notwithstanding his departure prior to the making of the Repactuation, which PG says would have been negotiated and considered before he left. I agree with PG that the depositions serve a distinct and legitimate purpose, being to better understand Renova's role in relation to the various settlements and their form. It is not to somehow replicate what his evidence might be at a future trial. So the two putative examinations, a one-day deposition to occur shortly (if the MTQs are dismissed), as against evidence at trial in 2-3 years time are unlikely to be duplicative. Further, given the seriousness of the allegations in the Recourse Claim, it is difficult to see what is objectionable to PG making use of its legitimate right to seek a 1782 order with the prospect of yielding evidence to assist its legal advisers in formulating and making the Recourse Claim. The fact that it has been enunciated in the LBA does not mean that PG's position cannot be improved prior to the issuing of any claim. Beyond that, it is not necessary for me to attempt to assess the precise utility of such evidence. See the observations of Pumphrey J in *Nokia* set out at paragraph 70 above.

96.    As things stand, it is not clear that the evidence obtained from Mr de Freitas at his deposition will assist PG's claim, but it may do. If it positively does, then no doubt PG will have an interest in calling him as a witness at trial, including obtaining a detailed WS from him. In that event, if he chose not to assist further, after being deposed, this will be to the disadvantage of PG.

97.    On the other hand, if his evidence is positively unhelpful to PG then it will have to consider the merits of proceeding to plead and progress the Recourse Claim, for which endeavour evidence from Mr de Freitas is said to be relevant. If PG decides not to pursue the Recourse Claim in the light of his evidence at the depositions, then that is an end of the matter. On the other hand, if PG decides to pursue the Recourse Claim notwithstanding, BHP has already reserved the right to apply to strike it out. If it does, and if it is successful, then that, again, will be the end of the matter.

98.    If the Recourse Claim is able to be and is pursued by PG, however, even though Mr de Freitas's deposition is not favourable to it, the question then is whether BHP would wish to call him in its defence. BHP's present position, of course, is that he has effectively said all that he can say in his three WSs, and there is no further evidence he can give. On that footing, it is hard to see why BHP would call him. However, it is possible that in his depositions, he will give evidence that is positively helpful to BHP in rebutting the Recourse Claim. It is in that circumstance (and

only that circumstance) that the question of possible prejudice to BHP at trial arises if Mr de Freitas chooses, after being deposed, not to assist BHP and in particular not to give it a WS and later appear as a witness for it at trial.

99.    The above analysis explains why the position here is much more nuanced and uncertain than that pertaining in *Omega* (and indeed in *Benfield* and *Dreymoor*), where the putative witness was already "lined up" as it were to testify for the party who had <u>not</u> obtained the 1782 order. That is why the reference to "double cross-examination" was made, meaning the cross-examination of a witness by the party who <u>had</u> sought or obtained the 1782 order, and which witness's evidence was adverse to that party's case. This is the context in which one must address the claimed risk of prejudice to BHP in the putative trial process here.

**The risk of prejudice to BHP**

100.    In my judgment, any such risk is either small or speculative. First, it only arises at all in the event that (a) Mr de Freitas provides evidence that positively assists BHP's defence of the Recourse Claim, and (b) that claim is nonetheless pursued.

101.    Second, while Mr de Freitas has stated, through his lawyers, his present intention not to give evidence at trial here if he is deposed now, Mr de Freitas has not himself filed a WS setting out his position. He could easily have done so and it could have been filed by BHP. However, even if this is his present position, it is in my view speculative as to whether it would be maintained in the event of a trial 2 or 3 years hence and in circumstances where BHP would want to call him as a witness. After all, BHP has already made it clear that it would be prepared to defray his expenses and pay for his time; see paragraph 33 above. Moreover, he might well give evidence by video-link.

102.    I appreciate that in *Omega*, the Judge took into account the risk that the witness may be discouraged from attending trial here, after being deposed. See paragraph 66 above. However, again, that was in the context of what would be duplicative or double-cross-examination in the context of an existing court process. The same point can be made in relation to the fact that Males J in *Dreymoor* also took into account (but not in a way which led to an ASI) a potential risk that the relevant witness would not attend trial; see paragraph 81 above.

103.    Furthermore, in a sense, this is a problem of Mr de Freitas' own making. Of course he can decide not to give evidence in England, but it is hard to see why that should act as the

justification for an ASI, without more, and therefore as an effective veto of PG's right to the 1782 Order, even if it is justified in its own terms so far as the US court is concerned. That said, this point is not critical for my reasoning here.

**The Undertakings offered**

104.    These are offered to provide some reassurance to PG that if Mr de Freitas is not deposed, he will give evidence at trial.

105.    In my view, the undertakings offered by Mr de Freitas and by BHP that, one way or another, Mr de Freitas would give evidence, or be tendered as a witness, at trial, do not assist. First, as already noted, the (legitimate) purpose of the deposition is to obtain evidence from Mr de Freitas at the pre-action stage. On what is proposed by Mr de Freitas and BHP, this would not be possible.

106.    Second, the undertakings are of limited value. That proffered by Mr de Freitas is effectively unenforceable unless he enters this jurisdiction, having declined to give evidence here in breach of his undertaking. As for the undertaking to be given by BHP, I do not accept that a "best endeavours" form here will achieve much, because BHP could quite genuinely and simply say that it has tried to get Mr de Freitas here but has failed, and that will be the end of the matter.

107.    Finally, if he does not attend at trial, there is not much utility in PG then being able to return to the Arkansas Court to revive the subpoenas. First, it will be too late by then. Second, it is not clear how long Mr de Freitas may be resident in Arkansas. He only moved there recently for the purposes of working for a Dutch company which itself has offices around the world.

**Mr de Freitas's three previous witness statements**

108.    Although BHP says that these should suffice, they are not directed to the issues which it wishes to ask him about in relation to the ingredients of the Recourse Claim.

**The width of the subpoenas**

109.    To the extent that these are overbroad, that is not a matter for me, but rather, Judge Baker, to whom it has already been expressly stated that they should be narrowed. See *Soriano*, referred to at paragraphs 85 and 86 above.

**Misleading statements made by PG to the Arkansas Court**

110.   I have dealt with the "surreptitiously" point at paragraphs 37 - 39 above. However, in my view it is principally a matter for Judge Baker.

111.   It is also said at paragraphs 57 - 59 of BHP's Skeleton Argument that it was misleading for PG to say to the Arkansas Court that because Mr de Freitas is not a UK resident or a party to the Lien Claim, he was "beyond the English court's jurisdiction" and that "[w]ithout this Court's help, [PG] cannot obtain Mr. de Freitas's testimony in preparation for the Lien Claim". It is said that the first of these statements was misleading, because Mr de Freitas had previously supplied 3 WSs. However, that did not mean that he was a compellable witness and it remains the fact that he is beyond the court's jurisdiction. It is then said that the second statement was misleading because there was the possibility that BHP would tender him as a witness and PG had not explored this before moving the Arkansas Court. However, to my mind, that did not make what PG said at the time misleading. On what it knew it was entitled to say that it needed the help of the Arkansas Court. In any event, again this is principally a matter for Judge Baker.

**The Use of 1782 to aid English proceedings in principle, and in this case**

112.   It is not the law that it is VO to take advantage of a facility abroad to depose a witness, pre-action, even if this is not a procedure available here. Parties are entitled to make use of litigation advantages such as this, if available. See, again, *Soriano*, referred to at paragraph 85 above, and *South Carolina* at paragraph 53 above. Further, while the outcome of the deposition is not clear (see above) this does not mean that it is illegitimate to take advantage of 1782, and its utility is essentially a matter for the Arkansas Court. See paragraph 95 above. I do not consider that its very use here by PG is some illegitimate form of fishing, as alleged by BHP. Nor is it rendered such because PG has now produced its LBA. The fact that (as noted by BHP at paragraph 47 of its Skeleton Argument) PG did not suggest to the Arkansas Court that the deposition sought was <u>necessary</u> before it could plead a case against BHP is irrelevant. It did not have to show necessity, and in any event, again, that is a question of its utility, which was a matter for Judge Baker.

**Conclusion**

113.   For all the above reasons, I am clear that PG's making of the 1782 Application and intention to rely upon the 1782 Order (if sustained) is not unconscionable whether by being VO or (if

different) an interference with the English court process. This means that the ASI must be refused.

114. However, even if the conduct of PG was unconscionable, I would not, in my discretion, have granted the ASI. I explain why below.

## ANALYSIS: DISCRETION

115. When considering the question of discretion I do not refer back to the arguments made on the question of VO because they have already been taken into account there. What one is looking at here, since discretion only arises if VO is assumed to have been established, is the question whether in practice there are any discretionary factors which militate against the grant of the ASI and their significance.

116. I have already explained why I consider that there has been unjustified delay in BHP seeking the ASI, in paragraphs 44 - 47 above. Of course, this was not delay in a vacuum. Its failure to apply timeously before the ASI meant that the Arkansas court had to be fully engaged on the issue because of the MTQs. It is no answer to say that this would have happened anyway, since Mr de Freitas brought his own MTQ. That is because, if an ASI had been sought and granted here at an early stage, there would have been no need to take any further steps in Arkansas. Indeed, BHP could have sought an initial urgent ASI here simply to stop PG from acting on the subpoenas pending a full hearing, which is what happened in *Benfield*.

117. Second, from the outset, BHP relied in its MTQ on the English ASI process invoking *Omega* as a reason why the Arkansas court should quash the subpoenas, as noted above. Yet it had not invoked that ASI procedure here, which was an extremely odd position to take, in my view. In my judgment, this is a classic case of "having two bites at the cherry". Although BHP has submitted (and I have rejected) that it was not in a position anyway to seek an ASI in early 2025, that submission makes no sense where it was effectively telling the Arkansas Court that an English court <u>would</u>, if asked at that time, grant an ASI and thus the 1782 order should be quashed. It is no answer to that point to say that the reference to ASIs and *Omega* by BHP in its MTQ were simply to show that the English court was not receptive to the use of 1782 as matter of gathering evidence, being one of the *Intel* factors. That is because in principle, the English court is so receptive. Judge Baker noted this in her original judgment and that a number of District Courts have so stated. The English Court, in a particular case, <u>might</u> not be so

receptive should it be asked to grant an ASI, but of course that is precisely what was not done originally, here.

118.    I appreciate that the position here is not the same as in *Ecobank* which involved a judgment given abroad and attempts to set it aside for want of jurisdiction etc, and there are no substantive proceedings in Arkansas. Nonetheless, BHP's actions did in my view offend the principles expressed in that case.

119.    The consequence of all of this was to involve the Arkansas court in a protracted interlocutory process which lasted for two months. Of course, this principally involved written declarations and submission and the ultimate hearing lasted for only half a day. However, there obviously would have been court time involved in reading and assessing the written submissions and preparing for the hearing, and the same is true for all of the parties and their lawyers where considerable fees must have been incurred. The matter does not end with the remote hearing because there will no doubt be a substantial amount of time incurred and to be incurred by Judge Baker in writing her judgment. All of this could have been avoided. Instead, in reality, BHP decided to run all of its arguments as to why it would be wrong to permit PG to use the 1782 procedure, in Arkansas, rather than here, until it had exhausted all of its submissions there. PG characterised this as BHP voluntarily submitting to the jurisdiction of the Arkansas Court for these purposes. That may not be quite the correct label to use, but it does not matter; it is the substance of what has occurred which is important.

120.    While the Arkansas court has no "selfish interest" its role relating to orders under 1782 because this is all about evidence for use elsewhere (cf cases on competing *fora* which I accept are different), I do consider that there is at least a limited comity interest engaged here. When the intended claim for an ASI was made known to Judge Baker on 6 June, she at least had to pause for thought and consider what should be done in the light of it. Indeed, one of BHP's oral submissions before me was that it is to be inferred that Judge Baker has not issued her judgment thus far because she is in fact awaiting the outcome of my judgment, being conscious of comity implications. Actually, there is no evidence of that but if it were the case, it only goes to show the added distraction to the Arkansas court process caused by making the ASI now, and not much earlier. I think there is also an element here of BHP effectively asking this Court to say that the grant of the subpoenas in their own terms was wrong and that any judgment on the

MTQs which maintain them would also be wrong, which ties in with the notion that Judge Baker is awaiting my judgment in order, presumably, to take account of it in hers.

121.    That questions of comity can arise in 1782 cases is shown by the reference to it in *Dreymoor*. I do not accept that it can only arise if there has been a concluded judgment given. Of course, the facts here are different to those in *Dreymoor*, but I do not consider that the case-law shows that questions of comity cannot, as a matter of principle, arise in respect of 1782 cases were what has happened abroad falls short of a concluded judgment; it all depends on the circumstances.

122.    In my judgment, a question of comity does arise and it is a point adverse to BHP.

123.    In my view, there are significant discretionary factors which point against the ASI. When weighing them against the fact that PG's conduct is for these purposes assumed to have been VO, I consider that they outweigh it. In the event, of course, discretion does not arise.

## <u>CONCLUSION</u>

124.    It follows that the claim for the ASI must be dismissed. I am very grateful to counsel for their helpful and lucid submissions.